# EXHIBIT A

 **(/DEFAULT.ASPX)**

Civil
Case Information
Thirteenth Judicial Circuit of Kanawha County


20-C-134
Judge: TOD KAUFMAN
INNOVATIVE INSURANCE SOLUTIONS, LLC VS. AIX SPECIALTY INSURANCE COMPANY


**Plaintiff(s)**

              **Plaintiff Attorney(s)**

INNOVATIVE INSURANCE SOLUTIONS
LLC, INNOVATIVE INSU
     JAMES E. SIMON|KEVIN L. CARR|LAURA E.
              (POCHICK) HAYES


**Defendant(s)**

              **Defendant Attorney(s)**

AIX SPECIALTY INSURANCE COMPAN
AIX, INC
ETAL, AIX SPECIALTY
RECEIVERSHIP MANAGEMENT, INC
                   N/A


Date Filed: 02/07/2020
Case Type: DECLARATORY JUDGEMENT
Appealed: 0
Final Order Date: N/A
Statistical Close Date: N/A


| Line | Date | Action / Result |
|------|------|-----------------|
| 0001 | 02/07/2020 | # CASE INFO SHEET; COMPLAINT W/EXH'S; ISSUED SUM & 3 CPYS; |
| 0002 | | F FEE; RCPT 578226 & 578227; $245.00 |

---

These materials have been prepared by the Office of the Clerk of the various Circuit Courts from original sources and data believed to be reliable. The information contained herein, however, has not been independently verified by the Office of the Clerk or Software Computer Group, Incorporated. The Office of the Clerk of the Circuit Courts and Software Computer Group, Inc. assume no liability for the accuracy, completeness, or timeliness of the information contained herein.

Software Computer Group | PO Box 27 | Fraziers Bottom WV 25082

**CIVIL CASE INFORMATION STATEMENT**
**CIVIL CASES**
In the Circuit Court of ___Kanawha___ County, West Virginia

| | |
|---|---|
| PLAINTIFF: **Innovative Insurance Solutions, LLC**<br><br>DEFENDANTS:  **AIX Specialty Insurance Company, AIX, Inc.** and **Receivership Management, Inc.** in its capacity as the Independent Fiduciary of the AEU Holdings, LLC Employee Benefit Plan and Participating Plans | CASE NUMBER:<br>20-C-134<br>Kaufman |

II.    TYPE OF CASE:

| TORTS | OTHER CIVIL | |
|---|---|---|
| ☐ Asbestos | ☐ Adoption | ☐ Appeal from Magistrate Court |
| ☐ Professional Malpractice | ☐Contract | ☐ Petition for Modification of Magistrate Sentence |
| ☐ Personal Injury | ☐ Real Property | √ Miscellaneous Civil |
| ☐ Product Liability | ☐ Mental Health | ☐ Other |
| ☐ Other Tort | ☐ Appeal of Administrative Agency | |

III.    JURY DEMAND  √ Yes ☐No
CASE WILL BE READY FOR TRIAL BY (MONTH/YEAR):  __10/2020__

IV.    DO YOU OR ANY OF YOUR CLIENTS OR WITNESSES IN THIS CASE REQUIRE SPECIAL ACCOMMODATIONS DUE TO A DISABILITY OR AGE? ☐ Yes ☒ No
IF YES, PLEASE SPECIFY:
☐ Wheelchair accessible hearing room and other facilities
☐ Interpreter or other auxiliary aid for the hearing impaired
☐ Reader or other auxiliary aid for the visually impaired
☐ Spokesperson or other auxiliary aid for the speech impaired
☐ Other: _____

*Attorney Name:*  James E. Simon_____

*Firm:*  Spilman Thomas & Battle, PLLC____

*Address:*  P. O. Box 273, Chas., WV 25321___

*Telephone: (304) 340-3800_____*

☐*Pro Se*

*Representing   Innovative Insurance Solutions, LLC.*

**X** *Plaintiff      Defendants*

☐ *Cross-Complainant* ☐ *Cross-Defendant*

*Dated: _____02/07/2020_____*

Signature

PYMT Type
Rept #
Iss Sum. + cc        No Sum. Iss
√ Rct. to Atty.        $20cm X __
__Mailed CM/RM     $5 clk X __
__Mailed to sos w/ck#
__Sent to _____ w/ck# _____ $15 mdf X __
$200  $135

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

INNOVATIVE INSURANCE SOLUTIONS, LLC,

      Plaintiff,

v.                              CIVIL ACTION NO.: 20-C-134
                              JUDGE: Kaufman

AIX SPECIALTY INSURANCE COMPANY;
AIX, INC.; and
RECEIVERSHIP MANAGEMENT, INC., in its
capacity as the INDEPENDENT FIDUCIARY of the
AEU HOLDINGS, LLC EMPLOYEE BENEFIT PLAN
and PARTICIPATING PLANS,

      Defendants.

### COMPLAINT FOR DECLARATORY JUDGMENT, BREACH OF CONTRACT, COMMON LAW BAD FAITH, AND VIOLATION OF THE WEST VIRGINIA UNFAIR TRADE PRACTICES ACT

Plaintiff Innovative Insurance Solutions ("IIS") hereby requests a declaration that the liability insurance policy issued by, upon information and belief, either AIX Specialty Insurance Company or AIX, Inc. (collectively referred to as "AIX"[1]) to IIS bearing policy number Policy No. L1QD822040-00 ("Policy") provides coverage for the claims made against it in the civil action styled *Receivership Management, Inc. in its capacity as the Independent Fiduciary of the AEU Holdings, LLC Employee Benefit Plan and Participating Plans, v. A. J. Corso & Associates, Inc.; American Benefits Association, Inc.; America's Health Care Alliance, Inc.; Assurance Agency, Ltd.; Brown, Brown & Gomberg, Ltd.; Commercial Group Intermediaries, Inc.; Employers Network Association, Inc., d/b/a Louis Deluca and Affiliates; Innovative Insurance Solutions, LLC; The Ferrell Agency, Inc.; Financial Security Consultants, Inc.; The HFA Plan and Mark*

---

[1] The following allegations in this Complaint are brought against these two entities both individually and collectively.

*Krogulski, individually, Health Care Reform Benefits Solutions, Inc. d/b/a HRB Solutions, Inc.; HUB International Midwest Limited; M. Brown & Associates, LTD.; Madison Street Group, LLC; MGU of the West Insurance Services, Inc. d/b/a OneSource StopLoss Insurance; Trendsetters & Associates, Inc.; and Williams- Manny, Inc. d/b/a/ Gallagher Williams- Manny Insurance* Civil Action No. 1:19-cv-01385 pending in the United States District Court for the Northern District of Illinois ("Underlying Action"). The central question in this declaratory judgment action is whether there is a duty to defend and indemnify IIS for the actions and conduct alleged against it in the action brought by Plaintiff Receivership Management, Inc. in its capacity as the Independent Fiduciary of the AEU Holdings, LLC Employee Benefit Plan and Participating Plans ("Receivership Management").

On or about August 14, 2019, IIS purchased a professional liability insurance policy known as Insurance Agents Advantage ("Policy") from AIX. A copy of the policy is attached to this Complaint as **Exhibit A**. In that regard, IIS alleges as follows:

## I.    THE PARTIES

1.      Plaintiff IIS is a West Virginia limited liability company with its principal place of business in Kanawha County, West Virginia.

2.      Defendant AIX Specialty Insurance Company is a Delaware corporation with its principal place of business in Connecticut. Upon information and belief, AIX Specialty Insurance Company is licensed to conduct business in West Virginia and does conduct business in West Virginia.

3.      Defendant AIX, Inc. is a Delaware corporation with its principal place of business in Massachusetts. Upon information and belief, AIX, Inc. is licensed to conduct business in West Virginia and does conduct business in West Virginia.

2

4.      Defendant Receivership Management is a Tennessee corporation with its principal place of business in Tennessee.

## II.      JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to the Uniform Declaratory Judgments Act, W. Va. Code §§ 55-13-1, et seq. The Policy contains a limit of liability in the amount of $1,000,000.00 per occurrence. The instant matter seeks a judicial determination of whether, pursuant to the terms and conditions contained within the Policy, there is a duty to defend and indemnify IIS for actions and conduct alleged against it in the Underlying Action.

6.      This Court has authority to grant declaratory judgment pursuant to W. Va. Code §§ 55-13-1, et seq. because IIS and the Defendants are engaged in an actual controversy susceptible to specific relief over the meaning of provisions in the IIS Policy and any potential ensuing duties. This controversy is within the jurisdiction of the Court.

## III.      THE UNDERLYING ACTION

7.      In the Underlying Action, Receivership Management has alleged that IIS, along with the other Defendants, breached their common law duties, breached their contracts, violated ERISA along with other federal laws, commingled funds, and violated state laws in the marketing, sale and administration of an employee welfare benefit plan known as the AEU Holdings, LLC Employee Benefit Plan ("AEU Plan") which is comprised of hundreds of individual employer sponsored employee benefit plans created pursuant to ERISA section 3(1), 29 U.S.C. § 1002(1) known as Participating Plans. Specifically, it is alleged that IIS contracted with the AEU Plan to serve as an insurance producer and broker for the AEU Plan and contracted with the Participating Plans to place them into the AEU Plan. Furthermore, it is alleged that IIS breached its contracts by failing to establish a trust for the Participating Plans; by failing to ensure that the AEU Plan had

3

accurate up-to-date Plan Document/Summary Plan Description documents; by failing to ensure audits were completed; by failing to obtain bonds; all allegedly in violation of ERISA as well as state insurance laws. In addition, IIS is alleged to have breached the contracts by failing to ensure that each Participating Plan purchased stop-loss insurance via a Bermuda trust. Furthermore, it is alleged that IIS should not have marketed to, procured, or permitted the Participating Plans to enroll or renew enrollment in the AEU Plan until all legal and regulatory requirements were properly met. Receivership Management contends that due to the alleged improper actions of IIS, the AEU Plan was not operated correctly, which resulted in the improper commingling of funds, risk sharing among the individual Participating Plans, the violation of state insurance laws and regulations, and the insolvency of the AEU Plan. (*See* Count I of Third Amended Complaint attached as **Exhibit B**).

Not only is IIS accused of breaching its contracts, it is also accused of violating its fiduciary and common law duties to the AEU Plan and the Participating Plans. Specifically, it is alleged that IIS acted in a dual capacity as a broker for the AEU Plan and as an agent for the Participating Plans. As such, according to the Third Amended Complaint in the Underlying Action, IIS owed a duty of reasonable care to the AEU Plan and the Participating Plans. Receivership Management contends that IIS violated its duties by failing to "exercise good faith, reasonable skill, and ordinary diligence in its activities relating to the AEU Plan and Participating Plans." (*See* ¶136 of **Exhibit B**). Also, it is alleged that IIS did not place the appropriate health care coverage for its Participating Plan clients. In addition, Receivership Management contends that IIS failed to investigate the financial soundness of the AEU Plan and should have known that the AEU Plan was insolvent and not to place Participating Plans with the AEU Plan. There are allegations that IIS improperly marketed the AEU Plan and did not accurately represent the nature, extent, and scope of the

4

coverage being offered. Finally, there are allegations that IIS marketed and sold the AEU Plan in violation of the underwriting guidelines and failed to segregate fiduciary funds such that funds were comingled. (*See* pgs. 21-31 of **Exhibit B**).

The last set of allegations against IIS are that IIS failed to ensure that the AEU Plan had the necessary license from West Virginia to transact insurance. As a result, Receivership Management contends that IIS allowed Participating Plans to "enroll and/or renew enrollment in a plan operated by a non admitted insurer." (*See* ¶ 228 of **Exhibit B**) In doing so, IIS allegedly violated W. Va. Code § 33-12C-4(a).

8. On October 2, 2019, Receivership Management filed the Third Amended Complaint and added IIS to the Underlying Litigation for the first time. IIS was served with the Third Amended Complaint on or about October 4, 2019. IIS submitted this lawsuit to AIX seeking coverage under the Policy. In response, AIX sent correspondence on October 28, 2019, in which AIX denied coverage to IIS based primarily on the assertion that the claim was not timely. (*See* Correspondence from Cathleen Long to Kristina Brooks dated October 28, 2019 attached as **Exhibit C**). IIS then provided evidence that the claim was timely, which prompted AIX to withdraw its declination of coverage based upon timeliness of the claim, but continue to assert that coverage is not afforded due to several exclusions. Namely, the exclusions purportedly governing alleged violations of ERISA, breach of contract, misappropriation, carrier failure to pay, pending and prior litigation, and claims of insolvency. (*See* Correspondence dated November 18, 2019, from Cathleen Long to Kristina Brooks attached as **Exhibit D**). In an attempt to persuade AIX to provide coverage, IIS sent correspondence to Cathleen Long on January 28, 2020. (*See* Correspondence dated January 28, 2020 from Laura E. Hayes to Cathleen Long attached as **Exhibit E**).

9.    As is evident, the actions complained of in the Third Amended Complaint and the

damages sought in the Underlying Action are covered under the Policy.

## IV.    THE AIX POLICY

10.    IIS is an insured under the Policy No. L1QD822040-00 issued by AIX.  This Policy

was in effect at all relevant times herein.  The Policy provides:

### A.    COVERAGE—WHAT THIS POLICY INSURES

    1.    <u>Professional Services Coverage</u>
       **We** will pay on **Your** behalf those sums which **You** become legally
       obligated to pay as **Damages** because of any **Claim** made against
       for a **Wrongful Act**.

In addition, the Policy provides that AIX has a duty to defend IIS against claims that are

asserted against it.  Specifically, the Policy provides that:

### B.    DEFENSE AND SETTLEMENT

    **We** have the right and duty to defend any **Claim** made under this **Policy**
    until there is a **Final Adjudication** against **You**, even if the allegations are
    groundless, false or fraudulent.  **We** will pay **Claim Expenses** in connection
    with a **Claim We** defend.

The Policy also contains the following definitions:

    **Insured**, also referred to herein as **You** or **Your**, means the **Named Insured**, any
**Predecessor Firm** and:
    …

3.  If the **Named Insured** is a limited liability company, any past or present managing
member, principal, or employee, but only while acting on behalf of the **Named Insured** in
such capacity;

**Professional Services** means:

1.    Professional services performed by the **Insured** for others for a fee, commission or
    other consideration   solely as an: insurance agent; insurance broker; insurance
    consultant; general insurance agent; managing general agent; managing general
    underwriter; program administrator; surplus lines insurance broker; wholesale
    insurance broker; notary; or insurance claims appraiser, handler or adjuster; and if

6

associated with the former; loss control or risk management services; and placing premium financing;

In addition, the Policy contains the following language:

E.    **EXCLUSIONS—WHAT THIS POLICY DOES NOT INSURE**

This **Policy** does not apply to **Claim(s)** or **Supplemental Coverage Matter(s)**:

9.  ERISA
    Based upon, arising out of, or in any way related to, directly or indirectly, any breach of fiduciary duty, responsibility, or obligation in connection with any employee benefit or pension plan including violations of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 ("ERISA") as amended, or similar statutory or common law of the United States of America or any state or jurisdiction therein;

    ***

15. Contract
    Based upon, arising out of, or in any way related to, directly or indirectly, liability **You** assume under any contract or agreement; however, this exclusion does not apply to liability **You** would have in the absence of such contract or agreement.

    ***

18. Misappropriation
    Based upon, arising out of, or in any way related to, directly or indirectly, any actual or alleged commingling, missing or improper use of funds, premiums, accounts, fees, taxes, claims payments, commissions or brokerage monies for which any **Insured** collected or should have collected; any funds received by any **Insured** or credited to any Insured's account which the **Insured** returned or should have returned; or any claim amount that any **Insured** paid or should have paid to another person or organization;

    ***

25. Carrier Failure to Pay
    Based upon, arising out of, or in any way related to, directly or indirectly, failure to pay or delay in paying all or part of any benefit payment due or alleged to be due under any insurance policy, bond or benefit plan, or any actual or alleged lack of good faith or fair dealing in the handling of any claim or obligation due or alleged to be due under

7

any insurance policy, bond or benefit plan by or on behalf of or in the name or right of any **Insured**;

\*\*\*

27. Pending and Prior Litigation
Based upon, arising out of, or in any way related to, directly or indirectly, any demand, litigation, or alternative dispute resolution, administrative, regulatory, or investigation that is pending prior to the Pending or Prior Litigation Date stated in Item 7. of the Declarations page, or the same or substantially similar fact, circumstance, situation, transaction, event, act, error, or omission underlying or alleged therein;

\*\*\*

30. Insolvency
Based upon, arising out of, or in any way related to, directly or indirectly, the financial inability to pay, insolvency, receivership, bankruptcy or liquidation of any insurance company, any Individual Practice Association, Health Maintenance Organization, Preferred Provider Organization, Dental Service Plan, Risk Retention Group, Risk Provider Group, self-insured plan or any pool, syndicate, association or other combination formed for the purpose of providing insurance, or reinsurance, or any healthcare provider or any reinsurer with You directly placed the subject risk; however, this Exclusion does not apply if, at the time You placed the subject risk with such entity, it was rated by Demotech as A or higher, by AM Best as B+ or higher, or alternatively, was a member insurer of the state guaranty fund or guaranty association in the state or of domicile of the subject risk, or was guaranteed by a governmental body or bodies and/or operated by a governmental body or bodies, or was placed through a state established residual market insurance program or was placed with a County Mutual reinsured by carriers rated by AM Best as B+ or higher.

## V.    DUTIES OWED TO IIS

11.    AIX is citing the above exclusions to deny both a defense and indemnification to IIS. However, AIX has failed to investigate and consider all of the allegations presented against IIS in the Underlying Action.

12.    Clearly, there are allegations against IIS that are not encompassed within the exclusions that AIX is relying upon to deny coverage for the Underlying Action. Such allegations include, but are not limited to the following:

8

a.   failing to exercise good faith, reasonable skill, and ordinary diligence in its

activities relating to the AEU Plan and Participating Plans;

b.   failing to place the appropriate health care coverage for its Participating

Plan clients;

c.   not accurately representing the nature, extent, and scope of the coverage

being offered to the Participating Plans; and

d.   failure to ensure that the AEU Plan had the necessary license from West

Virginia to transact insurance in violation of W. Va. Code § 33-12C-4(a).

13.   West Virginia law provides in *AETNA Casualty and Surety Co. v. Pitrolo*, 342 S.E.

2d 156 (W. Va. 1986) that:

> [a]s a general rule, an insurer's duty to defend is tested by whether the allegations
> in the Plaintiff's complaint are reasonably susceptible of an interpretation that the
> claim may be covered by the terms of the insurance policy. There is no requirement
> that the facts alleged in the complaint specifically and unequivocally make out a
> claim within coverage.

*Id.* at 160.

The Court also stated that:

> it is generally recognized that the duty to defend an insured may be broader than
> the obligation to pay under a particular policy. This ordinarily arises by virtue of
> language in the ordinary liability policy that obligates the insurer to defend even
> though the suit is groundless, false, or fraudulent.

*Id.* at 160.

14.   Pursuant to *Camden-Clark Memorial Hospital v. Fire and Marine Insurance*, 682

S.E. 2d 566, 575 (W. Va. 2009) if only one claim is covered, then an insurer has to defend all

claims against the insured. Therefore, AIX clearly has a duty to defend IIS for all claims asserted

against it in the Underlying Action.

9

15.     AIX also has duty to indemnify IIS for the allegations in the Underlying Action because the exclusions are not applicable to the allegations in the Underlying Action.

## VI.     COUNTS

### COUNT I:  BREACH OF CONTRACT

16.     IIS realleges and incorporates the allegations set forth above as if fully contained herein.

17.     AIX contracted with IIS to insure IIS against claims asserted against it for professional services IIS rendered.

18.     By denying coverage to IIS for the allegations in the Underlying Action, AIX has breached its contract with IIS.

19.     Because IIS has been forced to sue AIX in order to have AIX honor its obligations under the Policy, IIS is entitled to *Hayseeds* damages which include attorneys' fees, litigation costs, as well as any and all economic losses it has incurred. *Hayseeds, Inc. v. State Farm Fire & Cas.,* 352 S.E.2d 73 (W. Va. 1986).

### COUNT II:  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

20.     IIS realleges and incorporates the allegations set forth above as if fully contained herein.

21.     By its actions described herein, AIX has breached the implied covenant of good faith and faith dealing and committed common law bad faith.

22.     As a direct result of AIX's breaches, IIS has suffered economic damages and is entitled to punitive damages.

10

## COUNT III: VIOLATION OF THE WEST VIRGINIA
## UNFAIR TRADE PRACTICES ACT

23.     IIS realleges and incorporates the allegations set forth above as if fully contained

herein.

24.     By its actions described herein, AIX has violated the West Virginia Unfair Trade

Practices Act, West Virginia Code § 33-11-4(9) ("WVUTPA"). Specifically, AIX violated the

following subsections of the West Virginia Unfair Trade Practices Act with such frequency as to

amount of a general business practice:

(a)     Misrepresenting pertinent facts or insurance policy provisions relating to
coverages at issue;

(c)     Failing to adopt and implement reasonable standards for the prompt
investigation of claims arising under insurance policies;

(d)     Refusing to pay claims without conducting a reasonable investigation based
upon all available information;

(n)     Failing to promptly provide a reasonable explanation of the basis in the
insurance policy in relation to the facts or applicable law for denial of a claim or
for the offer of a compromise settlement.

25.     As a direct result of AIX's general business practice of violating the WVUTPA, IIS

has suffered numerous economic damages and is entitled to punitive damages.

## VII.     JUSTICIABILITY OF CONTROVERSY

26.     The Policy at issue provides coverage for the allegations contained within the Third

Amended Complaint.

27.     Because the Policy does provide coverage to IIS for the allegations contained

within the Third Amended Complaint, AIX has a duty to defend and indemnify IIS for the

allegations and relief sought in the Underlying Action.

11

28.     A real, substantial, and immediate controversy exists between IIS, on the one hand, and AIX on the other hand.  This controversy is ripe for consideration by this Court, and it is clear that IIS has standing to seek declaratory relief.  Therefore, this is a justiciable claim.

## VIII.   STATEMENT OF PRECISE RELIEF SOUGHT

29.     IIS hereby seeks a declaration from this Court that there is a duty under the Policy to defend and indemnify IIS for the conduct alleged and relief sought in the Third Amended Complaint filed by Receivership Management.

30.     In addition, IIS prays for Judgment against AIX and for damages as follows:

    a.      For special and general damages according to proof;

    b.      For punitive damages;

    c.      For attorneys' fees;

    d.      For litigation costs;

    e.      For prejudgment and post-judgment interest;

    f.      For such other and further relief as the Court may deem just and proper.


**JURY TRIAL DEMANDED**

Respectfully submitted,

**INNOVATIVE INSURANCE SOLUTIONS, LLC.**

**BY: SPILMAN THOMAS & BATTLE, PLLC**

Kevin L. Carr (WV State Bar # 6872)
Laura E. Hayes (WV Bar # 7345)
James E. Simon (WV Bar #13265)
300 Kanawha Boulevard, E. (25301)
P. O. Box 273
Charleston, WV  25321-0273
Telephone: (304) 340-3800
Fax: (304) 340-3801

13

# Exhibit
# A



## IMPORTANT NOTICE TO PRODUCER

Insured Name:        Innovative Insurance Solutions LLC;  Mullins
Consulting & Marketing
Policy Number:       L1QD822040-00
All Risks Producer:   Tabitha DeGirolano
All Risks Email:      tdegirolan@allrisks.com

*Thank you for the order!*

# PLEASE REVIEW
# THIS POLICY CAREFULLY

The coverages and terms of the policy may differ from
those requested in your application.

Please review this policy and contact your All Risks
Producer immediately via email if you believe any
changes should be made to the policy.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SERVICE OF SUIT CLAUSE

The following is added to the policy **CONDITIONS:**

In the event of our failure to pay any amount claimed to be due by the terms of this policy, at your request, we will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this endorsement constitutes or should be understood to constitute a waiver of our rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States, or of any state in the United States. It is further agreed that service of process in such suit may be made upon Counsel, Legal Department, AIX Specialty Insurance Company, 5 Waterside Crossing, Suite 201, Windsor, Connecticut 06095 or his or her representative, and that in any suit instituted against us by the terms of this policy, we will abide by the final decision of such court or of any appellate court in the event of an appeal.

If any statute of any state, territory or district of the United States makes such provision, we hereby designate the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his or her successors in office, as our true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by you or on your behalf, or your beneficiary, arising out of this insurance policy. We designate the above Counsel as the person said officer is authorized to mail such process or a true copy thereof.

All other terms and conditions of the policy remain unchanged.



POLICYHOLDER NOTICE

## INFORMATION REGARDING
## EXTENDED REPORTING PERIOD ENDORSEMENT
## ("ERP COVERAGE")

The enclosed policy provides coverage for claims reported during the policy period.  Subject to the policy's terms and conditions, you may purchase an Extended Reporting Period Endorsement, also known as "ERP coverage", that will extend the time for reporting claims arising out of professional services rendered while the policy was still in effect although the policy may have been cancelled, non-renewed or terminated.  Please refer to Section F. of your policy for the terms and conditions for eligibility, purchasing or obtaining an Extended Reporting Period endorsement.  *There is a limited time for requesting such an endorsement.*

The premium charged for the endorsement is expressed as a percentage of your policy's annual premium.

| *Length of "ERP" Offered* | *"ERP Coverage" Premium Factor* |
|---|---|
| 12 months coverage | 75 % of expiring annual premium |
| 24 months coverage | 135 % of expiring annual premium |
| 36 months coverage | 175 % of expiring annual premium |
| 48 months coverage | 195 % of expiring annual premium |
| 60 months coverage | 210 % of expiring annual premium |

*\*Extended Reporting Period Endorsements may be subject to state regulatory requirements.*

Please contact your agent or customer service representative for pricing specific to your situation and location.


The Hanover Insurance Group™

### SURPLUS LINES
# Insurance Agents Advantage
### Professional Liability Insurance

*Declarations Page*

**NOTICE: THIS POLICY IS A CLAIMS-MADE POLICY. PLEASE READ THE POLICY CAREFULLY.**

**Policy Number** L1QD822040-00          **AIX Specialty Insurance Company**

5 Waterside Crossing, Suite 201
Windsor, CT 06095
(A Stock Insurance Company, herein called the **Insurer**)

| FOR SURPLUS LINES POLICYHOLDER NOTICE – PLEASE SEE PAGE 3 |
| --- |

**Issue Date** 9/24/2019

**Item 1.** **NAMED INSURED AND ADDRESS**

Innovative Insurance Solutions LLC; Mullins Consulting & Marketing
5036 Washington Street
Cross Lanes, WV 25313

**Item 2.** **POLICY PERIOD**

Inception Date: 8/14/2019                    Expiration Date: 8/14/2020

(12:01 AM standard time at the address shown in Item 1.)

**Item 3.** **LIMIT OF LIABILITY**
    **a.** $ 1,000,000 for each **Claim**; not to exceed
    **b.** $ 3,000,000 for all **Claims** in the Aggregate

**Item 4.** **SUBLIMITS OF LIABILITY**
Privacy and Security
Liability Coverage
    **a.** $ 1,000,000 for each **Claim**; not to exceed
    **b.** $ 3,000,000 for all **Claims** in the Aggregate

**Item 5.** **DEDUCTIBLE**
    **a.** $ 5,000 each **Claim**
    **b.** $ for all **Claims** in the Aggregate

**Item 6.** **SUPPLEMENTAL COVERAGE LIMIT AND DEDUCTIBLE**

|  | LIMIT | DEDUCTIBLE |
| --- | --- | --- |
| Breach Event Expenses and Cyber Investigation Expenses | $ 100,000 in the Aggregate | $ 0 |
| Pre-Claim Assistance | $ 15,000 in the Aggregate | $ 0 |
| Disciplinary Proceedings Coverage | $ 50,000 per **Insured** / $ 50,000 for all **Insureds** | $ 0 |
| Subpoena Assistance | $ 15,000 in the Aggregate | $ 0 |
| Crisis Event Expense | $ 25,000 per **Event** / $ 25,000 in the Aggregate | $ 0 |



**SURPLUS LINES**
# Insurance Agents Advantage
**Professional Liability Insurance**

*Declarations Page*

| | | | | |
|---|---|---|---|---|
| Catastrophe Extra Expense | $ $ | 25,000per Catastrophe / 25,000in the Aggregate | $ | 0 |

**Item 7.**   **PENDING OR PRIOR LITIGATION DATE** 8/14/2019

**Item 8.**   **RETROACTIVE DATE** 11/11/2008

**Item 9.**   **PREMIUM**
Policy Fee
Surplus Lines Tax

**Item 10.**   **ENDORSEMENTS EFFECTIVE AT INCEPTION:**  See Schedule of Forms attached.

**Item 11.**   **NOTICE TO INSURER**

Report a claim to the Company as required by Section G. Duties in the Event of Claim(s) or Potential Claim(s)
to:   The Hanover Insurance Company
P.O. Box 15145
Worcester, MA 01615

**National Claims Telephone Number:** 800-628-0250
**Facsimile:** 800-399-4734
**Email:** firstreport@hanover.com

**Broker on behalf of:** All Risks, Ltd
10150 York  Rd, 5th Floor
Hunt Valley, MD 21030

We have caused this Policy to be signed by our President and Secretary and countersigned where required by a duly
authorized agent of the Company.

John C. Roche
President

Charles Frederick Cronin
Secretary

920-1002SL  03/19

Page 2 of 3



**SURPLUS LINES**
# Insurance Agents Advantage
**Professional Liability Insurance**

*Declarations Page*

## SURPLUS LINES DISCLOSURE

**SURPLUS LINES POLICYHOLDER NOTICE**:

THIS COMPANY IS NOT LICENSED TO DO BUSINESS IN WEST VIRGINIA AND IS NOT SUBJECT TO THE WEST VIRGINIA INSURANCE GUARANTY ACT.



**SURPLUS LINES**
# Insurance Agents Advantage
### Professional Liability Insurance

**TABLE OF CONTENTS**

A. COVERAGE – WHAT THIS POLICY INSURES ................................................................. 1
    1. Professional Services Coverage ............................................................. 1
    2. Personal Injury Coverage ...................................................................... 1
    3. Privacy and Security Liability Coverage ................................................. 1
    4. Supplemental Coverage ........................................................................ 1
B. DEFENSE AND SETTLEMENT (INCLUDED IN THE LIMIT OF LIABILITY) ................... 2
C. LIMIT OF LIABILITY AND DEDUCTIBLE ................................................................ 3
    1. Limit of Liability ................................................................................... 3
    2. Deductible ........................................................................................... 3
    3. Aggregate Deductible .......................................................................... 3
    4. Reimbursement ................................................................................... 3
D. DEFINITIONS ...................................................................................................... 3
E. EXCLUSIONS – WHAT THIS POLICY DOES NOT INSURE ...................................... 9
F. EXTENDED REPORTING PERIODS ...................................................................... 15
G. DUTIES IN THE EVENT OF CLAIM(S), POTENTIAL CLAIM(S), OR
    SUPPLEMENTAL COVERAGE MATTER(S) .......................................................... 15
H. CONDITIONS ..................................................................................................... 16
    1. Cancellation and Non-Renewal ........................................................... 16
    2. Representations and Application .......................................................... 16
    3. Legal Action Against Us ...................................................................... 16
    4. Change in Ownership, Control, or Exposure ......................................... 17
    5. Transfer of Rights of Recovery Against Others to Us ............................ 17
    6. Assignment ........................................................................................ 17
    7. Sole Agent for the Insured .................................................................. 17
    8. Coverage Territory and Valuation ........................................................ 17
    9. Other Insurance ................................................................................. 18
    10. Two or More Policies, Coverage Parts, or Endorsements Issued by Us ... 18
    11. Conformance to Law and Trade Sanctions ........................................... 18
    12. Section Titles .................................................................................... 18
    13. Bankruptcy ....................................................................................... 18
    14. Liberalization .................................................................................... 18



**SURPLUS LINES**
# Insurance Agents Advantage
## Professional Liability Insurance

**This is a CLAIMS-MADE AND REPORTED policy. Subject to the terms, conditions, exclusions and limitations of this Policy, coverage is limited to liability for only those Claims that are first made against You and reported to Us in writing after the Retroactive Date and during the Policy Period or any optional Extended Reporting Period, if exercised by You.**

**This is a "defense within limits" Policy with Claim Expenses included within the Limit of Liability. The Limit of Liability available to pay Damages will be reduced by amounts We pay for Claim Expenses as defined in the Policy. Further note that amounts incurred for Claim Expenses and Damages are subject to the deductible.**

**Please read this policy carefully.**

Throughout this **Policy**, the terms **We, Us** and **Our** refer to the **Company** providing this insurance. The terms **You** and **Your** refer to the persons and entities insured under this **Policy**. Other terms in bold print have special meaning and are defined in this **Policy**.

In consideration of the premium charged, in reliance upon the statements in **Your** application and subject to the Declarations page, limitations, conditions, definitions and other provisions of this **Policy**, including endorsements hereto, **We** agree with **You** as follows:

**A. COVERAGE – WHAT THIS POLICY INSURES**

1. Professional Services Coverage

   **We** will pay on **Your** behalf those sums which **You** become legally obligated to pay as **Damages** because of any **Claim** made against **You** for a **Wrongful Act**.

2. Personal Injury Coverage

   **We** will pay on **Your** behalf those sums which **You** become legally obligated to pay as **Damages** because of any **Claim** made against **You** for a **Wrongful Act** that is for **Personal Injury**.

3. Privacy and Security Liability Coverage

   **We** will pay on **Your** behalf those sums which **You** become legally obligated to pay as **Damages** because of any **Claim** made against **You** for a **Wrongful Act** resulting in a **Privacy Breach** or **Security Breach**. Any payment made hereunder is subject to the sublimit of liability referenced in Item 4. of the Declarations page. The sublimit of liability is part of, and not in addition to the Limits of Liability referenced in Item 3. of the Declarations page.

4. Supplemental Coverage

   **Supplemental Coverages** limits are shown on Item 6. of the Declarations page. If no limit is shown on the Declarations page for a **Supplemental Coverage**, no coverage is afforded for that **Supplemental Coverage**. **Supplemental Coverage** limits apply as described in Section C.1. of this **Policy**.

   a. Breach Event Expenses

      **We** will pay **Breach Event Expenses** directly resulting from a **Privacy Breach** or **Security Breach** first discovered by **You** during the **Policy Period**.

   b. Cyber Investigation Expenses

      **We** will pay **Cyber Investigation Expenses** directly resulting from a **Regulatory Investigation** regarding a **Privacy Breach** or **Security Breach** first discovered by **You** during the **Policy Period**.

   c. Pre-Claim Assistance

      If **You** report a **Potential Claim** to **Us** in writing during the **Policy Period**, any costs or **Defense Expenses We** incur in investigating or monitoring the **Potential Claim** will be paid by **Us**. The decision to incur any costs or **Defense Expenses** in regards to a **Potential Claim** is at **Our** sole discretion.

   d. Disciplinary Proceedings

      **We** will pay on **Your** behalf only **Defense Expenses** incurred in responding to a **Disciplinary Proceeding** commenced against **You** and reported to **Us** in writing during the **Policy Period**, or which was commenced

---

920-1001SL 03/19          © 2019 AIX Specialty Insurance Company. All Rights Reserved.          Page 1 of 18



**SURPLUS LINES**
# Insurance Agents Advantage
### Professional Liability Insurance

during the **Policy Period** and, if exercised, reported to **Us** in writing during any optional **Extended Reporting Period**. Inclusive within this coverage, **We** will pay up to $250 per day for any salaries and expenses of **Your** employees required to attend or participate in any **Disciplinary Proceeding**. **We** shall not pay any **Damages** incurred as a result of **Disciplinary Proceedings**.

e.  Subpoena Assistance

**We** will pay on **Your** behalf only **Defense Expenses** incurred in responding to a **Subpoena** first received by **You** and reported to **Us** in writing during the **Policy Period**. Any notice **You** give to **Us** of such **Subpoena** that complies with the conditions under Section G.3. will be deemed notification of a **Potential Claim** under Section G.4. of this **Policy**.

f.  Crisis Event

**We** will pay on **Your** behalf **Event Expenses** for a **Crisis Event** first occurring and reported to **Us** in writing during the **Policy Period**.

g.  Catastrophe Extra Expense

**We** will reimburse You **Catastrophe Extra Expenses** as a result of a catastrophe first occurring and reported to **Us** in writing during the **Policy Period**.

The following additional requirements and limitations shall apply to coverage provided under A.1., A.2., A.3. and A.4. above:

a.  The **Wrongful Act** and **Professional Service**s must have first occurred on or after the applicable **Retroactive Date(s)**;

b.  None of **You** had knowledge of facts which could have reasonably caused **You** to foresee a **Claim** or **Supplemental Coverage Matter** or knowledge of any **Claim** or **Supplemental Coverage Matter**, prior to the inception date of this **Policy**; and

c.  The **Claim** or **Supplemental Coverage Matter** must first be made and reported to **Us** in writing during the **Policy Period** or any **Extended Reporting Period** if applicable.

## B.  DEFENSE AND SETTLEMENT

**We** have the right and duty to defend any **Claim** made under this **Policy** until there is a **Final Adjudication** against **You**, even if the allegations are groundless, false or fraudulent. **We** will pay **Claim Expenses** in connection with a **Claim We** defend. **We** are not obligated to defend any criminal investigation, criminal proceeding or prosecution, or any **Claim** for **Equitable Relief**, against **You**. If a **Claim** is not covered under this **Policy**, **We** will have no duty to defend it.

**Our** duty to defend any **Claim** or pay any amount as **Damages, Claim Expenses** or **Supplemental Coverage Matters** will cease when **Our** Limit of Liability has been exhausted. Upon exhaustion of the limits of liability, **We** will tender control of the defense to the **Named Insured**. The **Named Insured** agrees to accept this tender of defense.

**We** will not settle a **Claim** without **Your** consent. If **You** refuse to consent to a settlement **We** recommend and which a claimant would accept, then **Our** liability for the **Claim** will not exceed:

1.  The amount **We** would have been liable for **Damages** if the **Claim** had been settled, including **Claim Expenses** incurred up to the time of **Your** refusal; and

2.  Seventy (70%) percent of **Damages** incurred in excess of the amount for which the **Claim** could have been settled plus Seventy (70%) percent of **Claim Expenses** incurred after the time of **Your** refusal.

After such refusal, **You** shall be responsible for the remaining percentage of **Damages** and **Claims Expenses**. For the purpose of this section, settlement includes, but is not limited to, any resolution of a **Claim** that would have occurred as a result of any court-ordered process which **You** chose not to accept.

The **Named Insured** is responsible for any expenses, including fees or costs charged by a lawyer defending **You**, incurred without **Our** written consent.



**SURPLUS LINES**
# Insurance Agents Advantage
### Professional Liability Insurance

## C. LIMIT OF LIABILITY AND DEDUCTIBLE

1. Limit of Liability

   a. The Limit of Liability shown on Item 3.a. of the Declarations page per each **Claim** is the most **We** will pay for the sum of all **Damages** and **Claim Expenses** arising out of a single **Claim** or a series of related **Claims**, regardless of the number of persons or entities insured under this **Policy**, number of **Claims** made or the number of persons or entities making **Claims** during the **Policy Period** or during any **Extended Reporting Period**, if any.

   b. All **Claim Expenses** will first be subtracted from the Limit of Liability, with the remainder, if any, being the amount available to pay for **Damages**.

   c. The Aggregate limit shown on Item 3.b. of the Declarations page is the most **We** will pay for the sum of all **Damages** and **Claim Expenses** for all **Claims** under this **Policy**.

   d. The **Supplemental Coverage** Limits shown on Item 6. of the Declarations page, if applicable, are the most **We** will pay for all **Defense Expenses, Event Expenses, Cyber Expenses**, and **Catastrophe Extra Expenses** arising out of a single **Supplemental Coverage Matter** or a series of related **Supplemental Coverage Matters** for each **Supplemental Coverage**. The Aggregate **Supplemental Coverage** Limits shown on Item 6. of the Declarations page, if applicable, are the most **We** will pay for the sum of all **Defense Expenses, Event Expenses, Cyber Expenses**, and **Catastrophe Extra Expenses** for all **Supplemental Coverage Matters** for each **Supplemental Coverage**. The applicable **Supplemental Coverage** Limits are in addition to the Limits of Liability referenced in Item 3. of the Declarations page.

2. Deductible

   a. **You** will pay the deductible amounts shown on the Declarations page. The deductibles apply as applicable to each **Claim**, and **Supplemental Coverage Matter**. If different parts of a **Claim** or related **Cyber Expenses** are subject to different deductibles in different Insuring Agreements, the applicable deductibles will be applied separately to each part of such **Claim** or **Cyber Expense** but the sum of such deductibles shall not exceed the largest applicable deductible for a single **Claim** and related **Cyber Expenses. Cyber Expenses** are subject to the deductible applicable to the **Policy Period** during which such **Cyber Expense** was deemed to have been discovered or incurred. **You** must pay the deductible immediately when invoiced or, in the event that offers of judgment or settlement demands are made which **You** and **We** agree should be accepted, prior to the expiration of the time period for responding to such offers or demands.

   b. If **We** ask, and **You** agree to use **Mediation** to resolve a **Claim** brought against **You**, and if the **Claim** is resolved by **Mediation, Your** deductible obligation for that **Claim** will be reduced by 50%, subject to a maximum reduction of $12,500.

3. Aggregate Deductible

   The Aggregate Deductible amount will be shown in the Declarations page, if applicable, and is the most **You** will pay for the sum of all Deductibles for all **Claims** first made and reported to **Us** during the **Policy Period**.

4. Reimbursement

   In the event that **We** voluntarily choose or are compelled by a court of law to make any payment of the deductible and request reimbursement from **You**, the reimbursement is payable immediately, but no later than thirty (30) days after **Our** written demand.

## D. DEFINITIONS

**Arbitration** means the binding intervention of a qualified neutral third party chosen by **You** and the other party to a **Claim** with agreement by **Us**.

**Bodily Injury** means physical injury of a person, sickness, disease or death and, if arising out of the foregoing, mental anguish, emotional distress, mental injury, shock or humiliation.



**Breach Event Expenses** means the reasonable and necessary expenses incurred for a stipulated period of time with **Our** prior approval, from the date a **Security Breach** or **Privacy Breach** is first discovered by any of **You**:

1. To conduct an investigation and forensic analysis to determine the cause of a covered **Security Breach** or **Privacy Breach**;

2. To determine and notify the individuals whose **Confidential Records** were accessed or acquired including, but not limited to the cost of mailing, printing, advertising and other communications;

3. To establish a call center to be used by individuals whose **Confidential Records** were accessed or acquired;

4. For credit or identity monitoring or identity theft education assistance including fees, costs or expenses associated with the purchase of an identity fraud insurance policy to benefit individuals whose **Confidential Records** were accessed or acquired;

5. To retain a public relations crisis management or law firm as consultants to minimize harm directly arising from a covered **Security Breach** or **Privacy Breach**; or

6. For any other expenses or services pre-approved in writing by **Us** at **Our** sole and absolute discretion.

**Breach Notice Law** means any federal, state, local or foreign privacy legislation, regulation and their functional equivalent that requires an entity to provide notice to affected natural persons of any actual or potential unauthorized access to their **Confidential Records**.

**Catastrophe Extra Expenses** means the reasonable extra expenses actually incurred by **You**, beginning on the date of a catastrophe and for the next thirty (30) days, only to assist in the insurance claims processing needs of **Your** customer(s) who have been affected by the catastrophe. The catastrophe must first occur during the **Policy Period**, and be declared as such by the Property Claims Services.

**Claim** means a:

1. Written demand received by an **Insured** for **Damages** or **Equitable Relief**;

2. **Suit**;

3. Formal administrative or regulatory proceeding commenced by the filing of charges, formal investigative order or similar document;

4. Arbitration or mediation proceeding commenced by the receipt of a demand or mediation or similar document; or

5. Written request first received by an **Insured** to toll or waive a statute of limitations.

All **Claims** made against any **Insured** that include, in whole or in part, allegations of **Wrongful Acts**, facts or circumstances that have a causal or logical connection will be considered one **Claim**. **Wrongful Acts**, facts or circumstances shall be deemed to have a causal connection if one or more of the **Wrongful Acts**, facts or circumstances alleged in one or more of such **Claims** give rise (directly or indirectly) to the **Wrongful Acts**, facts or circumstances alleged in the other of such **Claims**. **Wrongful Acts**, facts or circumstances shall be deemed to have a logical connection if there is a goal, motive or methodology that is both common and central to the matters alleged in such **Claims**. All such **Claims** will be considered first made at the time the earliest such **Claim** was made against any **Insured**.

**Claim Expenses** means all expenses **We** incur or authorize in writing for the investigation, adjustment, defense or appeal of a **Claim**. These expenses include fees charged by a lawyer, mediator or arbitrator with **Our** consent for which **You** are obligated. **Claim Expenses** also mean:

1. The premium on appeal, attachment or similar bond; and

2. Up to $250 per day per **Insured** as supplemental payment for reasonable expenses incurred for attendance at hearings, trials, or depositions, at **Our** request or with **Our** consent, by such **Insured**. Such payment shall not exceed $10,000 in the aggregate for all **Insureds** for all **Claims**.

**Claim Expenses** do not include salaries, wages, fees, overhead or benefit expenses associated with:

3. Any **Insured** except as specified in subparagraph 2. above; or

4. **Our** employees.

 **SURPLUS LINES**
# Insurance Agents Advantage
## Professional Liability Insurance

**Company** means the insurance company that issued this **Policy**, as shown on the Declarations page or referred to herein as **We, Us,** or **Our**.

**Computer** means a single hardware device or group of hardware devices, on which software, applications, script, code or computer programs, containing **Data** can be operated and viewed.

**Confidential Record** means a natural person's first name or first initial and last name, in combination with:

1. Non-public personally identifiable information, as defined in applicable federal, state, local or foreign legislation or regulations, including social security number, driver's license number or other personal identification number (including an employee identification number or student identification number);

2. Financial account number (including a bank account number, retirement account number or healthcare spending account number);

3. Credit, debit or payment card numbers;

4. Any Information related to employment by an **Insured**;

5. Individually identifiable information considered nonpublic personal information pursuant to Title V of the Gramm-Leach Bliley Act of 1999, as amended; or

6. Any individually identifiable information considered protected health information pursuant to the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended;

which is owned by an **Insured** or for which an **Insured** is legally liable and is intended by an **Insured** to be accessible only by natural persons or entities it has specifically authorized to have such access.

**Crisis Event** means:

1. **Your** death, departure or debilitating illness; or

2. Potential dissolution of the **Named Insured**;

that the **Named Insured** reasonably believes will have a material, adverse impact on the **Named Insured's** reputation.

**Crisis Management Firm** means any service provider hired by **You** and approved in writing by **Us**. **Our** consent will not be unreasonably withheld.

**Cyber Attack** means the transmission of fraudulent or unauthorized **Data** that is intended to, and successfully modifies, alters, damages, destroys, deletes, records, transmits, or consumes information within a **System** without authorization, including **Data** that is self-replicating or self-propagating, and which causes the disruption of the normal operation of a **System**.

**Cyber Expense** means **Breach Event Expenses** and **Cyber Investigation Expenses**. All **Cyber Expenses** based upon, arising out of or in any way related to any **Claim, Potential Claim,** Pre-Claim Assistance, investigation, proceeding, fact, circumstance, situation, **Privacy Breach, Security Breach,** or logically or causally connected **Privacy Breach,** or **Security Breach** will be considered one **Cyber Expense**. Such **Cyber Expense** will be considered first discovered at the time the earliest such **Cyber Expense** is discovered by any of **You**.

**Cyber Investigation Expenses** means all expenses **We** incur or authorize in writing for the investigation, adjustment, defense or appeal of a **Regulatory Investigation**.

**Damages** means monetary judgments, awards or settlements unless otherwise excluded. **Damages** includes pre-judgment interest; and post judgment interest that accrues after entry of judgment and before **We** have paid, offered to pay or deposited in court that part of judgment within the applicable Limit of Liability.

**Damages** also means punitive or exemplary **Damages** or the multiple portions thereof, if insurable under the applicable law of the jurisdiction most favorable to the insurability of such **Damages**.

**Damages** do not include any costs or expenses in complying with any demand for or award of **Equitable Relief**, even if such compliance is compelled as a result of a judgment, award or settlement. **Damages** also do not include return, restitution or reduction of professional fees, or fines, statutory penalties, or sanctions against **You** (except as provided with respect to punitive or exemplary damages), whether imposed by law or otherwise.

**Data** means a representation of information, knowledge, facts, concepts or instructions which are being processed or have been processed in a **Computer**.



**SURPLUS LINES**
# Insurance Agents Advantage
### Professional Liability Insurance

**Defense Expenses** means all expenses **We** incur or authorize in writing for the investigation, adjustment, or defense of a **Supplemental Coverage Matter**. These expenses include fees charged by a lawyer, mediator or arbitrator with **Our** consent for which **You** are obligated. **Defense Expenses** do not include **Damages**, other relief or **Claim Expenses**.

**Disciplinary Proceeding** means any proceeding by a disciplinary official or agency to investigate or prosecute charges alleging professional misconduct in the performance of **Your Professional Services**.

**Domestic Partner** means any natural person granted legal status as a domestic partner under any applicable federal, state or local law or under the provisions of any formal program established by the **Named Insured**.

**Employed Lawyer** means a natural person licensed to practice law, and employed by the **Named Insured** as a full time or part time salaried lawyer to provide legal services to the **Named Insured**.

**Employment Practices** means any actual or alleged:

1. Wrongful termination of the employment of, demotion of, or failure or refusal to hire or promote any person in violation of law or in breach of any agreement to commence or continue employment;
2. Unlawful employment discrimination;
3. Sexual harassment of an employee or applicant for employment; or
4. Retaliatory treatment against an employee on account of that employee's exercise or attempted exercise of his or her rights under law.

**Equitable Relief** means a remedy other than the payment of monetary damages. **Equitable Relief** includes non-monetary relief and injunctive relief.

**Event Expenses** means the reasonable fees, costs, and expenses for consulting services performed by a **Crisis Management Firm**, as a result of a **Crisis Event** and/or **Reputation Event**.

**Extended Reporting Period** means an additional period of time for reporting **Claim(s)**. The **Extended Reporting Period** starts on the **Policy Termination Date** and ends at the **Extended Reporting Period** expiration date.

**Final Adjudication** means a final judgment or settlement entered into terminating the litigation or administrative proceedings.

**Independent Contractor** means a natural person who performs **Professional Services** on behalf of the **Named Insured**, subject to a written contract with, and at the direction and control of the **Named Insured**.

**Insured**, also referred to herein as **You** or **Your**, means the **Named Insured**, any **Predecessor Firm** and:

1. If the **Named Insured** is a sole proprietorship, any past or present employee, but only while acting on behalf of the **Named Insured** in their capacity as an employee;
2. If the **Named Insured** is a partnership, any past or present general or managing partner, principal or employee, but only while acting on behalf of the **Named Insured** in such capacity;
3. If the **Named Insured** is a limited liability company, any past or present managing member, principal or employee, but only while acting on behalf of the **Named Insured** in such capacity;
4. If the **Named Insured** is a corporation, any past or present officer, director, trustee, or employee, but only while acting on behalf of the **Named Insured** in such capacity;
5. The **Named Insured's** temporary or leased employees, but only while acting on behalf of the **Named Insured**;
6. A past or present **Subsidiary** of the **Named Insured**, but only for **Professional Services** rendered while a **Subsidiary** of the **Named Insured**;
7. **Your** lawful spouse or **Domestic Partner**, solely for liability arising from any **Wrongful Act** of an **Insured** committed without the participation of such spouse or **Domestic Partner**;
8. **Your** heirs, assigns and legal representatives in the event of **Your** death, incapacity or bankruptcy to the extent that **You** would have been covered;
9. Any past or present **Employed Lawyer**, but only while acting in such capacity on behalf of the **Named Insured**. or



10. Any past or present **Independent Contractor**, but only while acting in such capacity on behalf of the **Named Insured**.

**Liquidated Damages** means a sum of money stipulated by the parties to a contract as the amount of damages to be recovered for a breach of such contract.

**Loss** means **Claim Expenses**, **Damages**, **Defense Expenses**, **Event Expenses**, **Catastrophe Extra Expenses**, and **Cyber Expenses**, and does not include **Equitable Relief**.

**Mediation** means the non-binding intervention of a qualified neutral third party chosen by **You** and the other party to a **Claim** with agreement by **Us**.

**Named Insured** means the sole proprietor, entity, partnership, or corporation designated in the Declarations page.

**Personal Injury** means:

1. False arrest, detention or imprisonment;
2. Wrongful entry, eviction or other invasion of private occupancy;
3. Malicious prosecution;
4. Abuse of process;
5. The publication or utterance of libel, slander or other defamatory or disparaging material; or
6. A publication in violation of a person's right of privacy.

**Policy** means this **Policy** form, the Declarations page, and any endorsements to the **Policy** issued by **Us**, and **Your** application.

**Policy Period** means the period from the inception date of this **Policy** to the **Policy Termination Date**.

**Policy Termination Date** means the expiration date of this **Policy** as shown on the Declarations page, or the cancellation date of this **Policy**, whichever is earlier.

**Pollutants** include, but are not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, soot, fumes, asbestos or asbestos-containing products, acids, alkalis, chemicals, waste and any electric, magnetic or electromagnetic field of any frequency. Waste includes but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

**Potential Claim** means a **Wrongful Act** or any facts or other circumstances which may subsequently give rise to a **Claim**.

**Predecessor Firm** means a legal entity, disclosed as such in **Your** last application provided to **Us** for this **Policy**, or to **Us** for a **Policy** of which this **Policy** is a renewal or replacement, that was engaged in **Professional Services**, is dissolved or inactive, and to whose assets and liabilities the **Named Insured** is the majority (more than 50%) successor in interest.

**Privacy Breach** means:

1. **Your** failure to protect a **Confidential Record**, including a **Cyber Attack** on **Your System**, or the actions of a **Rogue Employee**, which directly results in the unauthorized disclosure of one or more **Confidential Records**;
2. The theft or negligent loss of hardware, **Storage Media**, **System Output**, **Data** or other documents owned or controlled by, or on behalf of, **You** on which **Confidential Records** are stored or recorded;
3. **Your** negligent failure to disclose an event referenced in 1. or 2. above in violation of any **Breach Notice Law**; or
4. **Your** negligent violation of any applicable federal, state, foreign or local privacy legislation or regulation in connection with any **Claim**.

**Professional Services** means:

1. Professional services performed by the **Insured** for others for a fee, commission or other consideration solely as an: insurance agent; insurance broker; insurance consultant; general insurance agent; managing general agent; managing general underwriter; program administrator; surplus lines insurance broker; wholesale insurance broker; notary; or insurance claims appraiser,



**SURPLUS LINES**
# Insurance Agents Advantage
**Professional Liability Insurance**

handler or adjuster; and if associated with the former, loss control or risk management services, and placing premium financing;

2. Pro bono services in any of the above capacities, as long as such services are performed with the prior written consent of the **Named Insured**; and

3. Legal services performed by an **Employed Lawyer**, but only if such legal services are provided to the **Named Insured**.

**Property Damage** means physical injury to, loss, or destruction of tangible property, including the resulting loss of use thereof; or loss of use of tangible property which has not been physically injured or destroyed. **Data** is not tangible property.

**Regulatory Investigation** means a formal request for information, civil investigative demand or civil proceeding, including requests for information related thereto, brought by or on behalf of a state Attorney General, the Federal Trade Commission, the Federal Communications Commission or any other federal, state, local or foreign governmental agency.

**Reputation Event** means a **Wrongful Act(s)** that the **Named Insured** reasonably believes will have material, adverse impact on the **Named Insured's** reputation resulting in a loss of revenues because of diminished customer confidence based on unfavorable information made available by or appearing on:

1. Social media;

2. Television or radio broadcasts; or

3. Newspapers;

provided such written media was in general circulation and such electronic media was available to the public on a fully open network that was neither password protected nor restricted from access by any method.

**Retroactive Date(s)** refer to the dates shown in Item 8. of the Declarations page. If no **Retroactive Date** is shown on the Declarations page, the **Retroactive Date** will be inception date of the **Policy**.

**Rogue Employee** means a permanent employee of the **Named Insured** who has gained unauthorized access, or has exceeded authorized access, to a **System** or **Confidential Records** owned or controlled by **You** or an entity that is authorized by **You** to hold, process or store **Confidential Records** for **Your** exclusive benefit.

**Security Breach** means:

1. The failure or violation of the security of **Your System**, including the impairment or denial of access to **Your System**, a **Cyber Attack**, or unauthorized acts or omissions by a **Rogue Employee** which damages or harms **Your System** or the **System** of a third party with whom **You** provide services for a fee;

2. The theft or loss of hardware or **Storage Media** controlled by, or on behalf of, **You** on which **Data** is stored; or

3. The failure to disclose an event in 1. or 2. above which violates any **Breach Notice Law**.

**Storage Media** means objects on which **Data** is stored so that it can be read, retrieved or processed by a **Computer**. **Storage Media** does not mean paper. **Storage Media** also does not mean money, financial instruments, or documents.

**Stranger Owned Life Insurance** means an arrangement where a life insurance policy is issued to an insured, or an individual with an insurable interest to the insured, where the resources to purchase the policy are provided or guaranteed by a person or entity who has no insurable interest to the insured and who also has a contractual right to repayment or other means of satisfaction of the resources such as obtaining control of policy rights or benefits.

**Subpoena** means a subpoena received by **You** for documents or testimony arising out of **Your** rendering of **Professional Services** provided that:

1. The subpoena arises out of a lawsuit to which **You** are not a party; and

2. **You** have not been engaged to provide advice or testimony in connection with the lawsuit or have not provided such advice or testimony in the past.



**SURPLUS LINES**
# Insurance Agents Advantage
**Professional Liability Insurance**

**Subsidiary** means any entity of which the **Named Insured** owns more than fifty percent (50%) either directly or indirectly; and

1. Is identified by **You** in **Your** last application provided to **Us** for this **Policy**, or to **Us** for a **Policy** of which this **Policy** is a renewal or replacement; or

2. Which becomes a subsidiary during the **Policy Period** provided that such entity does not represent more than a ten percent (10%) increase in the total assets or gross revenue of the **Named Insured**. Where such entity represents an increase in the total assets or gross revenue of the **Named Insured** of more than ten percent (10%), such entity shall be deemed a **Subsidiary** under the **Policy**, but only upon the condition that within sixty (60) days of its becoming a subsidiary, **You** shall have provided **Us** with full particulars of the new subsidiary and agree to any additional premium and/or amendment of the provisions of this **Policy** required by **Us** relating to such new subsidiary, subject to the review and acceptance by **Us** of full and complete underwriting information. Further, coverage as shall be afforded to the new subsidiary is conditioned upon the **Named Insured** paying when due any additional premium required by **Us** relating to such new subsidiary.

**Suit** means a civil proceeding for monetary, non-monetary or injunctive relief, which is commenced by service of a complaint or similar pleading. **Suit** includes a binding **Arbitration** proceeding in which **Damages** are alleged, and to which **You** must submit or do submit with **Our** consent.

**Supplemental Coverage** means coverages under Section A.4. Supplemental Coverage.

**Supplemental Coverage Matter** means facts or other circumstances which are covered under Section A.4. Supplemental Coverage.

**System** means a **Computer, Storage Media** and all input, output, processing storage and communication devices controlled, supervised or accessed by the operation systems that are proprietary to, or licensed to, the owner of the **Computer**.

**System Output** means a tangible substance on which one or more **Confidential Records** are printed from a **System**.

**Unauthorized Access** means the use of or access to **Systems** by a person not authorized to do so by the **Named Insured**; or the use or access to **Systems** in a manner not authorized by the **Named Insured**.

**Wrongful Act** and **Wrongful Acts** means any actual or alleged negligent act, error, omission, misstatement or **Personal Injury**, in the rendering or failure to render **Your Professional Services**.

## E. EXCLUSIONS - WHAT THIS POLICY DOES NOT INSURE

This **Policy** does not apply to **Claim(s)** or **Supplemental Coverage Matter(s)**:

1. Conduct

   Based upon, arising out of, or in any way relating, directly or indirectly, to any **Insured** committing any intentional, dishonest or fraudulent act or omission, however, **We** will defend **Claims** alleging any of the foregoing conduct until there is a judgment, **Final Adjudication**, adverse admission or finding of fact against **You** as to such conduct at which time **You** shall reimburse **Us** for all **Claim Expenses**. **We** shall not cover any **Claim** if **You** plead nolo contendere or no contest to a criminal proceeding against **You** arising out of the same, or essentially the same, material facts as such **Claim**;

   This exclusion does not apply to an **Insured** who did not personally commit or personally participate in committing any intentional, dishonest or fraudulent act or omission, provided that:

   a. Such **Insured** had neither notice nor knowledge of such intentional, dishonest or fraudulent act or omission; and

   b. Such **Insured**, upon receipt of notice or knowledge of such intentional, dishonest or fraudulent act or omission, immediately notifies **Us**;

2. Unearned Personal Profit

   Based upon, arising out of, or in any way relating directly or indirectly to any **Insured** gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled;

---

920-1001SL 03/19         © 2019 AIX Specialty Insurance Company. All Rights Reserved.         Page 9 of 18



3. Criminal Acts

   Based upon, arising out of, or in any way related to, directly or indirectly, any willful or criminal violation of any statute, rule or law;

4. Non-Monetary Relief

   Based upon, arising out of, or in any way related to, directly or indirectly, any demand for **Equitable Relief**;

5. Pollution

   Based upon, arising out of, or in any way related to, directly or indirectly:

   a. The actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **Pollutants** at any time;

   b. Any directive, request or voluntary decision that any **Insured** monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; or

   c. Any governmental or regulatory directive or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; or

   d. The failure to discover, disclose, report or advise of the existence or amount of **Pollutants**;

   However this Exclusion does not apply to **Your** actual or alleged failure to place, effect, maintain, or renew any bond, suretyship or other form of insurance;

6. Fungi

   Based upon, arising out of, or in any way related to, directly or indirectly:

   a. The presence of, suspected presence of or exposure to:

      1) Fungi, including but not limited to mold, mildew and yeast; or

      2) Bacteria or viruses; or

      3) Dust, spores, odors, particulates or byproducts, including but not limited to mycotoxins and endotoxins, resulting from any of the organisms listed in 1) or 2) above, from any source whatsoever; or

   b. The failure to discover or disclose the existence of any of the organisms listed in a. above, from any source whatsoever; or

   c. Any loss, cost or expense arising out of the testing for, monitoring of, cleaning up of, removal of, containment of, treatment of, detoxification of, neutralization of, remediation of, disposal of or any other response to or assessment of the effects of any of the items in a. above, from any source whatsoever;

   However this Exclusion does not apply to **Your** actual or alleged failure to place, effect, maintain, or renew any bond, suretyship or other form of insurance;

7. Bodily Injury or Property Damage

   Based upon, arising out of, or in any way related to, directly or indirectly, **Bodily Injury** or **Property Damage**, however that this exclusion does not apply to **Claims** of mental injury, mental anguish, mental tension, or emotional distress caused by **Personal Injury**, however this Exclusion does not apply to **Your** actual or alleged failure to place, effect, maintain, or renew any bond, suretyship or other form of insurance;

8. Securities Laws

   Based upon, arising out of, or in any way related to, directly or indirectly:

   a. Any purchase, sale, or offer, or solicitation of an offer to purchase or sell securities;

   b. Any violation of any securities law, including the Securities Act of 1933 as amended, or the Securities Exchange Act of 1934 as amended, or any regulation promulgated under the foregoing statutes, or any federal, state or local laws similar to the foregoing statutes (including "Blue Sky" laws), whether such law is statutory, regulatory or common law; or

   c. Any violation of the Organized Crime Control Act of 1970 (commonly known as Racketeer Influenced And Corrupt Organizations Act, or "RICO") as amended, or any regulation promulgated thereunder or any federal, state or local law similar to the foregoing, whether such law is statutory, regulatory or common law;



**SURPLUS LINES**
# Insurance Agents Advantage
### Professional Liability Insurance

9. ERISA

Based upon, arising out of, or in any way related to, directly or indirectly, any breach of fiduciary duty, responsibility, or obligation in connection with any employee benefit or pension plan, including violations of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 ("ERISA") as amended, or similar statutory or common law of the United States of America or any state or jurisdiction therein;

10. Employment Practices

Based upon, arising out of, or in any way related to, directly or indirectly:

a. Any **Employment Practices** liability; or

b. Any discrimination on any basis, including, but not limited to: race, creed, color, religion, ethnic background, national origin, age, handicap, disability, gender, sexual orientation or pregnancy;

However this Exclusion does not apply to **Your** actual or alleged failure to place, effect, maintain, or renew any bond, suretyship or other form of insurance;

11. Intellectual Property

Based upon, arising out of, or in any way related to, directly or indirectly, any misappropriation or misuse of trade secret or infringement of patent, copyright, trademark, trade dress or any other intellectual property right; however this Exclusion does not apply to **Your** actual or alleged failure to place, effect, maintain, or renew any bond, suretyship or other form of insurance;

12. Deceptive Business Practices

Based upon, arising out of, or in any way related to, directly or indirectly, false advertising, misrepresentation in advertising, antitrust, unfair competition, restraint of trade, unfair or deceptive business practices, including but not limited to, violations of any local, state or federal consumer protection laws;

13. Spamming

Based upon, arising out of, or in any way related to, directly or indirectly, any alleged unsolicited fax, electronic mail or any other means, where prohibited by law, including any actual or alleged violation of the Telephone Consumer Protection Act ("TCPA") of 1991, any amendments thereto, any rules or regulations promulgated thereunder, or any similar provisions of any federal, state, or local, statutory law or common law, anywhere in the world;

14. Government Body

Against **You**, that is brought by or on behalf of any federal, state or local government agency or professional or trade licensing organizations; however, this exclusion does not apply where the **Claim** alleges a **Wrongful Act** in **Your** rendering **Professional Services** to such entity, or for a **Disciplinary Proceeding**;

15. Contract

Based upon, arising out of, or in any way related to, directly or indirectly, liability **You** assume under any contract or agreement; however this exclusion does not apply to liability **You** would have in the absence of such contract or agreement;

16. Insured vs Insured

Arising out of a **Claim** by any **Insured** under this **Policy** against any other insured under this **Policy**, or against **You** that is brought by or on behalf of:

a. Any business entity that is owned, managed or operated, directly or indirectly, in whole or in part, by **You**;

b. Any parent company, **Subsidiary**, successor or assignee of **Yours**, or anyone affiliated with **You** or such business entity through ownership or control, in whole or in part, by **You**; or

c. Any independent contractor supplying material or services to **You**;



# Insurance Agents Advantage
### Professional Liability Insurance

However this Exclusion 16. does not apply to:

d. **Claims** by an **Insured** solely as a customer or client of the **Named Insured**, provided that the **Named Insured** has no current or former ownership interest in, and does not control, manage or operate, the risk to be insured; or

e. **Claims** solely against an **Employed Lawyer**, brought by a director, officer or employee of the **Named Insured** to whom the **Employed Lawyer** provided legal services at the direction of the **Named Insured**, regarding a matter within the scope of such director's, officer's or employee's duties with the **Named Insured**;

17. Over Redemption

Based upon, arising out of, or in any way related to, directly or indirectly, any actual or alleged loss resulting from over redemption of coupons, awards or prizes in connection with any advertisement, promotion, game, sweepstakes, contest or game of chance;

18. Misappropriation

Based upon, arising out of, or in any way related to, directly or indirectly, any actual or alleged commingling, missing or improper use of funds, premiums, accounts, fees, taxes, claims payments, commissions or brokerage monies for which any **Insured** collected or should have collected; any funds received by any **Insured** or credited to any **Insured's** account which the **Insured** returned or should have returned; or any claim amount that any **Insured** paid or should have paid to another person or organization;

19. False Pretenses

Based upon, arising out of, or in any way related to, directly or indirectly, any transfer, payment or delivery of funds, money or property, by anyone, which was caused or induced by trick, artifice, or the misrepresentation of a fact including, but not limited to, funds transfer fraud, social engineering, computer fraud, pretexting, phishing, spear phishing or any other confidence trick;

20. Websites

Based upon, arising out of or in any way related to, directly or indirectly:

a. Controlling, creating, designing, or developing any third party's Website; or

b. Controlling, creating, designing, developing, determining, or providing the content or material of any third party's website; or

c. Controlling, facilitating, providing, or failing to control, facilitate, or provide, access to the internet;

21. Software & Computer Code

Based upon, arising out of or in any way related to, directly or indirectly, any infringement of, violation of, or assertion of, any right to or interest in any:

a. Software or its source content or material;

b. **Computer** code or its source content or material or expression method; or

c. Process designed to control or facilitate any operation or other use of a **Computer** or automated system; or

22. Warranty

Based upon, arising out of or in any way related to, directly or indirectly, the failure of goods, products, or services to conform with any electronic, oral, written, or other representation or warranty with respect to durability, fitness, performance, quality or use.

23. Market Values

Based upon, arising out of, or in any way related to, directly or indirectly:

a. Any promises, warranties, or guarantees made by any **Insured** as to:

  1) The availability of funds or specified rate of interest or return;

  2) The future value of investments, real property or personal property;

  3) Potential sales, earnings, profitability, or economic value; or



**SURPLUS LINES**
# Insurance Agents Advantage
### Professional Liability Insurance

    4)  Cost, contract price, or estimates of probable costs;

b.  Any fluctuation in the value of any security or investment, or the failure of any investment to perform as expected or desired;

c.  The failure to secure financing;

d.  The preparation of pro-forma statements which are the basis of, or are used to secure capital through debt, equity, credit, or other means;

e.  Any **Insured's** exercise of authority or discretionary control with respect to any client's funds or accounts;

f.  Any **Insured's** advice and/or selection of any investment manager, investment advisory and/or custodial firm; or

g.  Any **Insured's** failure to adhere to directions, instructions, or investment preferences stated by an investor;

24. <u>Breach of Authority</u>

Based upon, arising out of, or in any way related to, directly or indirectly, intentional breach of underwriting or binding authority by or on behalf of or in the name or right of any **Insured;**

25. <u>Carrier Failure to Pay</u>

Based upon, arising out of, or in any way related to, directly or indirectly, failure to pay or delay in paying all or part of any benefit payment due or alleged to be due under any insurance policy, bond or benefit plan, or any actual or alleged lack of good faith or fair dealing in the handling of any claim or obligation due or alleged to be due under any insurance policy, bond or benefit plan by or on behalf of or in the name or right of any **Insured;**

26. <u>Prior Notice</u>

Based upon, arising out of, or in any way related to, directly or indirectly:

a.  Any fact, circumstance, situation, transaction, event, act, error, or omission that, before the inception date of the first policy issued by **Us** of which this **Policy** is a direct renewal or replacement without interruption, was the subject of any notice under any prior or concurrent policy; or

b.  Any **Security Breach, Privacy Breach,** or **Cyber Expense,** investigation, proceeding, act, event, transaction, decision, fact, circumstance or situation which has been the subject of any notice given to any other insurer, under any similar policy prior of which this **Policy** is a direct or indirect renewal or replacement;

27. <u>Pending and Prior Litigation</u>

Based upon, arising out of, or in any way related to, directly or indirectly, any demand, litigation, or alternative dispute resolution, administrative, regulatory, or investigation that is pending prior to the Pending or Prior Litigation Date stated in Item 7. of the Declarations page, or the same or substantially similar fact, circumstance, situation, transaction, event, act, error, or omission underlying or alleged therein;

28. <u>Obligations to Employees</u>

Based upon, arising out of, or in any way related to, directly or indirectly, any actual or alleged obligation of the **Insured** pursuant to any workers' compensation, unemployment compensation, disability benefits or similar law; however this Exclusion does not apply to **Your** actual or alleged failure to place, effect, maintain, or renew any bond, suretyship or other form of insurance;

29. <u>Unauthorized Practice of Law</u>

Based upon, arising out of, or in any way related to, directly or indirectly, any actual or alleged unlawful or unauthorized practice of law, however this Exclusion does not apply to **Your** actual or alleged failure to place, effect, maintain, or renew any bond, suretyship or other form of insurance;

30. <u>Insolvency</u>

Based upon, arising out of, or in any way related to, directly or indirectly, the financial inability to pay, insolvency, receivership, bankruptcy or liquidation of any insurance company, any Individual Practice Association, Health Maintenance Organization, Preferred Provider Organization, Dental Service Plan, Risk Retention Group, Risk Provider Group, self-insured plan or any pool, syndicate, association, or other combination formed for the purpose of providing insurance, or reinsurance, or any healthcare provider or any reinsurer with which **You** directly placed



# Insurance Agents Advantage
## Professional Liability Insurance

the subject risk; however, this Exclusion does not apply if, at the time **You** placed the subject risk with such entity, it was rated by Demotech as A or higher, by AM Best as B+ or higher, or alternatively, was a member insurer of the state guaranty fund or guaranty association in the state or of domicile of the subject risk, or was guaranteed by a governmental body or bodies and/or operated by a governmental body or bodies, or was placed through a state established residual market insurance program or was placed with a County Mutual reinsured by carriers rated by AM Best as B+ or higher.

31. Cobra Administration

    Based upon, arising out of, or in any way related to, directly or indirectly, **Your** administration under the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA) including any amendments, regulations, or enabling statutes pursuant thereto, or any other similar federal, state or provincial statute or regulation;

32. Named Fiduciary

    Based upon, arising out of, or in any way related to, directly or indirectly, **Your** status as a Named Fiduciary;

33. Third-Party Administrator

    Based upon, arising out of, or in any way related to, directly or indirectly, third-party administrator activities, whether **You** perform such activities for a fee or not; or

34. Viaticals and Stranger Owned Life Insurance

    Based upon, arising out of, or in any way related to, directly or indirectly, the sale or servicing of investments in viaticated policies or of the sale or servicing of investments in **Stranger Owned Life Insurance.**

This **Policy** does not apply to any **Cyber Expense** for:

35. Assumed Obligations

    Any costs or expenses incurred to perform any obligation assumed by, on behalf of, or with the consent of any **Insured**; however, this Exclusion does not apply to **Breach Event Expenses**;

36. Return of Payments

    Any return of fees, charges, commissions or other compensation paid to an **Insured**;

37. Investigations

    Any costs, fees or expenses incurred or paid by any **Insured** in establishing the existence of, or amount of loss; however, this Exclusion does not apply to **Breach Event Expenses** for the retention of an information security forensic investigator or forensic accountant;

38. System Changes

    Any costs or expenses incurred to replace, upgrade, update, improve, or maintain a **System**;

39. Non-monetary Relief

    Any costs of compliance with any order for, grant of or agreement to provide non-monetary relief, including injunctive relief; however, this Exclusion does not apply to **Breach Event Expenses**;

40. Taxes, Fines and Penalties

    Any fines or penalties imposed by law, taxes or **Liquidated Damages**;

41. Potential Income

    Any potential income not realized by any **Insured**;

42. Uniform Commercial Code

    Any loss, costs or expenses any **Insured** agrees to incur or incurs on behalf of another natural person or entity when such **Insured** is not obligated to incur such loss, costs or expenses under the Uniform Commercial Code or any other law, statute, rule or code anywhere in the world, including the rules or codes of any clearing or similar entity, provided that this Exclusion 8. does not apply to the Breach Event Expenses Insuring Agreement;

43. Consequential Loss

    Any loss, costs or expenses based upon, arising from or in consequence of an indirect or consequential loss of any nature; or

---

 **The Hanover** Insurance Group™

**SURPLUS LINES**
# Insurance Agents Advantage
## Professional Liability Insurance

44. Malfunction or Error

Any loss, costs or expenses resulting from mechanical failure, faulty construction, error in design, latent defect, wear or tear, gradual deterioration, electrical disturbance, **Storage Media** failure or breakdown or any malfunction or error in programming, or error or omission in processing.

## F. EXTENDED REPORTING PERIODS

1. Automatic Extended Reporting Period

   **You** will be entitled to an automatic **Extended Reporting Period** for no additional premium. This extension is applicable to any **Claim** made against **You** during the **Policy Period** and reported to **Us** in writing, during the sixty (60) days immediately following the **Policy Termination Date**.

2. Optional Extended Reporting Period

   **We** will provide an optional **Extended Reporting Period** as described below:

   If this **Policy** is canceled, terminated or non-renewed, **You** shall have the right, upon payment of an additional premium, to an extension of the reporting period for any **Claim** against you first made and reported after the **Policy Termination Date**, but only with respect to **Wrongful Acts** committed wholly prior to the **Policy Termination Date** and otherwise covered by this **Policy**.

   If purchased, this optional **Extended Reporting Period** shall be in place of, not in addition to, the automatic **Extended Reporting Period**.

   a. The available optional **Extended Reporting Period** options and additional premium are determined in accordance with the rules, rates and rating plans **We** then have in effect in **Your** state.

   b. **You** must request the optional **Extended Reporting Period** in writing and must pay **Us** the additional premium within sixty (60) days following the date of such cancellation, termination or non-renewal. If **We** do not receive **Your** request and premium payment within sixty (60) days following the date of such cancellation, termination or non-renewal, **Your** right to purchase the optional **Extended Reporting Period** shall cease.

   c. If **We** cancel for non-payment of premium, the **Named Insured** may purchase an optional **Extended Reporting Period** only after any earned premium due **Us** is paid within ten (10) days after the date of cancellation or **Policy** expiration, whichever comes first.

   d. All premiums paid for an optional **Extended Reporting Period** shall be deemed fully earned as of the first day of the optional **Extended Reporting Period**. Once the premium for the optional **Extended Reporting Period** is paid, it may not be cancelled.

   The optional **Extended Reporting Period** does not extend the **Policy Period** or change the scope of coverage provided. There are no separate, additional or reinstated limits of liability for the **Extended Reporting Period**.

## G. DUTIES IN THE EVENT OF CLAIM(S), POTENTIAL CLAIM(S), OR SUPPLEMENTAL COVERAGE MATTER(S)

1. If **You** receive a **Claim**, **You** must provide **Us** written notice of the **Claim**, with full details including the date received, as soon as practicable, but in no event later than sixty (60) days after the **Policy Termination Date** or during the optional **Extended Reporting Period**, if purchased.

2. No **Insured** will, except at that **Insured's** own cost, voluntarily make a payment, assume any obligation, agree to a settlement or incur any expense related to a **Claim** without **Our** consent.

3. If **You** become aware of a **Potential Claim**, **You** must provide **Us** written notice as soon as practicable, but in no event later than the **Policy Termination Date**. To the extent possible notice should include:

   a. Where the **Wrongful Act** took place and any facts or circumstance concerning the **Wrongful Act**; and

   b. The names and addresses of any persons and entities involved; and

   c. The reasons why the **Potential Claim** may reasonably be expected to give rise to a **Claim**.



4. Any **Claim** arising out of the **Wrongful Act**, facts or circumstance which is subsequently made against **You** shall be deemed to have been first made at the time **We** received such written notice from **You**, if **We** receive proper notice of the **Potential Claim** according to paragraph 3. above.

5. If **You** receive a **Supplemental Coverage Matter**, **You** must provide **Us** with written notice of the **Supplemental Coverage Matter**, with full details, including the date received, as soon as practicable, but in no event later than the **Policy Termination Date**. Notice of a **Cyber Expense** must include the nature of the alleged **Security Breach**, or **Privacy Breach**, and the manner in which **You** first became aware of it. Discovery of a **Cyber Expense** is deemed to occur when any of **You** become aware of circumstances, acts or actual or potential liability to a third party regardless of when the act or acts causing or contributing to such **Cyber Expense** occurred, even if the amount of such **Cyber Expense** does not exceed the applicable deductible or the exact amount or details of such **Cyber Expense** may not be known.

6. **You** and any other involved **Insured** must:

   a. Immediately send **Us** copies of any demands, notices, summonses or legal papers received in connection with the **Claim**, **Potential Claim** or **Supplemental Coverage Matter**;

   b. Authorize **Us** to obtain records and other information;

   c. Cooperate with **Us** in the investigation, defense or settlement of the **Claim**, **Potential Claim** or **Supplemental Coverage Matter**; and

   d. Assist **Us**, upon **Our** request, in the enforcement of any right against any person or entity which may be liable to **You** because of **Damages** to which this insurance may apply.

   e. Provide **Us** proof of loss for **Cyber Expenses and Catastrophe Extra Expenses**, duly sworn to, with full particulars, within six (6) months after discovery.

The date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

## H. CONDITIONS

1. Cancellation and Non-Renewal

   a. **We** may cancel this **Policy** by written notice to the **Named Insured**. **We** will provide written notice at least sixty (60) days before cancellation is to be effective, however if **We** cancel for failure to pay premium when due, **We** will give ten (10) days written notice to the **Named Insured** before such cancellation is effective. Regardless of the reason for cancellation, return of unearned premium shall be calculated on a prorate basis.

   b. The **Named Insured** may cancel this **Policy** by written notice to **Us** stating when thereafter the cancellation shall be effective. If this **Policy** is cancelled, return of unearned premium shall be calculated on a pro rata basis.

   c. **We** are not required to renew this **Policy**. However, written notice of **Our** intent to non-renew this **Policy** shall be sent to the **Named Insured** at least sixty (60) days prior to expiration of the **Policy Period**.

2. Representations and Application

   By accepting this **Policy**, **You** agree that:

   a. The statements in the Declarations are accurate and complete;

   b. Those statements are based on representations **You** made to **Us** in **Your** application for this insurance **Policy**, or to **Us** for a **Policy** of which this **Policy** is a renewal or replacement;

   c. The representations made in **Your** application are the basis of this **Policy** are to be considered as incorporated into and constitute a part of this **Policy**;

   d. Those representations are material to the acceptance of the risk **We** assumed under this **Policy**;

   e. **We** have issued this **Policy** in reliance upon the truth, accuracy and completeness of such representations.

3. Legal Action Against Us

   No person or entity has a right under this **Policy** to:



**SURPLUS LINES**
# Insurance Agents Advantage
### Professional Liability Insurance

    a.  Join **Us** as a party or otherwise bring **Us** into a **Suit** asking for **Damages** from an **Insured**; or

    b.  Sue **Us** on this **Policy** unless all of its terms have been fully complied with.

A person or entity may sue **Us** to recover on an agreed settlement or on a final judgment against an **Insured**; but **We** will not be liable for **Damages** that are not payable under the terms of this **Policy** or that are in excess of the applicable Limit of Liability. An agreed settlement means a settlement and release of liability signed by **Us**, the **Insured** and the claimant or the claimant's legal representative.

4.  Change in Ownership, Control and Exposure

    If during the **Policy Period**:

    a.  Another person, entity, or group of persons or entities acquires more than fifty (50) percent of the assets of the **Named Insured**; or

    b.  Another person, entity, or group of persons or entities, acquires an amount of the outstanding securities representing more than fifty (50) percent of the voting power for the election of the **Named Insured's** directors or trustees; or

    c.  The **Named Insured** consolidates with or merges with another entity;

You shall notify **Us** of the change described in a., b., or c. above ("transaction"), as soon as practicable, but not later than sixty (60) days after the effective date of such transaction. **You** shall provide such additional information, pay any additional premium and agree to any amendment of the provisions of this **Policy**, as **We** require.

If **you** fail to meet the conditions described above, coverage under this **Policy** shall continue until termination of the **Policy Period**, but only with respect to **Claims** made for **Wrongful Acts** which took place prior to the transaction.

5.  Transfer of Rights of Recovery Against Others to Us

If **You** have any rights to recover all or part of any payment **We** have made under this **Policy**, these rights are transferred to **Us**. **You** must do nothing after a **Loss** to impair **Our** rights to seek or obtain recovery from others. At **Our** request, **You** will sue those responsible or transfer those rights to **Us** and help **Us** enforce them. In the event of any payment under this **Policy**, **We** shall be subrogated to the extent of such payment to all of **Your** rights of recovery. **You** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights and shall do nothing to prejudice or compromise such rights without **Our** express written consent.

6.  Assignment

No change in, modification of or assignment of interest in this **Policy** shall be effective except when made by a written endorsement to the **Policy**.

7.  Sole Agent for the Insured

By accepting this **Policy**, **You** agree that only the **Named Insured** is authorized to act on behalf of all **Insureds** with respect to the following: consenting to settlement or releasing rights under this **Policy**, payment for premiums and deductibles, receiving return premiums, giving or receiving notice of cancellation or non-renewal, requesting any **Extended Reporting Period** and agreeing to any changes in this insurance **Policy**. Each **Insured** agrees that the **Named Insured** shall act on its or their behalf with respect to such matters.

8.  Coverage Territory and Valuation

This **Policy** applies to a **Wrongful Act** committed anywhere in the world provided that the **Claim** or **Supplemental Coverage Matter** is made and **Suit** is brought against **You** within the United States, its territories or possessions or Canada. All premiums, limits, deductibles, **Loss** and other amounts are expressed and payable in the currency of the United States of America. If a judgment is rendered, a settlement is denominated or another element of **Loss** under this **Policy** is stated in a currency other than the United States of America dollars, payment under this **Policy** shall be made in United States of America dollar equivalent determined by the rate of exchange published in the *Wall Street Journal* on the date the judgment becomes final, the amount of the settlement is agreed upon or any element of **Loss** is due, respectively.



**SURPLUS LINES**
# Insurance Agents Advantage
## Professional Liability Insurance

9.  Other Insurance

 a.  If other valid and collectible insurance is available to **You** for **Loss** covered under this **Policy**, the insurance provided by this **Policy** shall be excess over such other insurance, regardless of whether or not such insurance is primary, contributory, excess, contingent or otherwise.

 b.  When this insurance is excess, **We** have no duty to defend **You** against any **Claim** if any other insurer has a duty to defend **You** against the **Claim**. If no other insurer defends **We** will undertake to do so but **We** will be entitled to **Your** rights against those other insurers.

 c.  When this insurance is excess over other insurance, **We** will pay only **Our** share of the amount of **Loss**, if any, that exceeds the sum of:

 1)  The total amount that all such other insurance would pay for the **Loss** in the absence of this insurance; and

 2)  The total of all deductibles, self-insurance and retentions under all that other insurance.

 **We** will share the remaining **Loss**, if any, with any other insurance that is not described in this provision and was not bought specifically to apply in excess of the Limit of Liability shown in the Declarations page of this **Policy**.

 d.  Method of Sharing

 If all the other insurance permits contribution by equal shares, **We** will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable Limit of Liability or none of the **Loss** remains, whichever comes first.

 If any other insurance does not permit contribution by equal shares, **We** will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable Limit of Liability to the total applicable limits of liability of all insurers.

10.  Two or More Policies, Coverage Parts, or Endorsements Issued by Us

 It is **Our** stated intention that this **Policy** and any other policy, coverage part or endorsement issued by **Us**, or by any company of The Hanover Insurance Group, shall not provide duplicate or overlapping coverage for the same **Claim** or **Supplemental Coverage Matter**. If this **Policy** and any other policy issued by **Us**, or by any company of The Hanover Insurance Group, to **You**, apply to the same **Claim** or **Supplemental Coverage Matter** then, Condition 9. Other Insurance notwithstanding:

 a.  **We** shall not be liable under this **Policy** for a greater proportion of the **Loss** than the applicable Limit of Liability of this **Policy** bears to the sum of the total limits of liability of all such policies; and

 b.  The maximum amount payable under all such policies combined shall not exceed the highest applicable Limit of Liability under any one policy.

11.  Conformance to Law and Trade Sanctions

 Coverage under this **Policy** does not apply to the extent trade, economic sanction, insurance or other laws or regulations prohibit **Us** from providing insurance. The terms of this **Policy** which are in conflict with the statutes of the state in which this **Policy** is issued are amended to conform to those statutes.

12.  Section Titles

 The titling of sections and paragraphs within this **Policy** is for convenience only and shall not be interpreted as a term or condition of this **Policy**.

13.  Bankruptcy

 **You** or **Your** estate's bankruptcy or insolvency does not relieve **Us** of **Our** obligations under this **Policy**.

14.  Liberalization

 If **We** adopt any revisions to the terms and conditions of this **Policy** form to provide more coverage without an additional premium charge during the **Policy** term, the broadened coverage will immediately apply. However, the broadened terms and conditions will not apply to any **Claims** or **Supplemental Coverage Matters** that were first made against **You** prior to the effective date of the revision.

 POLICYHOLDER NOTICE

# NOTICE TO WEST VIRGINIA APPLICANTS

1.  An insurer that is not licensed in this state is issuing the insurance policy that you have applied to purchase. These companies are called "nonadmitted" or "surplus lines" insurers.
2.  The insurer is not subject to the financial solvency regulation and enforcement that applies to licensed insurers in this state.
3.  These insurers generally do not participate in insurance guaranty funds created by state law. These guaranty funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.
4.  Some states maintain lists of approved or eligible surplus lines insurers and surplus lines brokers may use only insurers on the lists. Some states issue orders that particular surplus lines insurers cannot be used.
5.  For additional information about the above matters and about the insurer, you should ask questions of your insurance agent or surplus lines licensee. You may also contact your insurance commission consumer help line.

Please sign below to acknowledge that you have received a copy of this notice.

_____        _____
Signed                                                                               Date

_____
Title

 **Hanover**
Insurance Group℠

POLICYHOLDER NOTICE

---

## U.S. Treasury Department's
## Office of Foreign Assets Control ("OFAC")
## Advisory Notice To Policyholders

No coverage is provided by this policyholder notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this notice carefully.**

The Office of Foreign Assets Control ("OFAC") administers and enforces sanctions policy, based on Presidential Declarations of National Emergency.

OFAC has identified and listed numerous foreign agents, front organizations, terrorists, terrorists organizations, and narcotic traffickers as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site: http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated United States sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC.

Other limitations on the premiums and payments also apply.

 **POLICYHOLDER NOTICE**

## CUSTOMER NOTICE OF PRIVACY POLICY AND PRODUCER COMPENSATION PRACTICES DISCLOSURES—PRIVACY POLICY DISCLOSURE

### Collection of Information

We collect personal information so that we may offer quality products and services. This information may include, but is not limited to, name, address, Social Security number, and consumer reports from consumer reporting agencies in connection with your application for insurance or any renewal of insurance. For example, we may access driving records, insurance scores or health information. Our information sources will differ depending on your state and/or the product or service we are providing to you. This information may be collected directly from you and/or from affiliated companies, non-affiliated third parties, consumer reporting agencies, medical providers and third parties such as the Medical Information Bureau.

We, and the third parties we partner with, may track some of the web pages you visit through cookies, pixel tagging or other technologies. We currently do not process or comply with any web browser's "do not track" signals or similar mechanisms that request us to take steps to disable online tracking. For additional information regarding online privacy, please see our online privacy statement, located at www.hanover.com.

### Disclosure of Information

We may disclose non-public, personal information you provide, as required to conduct our business and as permitted or required by law. We may share information with our insurance company affiliates or with third parties that assist us in processing and servicing your account. We also may share your information with regulatory or law enforcement agencies, reinsurers and others, as permitted or required by law.

Our insurance companies may share information with their affiliates, but will not share information with non-affiliated third parties who would use the information to market products or services to you.

Our standards for disclosure apply to all of our current and former customers.

### Safeguards to Protect Your Personal Information

We recognize the need to prevent unauthorized access to the information we collect, including information held in an electronic format on our computer systems. We maintain physical, electronic and procedural safeguards intended to protect the confidentiality and integrity of all non-public, personal information, including but not limited to social security numbers, driver's license numbers and other personally identifiable information.

### Internal Access to Information

Access to personal, non-public information is limited to those people who need the information to provide our customers with products or services. These people are expected to protect this information from inappropriate access, disclosure and modification.

### Consumer Reports

In some cases, we may obtain a consumer report in connection with an application for insurance. Depending on the type of policy, a consumer report may include information about you or your business, such as:

- character, general reputation, personal characteristics, mode of living;
- credit history, driving record (including records of any operators who will be insured under the policy); and/or
- an appraisal of your dwelling or place of business that may include photos and comments on its general condition.



POLICYHOLDER NOTICE

### Access to Information

Upon written request, we will inform you if we have ordered an investigative consumer report. You have the right to make a written request within a reasonable period for information concerning the nature and scope of the report and to be interviewed as part of its preparation. You may obtain a copy of the report from the reporting agency and, under certain circumstances, you may be entitled to a copy at no cost.

You also may review certain information we have about you or your business in our files. To review information we maintain in our files about you or your business, please write to us, providing your complete name, address and policy number(s), and indicating specifically what you would like to see. If you request actual copies of your file, there may be a nominal charge.

We will tell you to whom we have disclosed the information within the two years prior to your request. If there is not a record indicating that the information was provided to another party, we will tell you to whom such information is normally disclosed.

There is information that we cannot share with you. This may include information collected in order to evaluate a claim under an insurance policy, when the possibility of a lawsuit exists. It may also include medical information that we would have to forward to a licensed medical doctor of your choosing so that it may be properly explained.

### Correction of Information

If after reviewing your file you believe information is incorrect, please write to the consumer reporting agency or to us, whichever is applicable, explaining your position. The information in question will be investigated. If appropriate, corrections will be made to your file and the parties to whom the incorrect information was disclosed, if any, will be notified. However, if the investigation substantiates the information in the file, you will be notified of the reasons why the file will not be changed. If you are not satisfied with the evaluation, you have the right to place a statement in the file explaining why you believe the information is incorrect. We also will send a copy of your statement to the parties, if any, to whom we previously disclosed the information and include it in any future disclosures.

### Our Commitment to Privacy

In the insurance and financial services business, lasting relationships are built upon mutual respect and trust. With that in mind, we will periodically review and revise our privacy policy and procedures to ensure that we remain compliant with all state and federal requirements. If any provision of our privacy policy is found to be non-compliant, then that provision will be modified to reflect the appropriate state or federal requirement. If any modifications are made, all remaining provisions of this privacy policy will remain in effect. For more detailed information about our customer privacy policy (including any applicable state-specific policies) and our online privacy statement, visit our Web site, located at www.hanover.com.

### Further Information

If you have questions about our customer privacy policy (including any applicable state-specific policies) or our online privacy statement, or if you would like to request information we have on file, please write to us at our Privacy Office, N435, The Hanover Insurance Group, Inc., 440 Lincoln Street, Worcester, MA 01653. Please provide your complete name, address and policy number(s). A copy of our Producer Compensation Disclosure is also available upon written request addressed to the attention of the Corporate Secretary, N435, The Hanover Insurance Group, 440 Lincoln Street, Worcester, MA 01653.

### Producer Compensation Disclosure

Our products are sold through independent agents and brokers, often referred to as "Producers." We may pay Producers a fixed commission for placing and renewing business with our company. We may also pay additional commission and other forms of compensation and incentives to Producers who place and maintain their business with us. Details of our Producer compensation practices may be found at www.hanover.com.



# POLICYHOLDER NOTICE

This notice is being provided on behalf of the following Hanover Companies: The Hanover Insurance Group, Inc. - Allmerica Financial Alliance Insurance Company - Allmerica Financial Benefit Insurance Company - Allmerica Plus Insurance Agency, Inc. - Citizens Insurance Company of America - Citizens Insurance Company of Illinois - Citizens Insurance Company of the Midwest - Citizens Insurance Company of Ohio - Citizens Management, Inc. - AIX Ins. Services of California, Inc.- Campania Insurance Agency Co. Inc. - Campmed Casualty & Indemnity Co. Inc. - Chaucer Syndicates Limited- Educators Insurance Agency, Inc.- Hanover Specialty Insurance Brokers, Inc. - The Hanover American Insurance Company - The Hanover Insurance Company - The Hanover New Jersey Insurance Company - The Hanover National Insurance Company - Hanover Lloyd's Insurance Company - Massachusetts Bay Insurance Company - Opus Investment Management, Inc. - Professionals Direct Insurance Services, Inc. -Professional Underwriters Agency, Inc. - Verlan Fire Insurance Company - Nova Casualty Company - AIX Specialty Insurance Company.



Endorsement

| | |
|---|---|
| Coverage: Professional Liability | Endorsement Number:   0 |
| Issued To: Innovative Insurance Solutions LLC;  Mullins Consulting & Marketing | Policy Number: L1QD822040-00 |
| Issued By: AIX Specialty Insurance Company | Effective Date:   08/14/2019 |

## SCHEDULE OF FORMS

To be attached to and form part of the Policy Number listed above.

| | | |
|---|---|---|
| AIL-0059 | 04/13 | Service of Suit |
| 920-1810SL PHN | 03/19 | ERP Policyholder Notice |
| 920-1002SL | 03/19 | Insurance Agent's Advantage Professional Liability Insurance  Declarations Page |
| 920-1001SL | 03/19 | Insurance Agent's Advantage Professional Liability Insurance Base Policy Form |
| 920-1805SL-WV PHI | 03/19 | Notice To West Virginia Applicants |
| 920-1800SL PHN | 03/19 | U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") Advisory Notice |
| 920-1801SL PHN | 03/19 | Customer Notice Of Privacy policy And Producer Compensation Practices Disclosures - P |
| 920-1003SL | 03/19 | Schedule of Forms |
| 920-1140SL | 03/19 | Professional Liability Enhancements |
| 920-1201SL | 03/19 | Claim Expenses in Addition to Limit of Liability |
| 920-1203SL | 03/19 | Deductible Does Not Apply to Claims Expenses (First Dollar Defense) |
| 920-1618SL | 03/19 | West Virginia Amendatory Endorsement |
| ARL EO 003 | 03/19 | Representation Statements |
| ARL EO 006 | 03/19 | Cyber Coverage Supplemental Application |

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.



Endorsement

| Coverage: Professional Liability | Endorsement Number: 0 |
| Issued To: Innovative Insurance Solutions LLC; Mullins Consulting & Marketing | Policy Number: L1QD822040-00 |
| Issued By: AIX Specialty Insurance Company | Effective Date: 08/14/2019 |

## PROFESSIONAL LIABILITY ENHANCEMENTS

In consideration of the premium charged it is agreed that:

A.   Item 6. of the Declarations page is amended to include:

| SUPPLEMENTAL COVERAGE | LIMIT |
|---|---|
| Cancelled Conferences | $ 25,000 for each Policy Period |
| Counseling Support | $ 5,000 for each Claim; not to exceed<br>$ for all Claims in the aggregate |
| Emergency Web Hosting | $ 500 for each Policy Period |
| Pet Boarding | $ 500 for each Claim; not to exceed<br>$ 500 for all Claims in the aggregate |
| Real Estate Emergency Consulting | $ 50,000 for each Policy Period |
| Replacement of Key Officers | $ 50,000 or ten (10) times the annual premium paid for this Policy, whichever is lesser, for each Policy Period |
| Temporary Meeting Space | $ 25,000 for each Policy Period |
| Travel Disruption Due to Terrorism | $ 50,000 for each Policy Period |
| Workplace Violence Counseling | $ 50,000 for each Policy Period |

B.   Section A.4. Supplemental Coverage is amended to include:

Cancelled Conferences

**We** will reimburse **You** for any business-related conference expenses, paid by the **Named Insured** and not otherwise reimbursed, for a canceled conference that an employee was scheduled to attend. The cancellation must be due directly to a **Natural Catastrophe** or a **Communicable Disease** outbreak that forces the cancellation of the conference.

It is further agreed as follows:

1.   The employee must have registered for the conference at least thirty (30) days prior to the cancellation; and

2.   The cancellation must be ordered by a local, state or federal Board of Health or other governmental authority having jurisdiction over the location of the conference.


Insurance Group™

Endorsement

| | | |
|---|---|---|
| Coverage: Professional Liability | Endorsement Number: | 0 |
| Issued To: Innovative Insurance Solutions LLC; Mullins Consulting & Marketing | Policy Number: | L1QD822040-00 |
| Issued By: AIX Specialty Insurance Company | Effective Date: | 08/14/2019 |

Counseling Support

**We** will reimburse **You** for emotional counseling expenses incurred by an **Insured** directly as a result of a **Claim** made against you during the **Policy Period**. The emotional counseling expenses incurred must have been for **Insureds** directly involved in the **Claim.**

Emergency Web Hosting

**We** will reimburse **You** for emergency web hosting fees necessitated by the **Named Insured's** need to relocate web hosting due to the **Unforeseeable Destruction** of the **Principal Location** during the **Policy Period**. Coverage will exist only for web hosting required for a web site.

Pet Boarding

**We** will reimburse **You** up to $50 per day for an individual **Insured** for reasonable pet boarding expenses incurred for attendance at hearings, trials, mediations, arbitrations or depositions, at **Our** request or with **Our** consent, by such **Insured**.

Real Estate Emergency Consulting

**We** will reimburse **You** for a real estate agent's fee or real estate consultant's fee necessitated by the **Named Insured's** need to relocate due to the **Unforeseeable Destruction** of the **Principal Location** during the **Policy Period.**

Replacement of Key Officers

**We** will reimburse **You** for **Expenses for Replacement of Key Officers** if the chief executive officer, president, managing partner or managing member suffers an **Injury** during the **Policy Period** which results in the loss of life during the **Policy Period.**

Temporary Meeting Space

**We** will reimburse **You** for rental of meeting space which is required by the temporary unavailability of the **Principal Location** due to the failure of a climate control system, or leakage of a hot water heater during the **Policy Period**. Reimbursement is only provided for the renting of temporary meeting space required for meeting with parties who are not insured under this policy.

Travel Disruption Due to Terrorism

**We** will reimburse an individual **Named Insured**, or current principal, partner, director or officer of the **Named Insured**, for **Emergency Travel Expenses** required due to a **Certified Act of Terrorism** during the **Policy Period.**.

Workplace Violence Counseling

**We** will reimburse **You** for emotional counseling expenses incurred directly as a result of **Workplace Violence** during the **Policy Period**. The emotional counseling expenses incurred must have been for:

1. **Insureds** who were victims of, or witnesses to, **Workplace Violence;**

2. The spouse or **Domestic Partner** of **Insureds** who were victims of, or witnesses to, **Workplace Violence;** and

3. Any client who directly witnessed **Workplace Violence.**


**The Hanover**
Insurance Group™

**Endorsement**

| | |
|---|---|
| Coverage: Professional Liability | Endorsement Number: 0 |
| Issued To: Innovative Insurance Solutions LLC; Mullins Consulting & Marketing | Policy Number: L1QD822040-00 |
| Issued By: AIX Specialty Insurance Company | Effective Date: 08/14/2019 |

C. Section D. Definitions is amended to include:

**Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the Federal Terrorism Risk Insurance Act. The Federal Terrorism Risk Insurance Act sets forth the following criteria for a **Certified Act of Terrorism:**

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Federal Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**Communicable Disease** means an illness, sickness, condition or an interruption or disorder of body functions, systems or organs that is transmissible by an infection or a contagion directly or indirectly through human contact, or contact with human fluids, waste, or similar agent.

**Emergency Travel Expenses** mean:

1. Hotel expenses incurred which directly result from the cancellation of a scheduled transport by a commercial transportation carrier, resulting directly from and within forty-eight (48) hours of, a **Certified Act of Terrorism**; and

2. The net additional expense incurred resulting from re-scheduling comparable transport, to replace a similar scheduled transport canceled by a commercial transportation carrier in direct response to a **Certified Act of Terrorism**;

provided that these expenses are on behalf of the **Named Insured** and not otherwise reimbursable.

**Expenses for Replacement of Key Officers** means the following reasonable expenses:

1. Costs of advertising the employment position opening;

2. Travel, lodging, meal and entertainment expenses incurred in interviewing job applicants for the employment position opening; and

3. Miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, costs to verify background and references of applicants, and legal expenses incurred to draw up an employment contract.

**Injury** means physical damage to the body caused by violence or an accident.

**Natural Catastrophe** means hurricane, tornado, earthquake, tusunami, meteor impact, volcanic eruption, or flood.

**Principal Location** means the first address of the **Named Insured** listed on the Declarations page.

**Unforeseeable Destruction** means damage resulting from a **Certified Act of Terrorism**, fire, collision or collapse which renders the **Principal Location** completely unusable.

**Workplace Violence** means any actual or alleged intentional and unlawful use of deadly force with intent to cause harm, occurring at the **Principal Location** and resulting in **Injury**.

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.


**Hanover**
Insurance Group™

Endorsement

| | |
|---|---|
| Coverage: Professional Liability | Endorsement Number:       0 |
| Issued To: Innovative Insurance Solutions LLC;  Mullins Consulting & Marketing | Policy Number: L1QD822040-00 |
| Issued By: AIX Specialty Insurance Company | Effective Date:       08/14/2019 |

## CLAIM EXPENSES IN ADDITION TO LIMIT OF LIABILITY

In consideration of the premium charged it is agreed that:

Section C.1. Limit of Liability, paragraphs a., b., and c., are deleted and replaced by:

a.  The Limit of Liability shown on Item 3.a. of the Declarations page per each **Claim** is the most **We** will pay for the sum of all **Damages** arising out of a single **Claim** or a series of related **Claims**, regardless of the number of persons or entities insured under this **Policy**, number of **Claims** made or the number of persons or entities making **Claims** during the **Policy Period** or during any **Extended Reporting Period**, if any.

b.  The amount of $       3,000,000       is the Limit of Liability for **Claim Expenses** arising out of all **Claims** first made against an **Insured** during the **Policy Period** and any **Extended Reporting Period**, if any.  The Limit of Liability for **Claim Expenses** is in addition to any applicable limit of liability stated in Item 3. of the Declarations page. For any sublimit, **Claim Expenses** are included within and not in addition to, the applicable sublimit.  In the event the Limit of Liability for **Claim Expenses** is exhausted, then **Claim Expenses** will be subtracted from the Limit of Liability stated in Item 3. of the Declarations page, with the remainder, if any, being the amount available to pay for **Damages**.

c.  The Aggregate limit shown on Item 3.b. of the Declarations page is the most **We** will pay for the sum of all **Damages** for all **Claims** under this **Policy**.

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

920-1201SL 03/19

Page 1 of 1



Endorsement

| Coverage: Professional Liability | Endorsement Number: 0 |
| Issued To: Innovative Insurance Solutions LLC;  Mullins Consulting & Marketing | Policy Number: L1QD822040-00 |
| Issued By: AIX Specialty Insurance Company | Effective Date: 08/14/2019 |

# DEDUCTIBLE DOES NOT APPLY TO CLAIMS EXPENSES
# (FIRST DOLLAR DEFENSE)

In consideration of the premium charged it is agreed that:

Section C.2. Deductible, paragraph a., is deleted and replaced by:

a.   **You** will pay the deductible amount shown on the Declarations page. The deductible applies as applicable to each **Claim** and **Supplemental Coverage Matter**. The deductible does not apply to **Claim Expenses**. If different parts of a **Claim** or related **Cyber Expenses** are subject to different deductibles in different Insuring Agreements, the applicable deductibles will be applied separately to each part of such **Claim** or **Cyber Expense** but the sum of such deductibles shall not exceed the largest applicable deductible for a single **Claim** and related **Cyber Expenses**. **Cyber Expenses** are subject to the deductible applicable to the **Policy Period** during which such **Cyber Expense** was deemed to have been discovered or incurred. **You** must pay the deductible immediately when invoiced or, in the event that offers of judgment or settlement demands are made which **You** and **We** agree should be accepted, prior to the expiration of the time period for responding to such offers or demands.

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

920-1203SL  03/19                                                                                   Page 1 of 1

 **Endorsement**

| | |
|---|---|
| **Coverage:** Professional Liability | Endorsement Number: 0 |
| **Issued To:** Innovative Insurance Solutions LLC;  Mullins Consulting & Marketing | Policy Number: L1QD822040-00 |
| **Issued By:** AIX Specialty Insurance Company | Effective Date: 08/14/2019 |

## WEST VIRGINIA STATE AMENDATORY ENDORSEMENT

In consideration of the premium charged it is agreed that:

Section H.1. of Conditions is deleted and replaced by:

1. Cancellation and Non-Renewal

    a.  **We** may cancel this **Policy** by mailing written notice of cancellation to the **Named Insured**:

        1)  Ten (10) days before such cancellation is effective for failure to pay premium when due; and

        2)  Thirty (30) days before such cancellation is effective for only the reasons listed below:

            a)  The **Policy** was obtained through material misrepresentation;

            b)  The **Insured** violates any of the material terms and conditions of this **Policy**;

            c)  Reinsurance is unavailable. **We** will supply sufficient proof of the unavailability to the Commissioner;

        Notice of cancellation will be mailed by certified mail, return receipt requested, to the **Named Insured** at the address shown on the **Policy** with a statement of the specific reasons for and the circumstances giving rise to the reasons for such cancellation, not more than thirty (30) days after the reason for the cancellation occurred or **We** learned that it arose, and not less than thirty (30) days prior to the effective date of cancellation. **You** have the right to request a hearing, pursuant to Section 33-20C-5 of the West Virginia Code, before the Commissioner or his designee within thirty (30) days of the receipt of the cancellation notice. Regardless of the reason for cancellation, return of unearned premium shall be calculated on a pro rata basis.

    b.  The **Named Insured** may cancel this **Policy** for itself and all other **Insureds** by written notice to **Us** stating when thereafter the cancellation shall be effective.

    c.  We are not required to renew this **Policy**. However, written notice of **Our** intent to non-renew this **Policy** shall be sent to the **Named Insured** by certified mail, return receipt requested, at least ninety (90) days prior to the expiration of the **Policy Period**. Changes in the terms available on renewal will not be considered a non-renewal.

All other terms and conditions remain unchanged. The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.



ALL RISKS, LTD. – National Specialty Programs
10150 York Road, 5th Floor, Hunt Valley, MD 21030
Toll Free: 800-366-5810
Fax: 410-828-8179
Contact us: agentsgroupsubs@allrisks.com
www.allrisks.com

## Insurance Agents & Brokers Errors & Omissions Insurance
## Representation Statements

Name of Applicant: Innovative Insurance Solutions, LLC; Mullins Consulting & Marketing

1. During the past five (5) years, has any Professional Liability claim or suit ever been made against the Applicant, any predecessor firm, or any of the Applicant's current or former professional staff?   ☒ Yes ☑ No

    If yes, indicate how many: _____
    *Please submit 5 year loss runs and complete a Supplemental Claim Form for each claim.*

2. Does any of the Applicant's professional staff know of any incident, negligent act, error or omission, or other circumstance that could result in a claim or suit against the Applicant or any predecessor firm or any of the Applicant's current or former professional staff?   ☒ Yes ☑ No

    If yes, indicate how many: _____
    *Please submit 5 year loss runs and complete a Supplemental Claim Form for each claim.*

3. Has any of the Applicant's or a predecessor firm's professional staff ever had their license revoked, suspended, or been formerly reprimanded or been the subject of a disciplinary action?   ☒ Yes ☑ No

    If yes, please provide complete details on a separate sheet.

4. Have you placed crop or aviation insurance at any point in the last five (5) years?   ☒ Yes ☑ No

5. Are you appointed with Hanover Insurance or any other Hanover affiliated company?   ☒ Yes ☑ No

The undersigned, acting on behalf of the Applicants, represents that the statements set forth in this Application are true and correct and that thorough efforts were made to obtain requested information from all of You to facilitate the proper and accurate completion of this Application.

The undersigned agree that the information provided in this Application and any material submitted herewith are the representations of all of You and that they are material and are the basis for issuance of the insurance Policy provided by Us. The undersigned further agree that the Application and any material submitted herewith shall be considered attached to and a part of the Policy. Any material submitted with the Application shall be maintained on file (either electronically or paper) with Us.

It is further agreed that:

- If any of You discover or become aware of any material change which would render the Application inaccurate or incomplete between the date of this application and the Policy inception date, notice of such change will be reported in writing to Us as soon as practicable;
- Any Policy issued will be in reliance upon the truthfulness of the information provided in this Application.
- The signing of this Application does not bind the Applicant to purchase insurance.

**NOTICE TO ALABAMA APPLICANTS:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

NOTICE TO ARIZONA AND MISSOURI APPLICANTS: Claim Expenses are inside the Policy Limits. All claim expenses shall first be subtracted from the limit of liability, with the remainder, if any, being the amount available to pay for damages.

NOTICE TO ARKANSAS, LOUISIANA AND WEST VIRGINIA APPLICANTS: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

NOTICE TO CALIFORNIA APPLICANTS: For your protection, California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

NOTICE TO COLORADO APPLICANTS: It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

NOTICE TO DISTRICT OF COLUMBIA APPLICANTS: Warning: It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

NOTICE TO FLORIDA APPLICANTS: Any person who knowingly and with intent to injure, defraud or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

NOTICE TO HAWAII APPLICANTS: For your protection, Hawaii law requires you to be informed that presenting a fraudulent claim for payment of a loss or benefit is a crime punishable by fines or imprisonment, or both.

NOTICE TO IDAHO AND OKLAHOMA APPLICANTS: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

NOTICE TO KANSAS APPLICANTS: Any person who commits a fraudulent insurance act is guilty of a crime and may be subject to restitution, fines and confinement in prison. A fraudulent insurance act means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto.

NOTICE TO KENTUCKY APPLICANTS: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

NOTICE TO MAINE, TENNESSEE, VIRGINIA, AND WASHINGTON APPLICANTS: It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

NOTICE TO MARYLAND APPLICANTS: Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

NOTICE TO MICHIGAN APPLICANTS: Any person who knowingly and with intent to defraud an insurance company or another person files an application for insurance containing any materially false information, or conceals for the purpose of misleading information concerning any fact material thereto, commits a fraudulent act, which is a crime and subjects the person to criminal and civil penalties.

NOTICE TO NEW JERSEY APPLICANTS: Any person who knowingly includes any false or misleading information on an application for an insurance policy or files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

NOTICE TO NEW HAMPSHIRE APPLICANTS: It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages.

NOTICE TO NEW MEXICO AND RHODE ISLAND APPLICANTS: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

NOTICE TO OHIO APPLICANTS: Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

NOTICE TO OREGON APPLICANTS: Any person who knowingly and with intent to defraud or solicit another to defraud any insurance company: (1) by submitting an application, or (2) by filing a claim containing a false statement as to any material fact, may be violating state law.

NOTICE TO PENNSYLVANIA APPLICANTS: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

NOTICE TO VERMONT APPLICANTS: Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law.

This Application must be signed by a representative of the Applicant acting as the authorized representative of the person(s) and entity(ies) proposed for this insurance.

Signature of Owner, Officer or Partner: _____

Name: ___Kristina Brooks___                Title: ___President /CEO___

Date: ___August 08, 2019___



ALL RISKS, LTD. – National Specialty Programs
10150 York Road, 5th Floor, Hunt Valley, MD 21030
Toll Free: 800-366-5810
Fax: 410-828-8179
Contact us: agentserosubs@allrisks.com
www.allrisks.com

## Insurance Agents & Brokers Errors & Omissions Insurance
## Cyber Coverage Supplemental Application

Name of Applicant: Innovative Insurance Solutions, LLC; Mullins Consulting & Marketing

| | |
|---|---|
| 1. Do you conduct background checks on employees who have access to sensitive data and systems? | ☑ Yes ☐ No |
| 2. Do you restrict user rights on computer systems so that individuals and third-party service providers only have access to those areas of the network or information that is necessary for them to perform their duties? | ☑ Yes ☐ No |
| 3. Are you using only software applications and operating systems: | |
|     a. That are currently supported by their provider? | ☑ Yes ☐ No |
|     b. That have the "automatic updates" turned on? | ☑ Yes ☐ No |
| 4. Do you have secure email practices such as automatically scanning and filtering emails? | ☑ Yes ☐ No |
| 5. Do you delete/destroy data stored on devices and media that are scheduled to be recycled, sold, or disposed? | ☑ Yes ☐ No |
| 6. Are you and your staff educated on computer and information security? | ☑ Yes ☐ No |
|     If yes, are they required to acknowledge their security responsibilities? | ☑ Yes ☐ No |
| 7. Do you have a Written Information Security Plan (WISP)? | ☑ Yes ☐ No |
| 8. Have you installed or activated anti-virus software active on all computers and networks? | ☑ Yes ☐ No |

9. How often do you make backups of critical data and systems?
    a. Full backups?    ☐ Yearly    ☐ Biannual    ☐ Quarterly    ☐ Never
    b. Incremental backups?    ☐ Yearly    ☐ Biannual    ☐ Quarterly    ☐ Never

The undersigned, acting on behalf of the Applicants, represents that the statements set forth in this Application are true and correct and that thorough efforts were made to obtain requested information from all of You to facilitate the proper and accurate completion of this Application.

The undersigned agree that the information provided in this Application and any material submitted herewith are the representations of all of You and that they are material and are the basis for issuance of the insurance Policy provided by Us. The undersigned further agree that the Application and any material submitted herewith shall be considered attached to and a part of the Policy. Any material submitted with the Application shall be maintained on file (either electronically or paper) with Us.

It is further agreed that:

- If any of You discover or become aware of any material change which would render the Application inaccurate or incomplete between the date of this application and the Policy inception date, notice of such change will be reported in writing to Us as soon as practicable;
- Any Policy issued will be in reliance upon the truthfulness of the information provided in this Application.
- The signing of this Application does not bind the Applicant to purchase insurance.

NOTICE TO ALABAMA APPLICANTS: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

NOTICE TO ARIZONA AND MISSOURI APPLICANTS: Claim Expenses are inside the Policy Limits. All claim expenses shall first be subtracted from the limit of liability, with the remainder, if any, being the amount available to pay for damages.

NOTICE TO ARKANSAS, LOUISIANA AND WEST VIRGINIA APPLICANTS: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

NOTICE TO CALIFORNIA APPLICANTS: For your protection, California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

NOTICE TO COLORADO APPLICANTS: It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

NOTICE TO DISTRICT OF COLUMBIA APPLICANTS: Warning: It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

NOTICE TO FLORIDA APPLICANTS: Any person who knowingly and with intent to injure, defraud or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

NOTICE TO HAWAII APPLICANTS: For your protection, Hawaii law requires you to be informed that presenting a fraudulent claim for payment of a loss or benefit is a crime punishable by fines or imprisonment, or both.

NOTICE TO IDAHO AND OKLAHOMA APPLICANTS: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

NOTICE TO KANSAS APPLICANTS: Any person who commits a fraudulent insurance act is guilty of a crime and may be subject to restitution, fines and confinement in prison. A fraudulent insurance act means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto.

NOTICE TO KENTUCKY APPLICANTS: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

NOTICE TO MAINE, TENNESSEE, VIRGINIA, AND WASHINGTON APPLICANTS: It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

NOTICE TO MARYLAND APPLICANTS: Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

NOTICE TO MICHIGAN APPLICANTS: Any person who knowingly and with intent to defraud an insurance company or another person files an application for insurance containing any materially false information, or conceals for the purpose of misleading information concerning any fact material thereto, commits a fraudulent act, which is a crime and subjects the person to criminal and civil penalties.

NOTICE TO NEW JERSEY APPLICANTS: Any person who knowingly includes any false or misleading information on an application for an insurance policy or files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

NOTICE TO NEW HAMPSHIRE APPLICANTS: It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages.

NOTICE TO NEW MEXICO AND RHODE ISLAND APPLICANTS: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

NOTICE TO OHIO APPLICANTS: Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

NOTICE TO OREGON APPLICANTS: Any person who knowingly and with intent to defraud or solicit another to defraud any insurance company: (1) by submitting an application, or (2) by filing a claim containing a false statement as to any material fact, may be violating state law.

NOTICE TO PENNSYLVANIA APPLICANTS: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

NOTICE TO VERMONT APPLICANTS: Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law.

This Application must be signed by a representative of the Applicant acting as the authorized representative of the person(s) and entity(ies) proposed for this insurance.

Signature of Owner, Officer or Partner: _Kristina Brooks_

Name: Kristina Brooks     Title: President/CEO

Date: August 08, 2019

# Exhibit
# B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Receivership Management, Inc. in its capacity as the Independent Fiduciary of the AEU Holdings, LLC Employee Benefit Plan and Participating Plans, ) ) ) ) | |
| Plaintiff, ) | |
| ) | Case No.  1:19-cv-01385 |
| v. ) | JURY DEMAND |
| ) | |
| A. J. Corso & Associates, Inc.; ) | Honorable Joan H. Lefkow |
| American Benefits Association, Inc.; ) | |
| America's Health Care Alliance, Inc.; ) | |
| Assurance Agency, Ltd.; ) | |
| Brown, Brown & Gomberg, Ltd.; ) | |
| Commercial Group Intermediaries, Inc.; ) | |
| Employers Network Association, Inc., ) | |
|       d/b/a Louis Deluca and Affiliates; ) | |
| Innovative Insurance Solutions, LLC; ) | |
| The Ferrell Agency, Inc.; ) | |
| Financial Security Consultants, Inc.; ) | |
| The HFA Plan and ) | **THIRD AMENDED** |
|       Mark Krogulski, individually; ) | **COMPLAINT** |
| Health Care Reform Benefit Solutions, Inc., ) | |
|       d/b/a HRB Solutions Inc.; ) | |
| HUB International Midwest Limited; ) | |
| M. Brown & Associates, Ltd.; ) | |
| Madison Street Group, LLC; ) | |
| MGU of the West Insurance Services, Inc., ) | |
|       d/b/a OneSource StopLoss Insurance; ) | |
| Trendsetters & Associates, Inc.; ) | |
| Williams-Manny, Inc., d/b/a Gallagher Williams- ) | |
|       Manny Insurance Group; ) | |
| ) | |
| Defendants. ) | |

This case is about a highly complex workplace health benefits plan intended to avoid the consumer protections and attendant costs of multi-state insurance regulation. Defendants are insurance agents and brokers who marketed and sold the plan. Defendants' breaches of contractual, common law, and statutory duties proximately caused harm to the plan and others for which Plaintiff, the Independent Fiduciary appointed to liquidate the plan, seeks damages.

## PARTIES AND OTHER RELEVANT PERSONS AND ENTITIES

### I.    The AEU Plan

1.    The AEU Holdings, LLC Employee Benefit Plan ("AEU Plan") is and at all relevant times has been a Multiple Employer Welfare Arrangement ("MEWA") as defined under Section 3(40) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(40). In 2017, the AEU Plan filed an annual Form 5500 with the Department of Labor ("DOL").

2.    A MEWA is "an employee welfare benefit plan or any other arrangement . . . which is established or maintained for the purpose of offering or providing [welfare plan benefits including health benefits] to the employees of two or more employers. . . ." 29 U.S.C. § 1002(40). A structure that involves risk sharing across multiple employers is a MEWA.

3.    The AEU Plan is comprised of hundreds of individual employer-sponsored employee benefit plans created pursuant to ERISA Section 3(1), 29 U.S.C. § 1002(1). (collectively, the "Participating Plans"). Employers created the Participating Plans to provide health benefits to employee participants and their dependents. The Participating Plans pooled funds and shared insurance risks in several ways, resulting in the MEWA referred to herein as the AEU Plan.

4.    At all relevant times the AEU Plan was transacting insurance in each of the States

2

where the Participating Plans were located and therefore was subject to the insurance laws and regulations in each of those States.  The AEU Plan, however, failed to comply with those laws and regulations, including as respects licensing, reserves, and financial reporting.

5.      The AEU Plan is insolvent and unable to pay an estimated $60 million of health insurance obligations rightfully owed pursuant to the applicable coverage terms.  Claimants include hundreds of doctors, hospitals and other medical providers, as well as thousands of individual employee participants and their dependents, many of whom had their medical care interrupted or terminated as a result of the AEU Plan's failure.

**II.     Plaintiff**

6.      Plaintiff Receivership Management, Inc. ("Independent Fiduciary") is and has been since the filing of the initial complaint in this case a Tennessee corporation with its principal place of business in Tennessee.  As such, it is a citizen of Tennessee.

7.      On November 2, 2017, the Secretary of Labor filed suit against the AEU Plan and various entities in the case *Acosta (now Pizzella) v. AEU Benefits, LLC, et al.*, U.S. District Court for the Northern District of Illinois, Case Number 1:17-cv-07931-JHL-SMF ("DOL Action").

8.      On November 3, 2017, the Court in the DOL Action entered an *ex parte* Temporary Restraining Order ("TRO").  The TRO ordered, in part, that Plaintiff Receivership Management, Inc. be appointed as the Independent Fiduciary of the AEU Plan and Participating Plans.

9.      On December 13, 2017, the Court in the DOL Action entered a Preliminary Injunction ordering, *inter alia*, that the Independent Fiduciary shall serve as the successor Trustee and Plan Administrator of the AEU Plan and Participating Plans, and shall have final and

3

exclusive fiduciary authority over the AEU Plan's administration, management, and assets. Preliminary Injunction ¶ 4.

10.     The Preliminary Injunction gives the Independent Fiduciary the "[a]uthority to identify and pursue claims on behalf of the Participating Plans and the AEU Plan[.]" *Id.* ¶ 14(j). Pursuant to that authority, the Independent Fiduciary brings this action.

**III.    Defendants**

11.     The Independent Fiduciary specifies that, unless otherwise noted, it is directing all allegations in this Second Amended Complaint that refer to "Defendants" or "Each Defendant" to all of the Defendants listed below.

**A.     Defendant Corso**

12.     At the time the initial Complaint was filed, Defendant A.J. Corso & Associates, Inc. ("Corso") was (and still is) an Illinois corporation with its principal place of business in Illinois. As such, at the relevant time, it was a citizen of Illinois.

13.     [Deleted by amendment.]

14.     At all relevant times, Anthony J. Corso, an individual, acted as the agent of Corso.

15.     Corso was paid over $344,000 in commissions for placing Participating Plans into the AEU Plan.

16.     The Participating Plans Corso placed into the AEU Plan also incurred unpaid claims during the relevant time.

17.     Thus, the amount in controversy as respects Corso is in excess of $75,000, exclusive of interest and costs.

4

**B.  Defendant ABA**

18.  At the time the initial Complaint was filed, Defendant American Benefits Association, Inc. ("ABA") was (and still is) a New Jersey corporation with its principal place of business in New Jersey. As such, at the relevant time, it was a citizen of New Jersey.

19.  ABA was paid substantial commissions during the relevant time.

20.  The Participating Plans ABA placed into the AEU Plan incurred unpaid claims exceeding $553,000 during the relevant time.

21.  Thus, the amount in controversy as respects ABA is in excess of $75,000, exclusive of interest and costs.

**C.  Defendant AHCA**

22.  At the time the initial Complaint was filed, America's Health Care Alliance, Inc. ("AHCA") was (and still is) an Ohio corporation with its principal place of business in Ohio. As such, at the relevant time, it was a citizen of Ohio.

23.  AHCA was paid over $696,000 in commissions for placing Participating Plans into the AEU Plan.

24.  The Participating Plans AHCA placed into the AEU Plan also incurred unpaid claims during the relevant time.

25.  Thus, the amount in controversy as respects AHCA is in excess of $75,000, exclusive of interest and costs.

**D.  Defendant Assurance**

26.  At the time the initial Complaint was filed, Defendant Assurance Agency, Ltd. ("Assurance") was (and still is) an Illinois corporation with its principal place of business in Illinois. As such, at the relevant time, it was a citizen of Illinois.

5

27.     Assurance was paid over $187,700 in commissions for placing Participating Plans into the AEU Plan.

28.     The Participating Plans Assurance placed into the AEU Plan also incurred unpaid claims during the relevant time.

29.     Thus, the amount in controversy as respects Assurance is in excess of $75,000, exclusive of interest and costs.

E.     **Defendant BB&G**

30.     At the time the initial Complaint was filed, Defendant Brown, Brown & Gomberg, Ltd. ("BB&G") was (and still is) an Illinois corporation with its principal place of business in Illinois. As such, at the relevant time, it was a citizen of Illinois.

31.     BB&G was paid over $137,400 in commissions for placing Participating Plans into the AEU Plan.

32.     Participating Plans BB&G placed into the AEU Plan incurred unpaid claims exceeding $2,715,000 during the relevant time.

33.     Thus, the amount in controversy as respects BB&G is in excess of $75,000, exclusive of interest and costs.

F.     **Defendant CGI**

34.     At the time the initial Complaint was filed, Commercial Group Intermediaries, Inc. ("CGI") was (and still is) an Illinois corporation with its principal place of business in Illinois. As such, at the relevant time, it was a citizen of Illinois.

35.     CGI was paid over $89,000 in commissions for placing Participating Plans into the AEU Plan.

36.     The Participating Plans CGI placed into the AEU Plan also incurred unpaid

6

claims during the relevant time.

37.     Thus, the amount in controversy as respects CGI is in excess of $75,000,
exclusive of interest and costs.

**G.     Defendant ENA**

38.     At the time the initial Complaint was filed, Defendant Employers Network
Association, Inc. d/b/a Louis Deluca and Affiliates ("ENA") was (and still is) a Delaware
corporation with its principal place of business in New York. As such, at the relevant time, it was
a citizen of Delaware and New York.

39.     ENA was paid substantial commissions during the relevant time.

40.     The Participating Plans ENA placed into the AEU Plan incurred unpaid claims
exceeding $2,800,000 during the relevant time.

41.     Thus, the amount in controversy as respects ENA is in excess of $75,000,
exclusive of interest and costs.

**H.     Defendant IIS**

42.     Defendant Innovative Insurance Solutions, LLC ("IIS") is named as a Defendant
for the first time in this Third Amended Complaint. IIS is a West Virginia limited liability
company. Its members are Jeffrey Mullins ("Mullins") and Kristina Brooks, who are residents
and citizens of West Virginia. As such, at the relevant time, IIS was a citizen of West Virginia.

43.     [Deleted by amendment.]

44.     IIS is a licensed insurance broker in West Virginia. At all relevant times, Mullins
acted as IIS's agent. Mullins is also the principal of Employers Innovative Network, LLC
("EINLLC"), a Professional Employer Organization. EINLLC, a former Defendant in this case
against which these allegations were originally asserted, is an affiliate of IIS and referred its

7

employer clients to IIS for placement in the AEU Plan. Through Mullins and EINLLC, and within the period provided by Federal Rule of Civil Procedure 4(m), IIS received such notice of this action that it will not be prejudiced in defending on the merits, and IIS, through Mullins and EINLLC, knew or should have known that this action would have been brought against it but for a mistake concerning its identity.

45.     IIS was paid over $208,000 in commissions for placing Participating Plans into the AEU Plan.

46.     The Participating Plans IIS placed into the AEU Plan also incurred unpaid claims during the relevant time.

47.     Thus, the amount in controversy as respects IIS is in excess of $75,000, exclusive of interest and costs.

**I.      Defendant Ferrell**

48.     [Deleted by amendment.]

49.     Defendant Ferrell Agency, Inc. ("Ferrell") is a West Virginia corporation with its principal place of business in West Virginia. As such, it is a citizen of West Virginia.

50.     Ferrell was paid over $196,000 in commissions for placing Participating Plans into the AEU Plan.

51.     The Participating Plans Ferrell placed into the AEU Plan also incurred unpaid claims during the relevant time.

52.     Thus, the amount in controversy as respects Ferrell is in excess of $75,000, exclusive of interest and costs.

**J.      Defendant FSC**

53.     At the time the initial Complaint was filed, Defendant Financial Security

8

Consultants, Inc. ("FSC") was (and still is) an Illinois corporation with its principal place of business in Illinois. As such, at the relevant time, it was a citizen of Illinois.

54.    [Deleted by amendment.]

55.    At all relevant times, Patrick Keenan, an individual, acted as the agent of FSC.

56.    FSC was paid over $240,000 in commissions for placing Participating Plans into the AEU Plan.

57.    The Participating Plans FSC placed into the AEU Plan also incurred unpaid claims during the relevant time.

58.    Thus, the amount in controversy as respects FSC is in excess of $75,000, exclusive of interest and costs.

**K.    HFA Defendants**

59.    At the time the initial Complaint was filed, Defendant The HFA Plan ("HFA") was (and still is) an unincorporated entity located in North Carolina. Its sole owner and member was (and still is) Mark Krogulski ("Krogulski"), who at the time the initial complaint was filed was (and still is) a resident and citizen of North Carolina.  As such, for purposes of subject matter jurisdiction, HFA and Krogulski are citizens of North Carolina.  Upon information and belief, at the time of the events alleged herein, Krogulski was a licensed insurance broker in Illinois and/or North Carolina.

60.    At all relevant times, Krogulski acted as the agent of HFA (collectively, the "HFA Defendants").

61.    At all relevant times, Krogulski had a direct financial stake in and was a high-ranking officer of HFA.

62.    The HFA Defendants were paid over $105,000 in commissions for placing

9

Participating Plans into the AEU Plan, with the checks being made out to E1440, LLC, an entity owned and controlled by Krogulski.

63.     The Participating Plans the HFA Defendants placed into the AEU Plan also incurred unpaid claims during the relevant time.

64.     Thus, the amount in controversy as respects each of the HFA Defendants is in excess of $75,000, exclusive of interest and costs.

**L.     Defendant HRB**

65.     At the time the initial Complaint was filed, Defendant Health Care Reform Benefit Solutions, Inc. dba HRB Solutions, Inc. ("HRB") was (and still is) an Illinois corporation with its principal place of business in Illinois. As such, at the relevant time, it was a citizen of Illinois.

66.     [Deleted by amendment.]

67.     At all relevant times, Catherine Sbarra, an individual, acted as the agent of HRB.

68.     HRB was paid over $19,000 in commissions for placing Participating Plans into the AEU Plan.

69.     The Participating Plans HRB placed into the AEU Plan incurred unpaid claims exceeding $83,000 during the relevant time.

70.     Thus, the amount in controversy as respects HRB is in excess of $75,000, exclusive of interest and costs.

**M.     Defendant HUB**

71.     At the time the initial Complaint was filed, HUB International Midwest Limited ("HUB") was (and still is) an Illinois corporation with its principal place of business in Illinois. As such, at the relevant time, it was a citizen of Illinois.

10

72.    HUB was paid over $394,000 in commissions for placing Participating Plans into the AEU Plan.

73.    The Participating Plans HUB placed into the AEU Plan incurred unpaid claims exceeding $6,976,000 during the relevant time.

74.    Thus, the amount in controversy as respects HUB is in excess of $75,000, exclusive of interest and costs.

**N.    Defendant MBA**

75.    At the time the initial Complaint was filed, Defendant M. Brown & Associates, Ltd. ("MBA") was (and still is) an Illinois corporation with its principal place of business in Illinois. As such, at the relevant time, it was a citizen of Illinois.

76.    [Deleted by amendment.]

77.    At all relevant times, Mark Brown, an individual, acted as the agent of MBA.

78.    MBA was paid $108,210 in commissions for placing Participating Plans into the AEU Plan.

79.    The Participating Plans MBA placed into the AEU Plan also incurred unpaid claims during the relevant time.

80.    Thus, the amount in controversy as respects MBA is in excess of $75,000, exclusive of interest and costs.

**O.    Defendant MSG**

81.    At the time the initial Complaint was filed, Madison Street Group, LLC ("MSG") was (and still is) a Georgia limited liability company. Its two members were (and still are) Daron Arline and Samuel Fink, who were (and still are) residents and citizens of Georgia. As such, at the relevant time, MSG was a citizen of Georgia.

11

82.     MSG was paid substantial commissions during the relevant time.

83.     The Participating Plans MSG placed into the AEU Plan incurred unpaid claims exceeding $728,000 during the relevant time.

84.     Thus, the amount in controversy as respects MSG is in excess of $75,000, exclusive of interest and costs.

**P.     Defendant MGU**

85.     At the time the initial Complaint was filed, MGU of the West Insurance Services, Inc. d/b/a OneSource StopLoss Insurance ("MGU") was (and still is) a California corporation with its principal place of business in California. As such, at the relevant time, it was a citizen of California.

86.     MGU was paid substantial commissions during the relevant time.

87.     The Participating Plans MGU placed into the AEU Plan incurred unpaid claims exceeding $279,000 during the relevant time.

88.     Thus, the amount in controversy as respects MGU is in excess of $75,000, exclusive of interest and costs.

**Q.     Defendant Trendsetters**

89.     At the time the initial Complaint was filed, Trendsetters & Associates, Inc. ("Trendsetters") was (and still is) an Illinois corporation with its principal place of business in Illinois. As such, at the relevant time, it was a citizen of Illinois.

90.     Trendsetters was paid over $136,000 in commissions for placing Participating Plans into the AEU Plan.

91.     The Participating Plans Trendsetters placed into the AEU Plan also incurred unpaid claims during the relevant time.

12

92.   Thus, the amount in controversy as respects Trendsetters is in excess of $75,000, exclusive of interest and costs.

**R.   Defendant Williams-Manny**

93.   At the time the initial Complaint was filed, Defendant Williams-Manny Inc. dba Gallagher Williams-Manny Insurance Group ("Williams-Manny") was (and still is) an Illinois corporation with its principal place of business in Illinois. As such, at the relevant time, it was a citizen of Illinois.

94.   Williams-Manny was paid over $132,000 in commissions for placing Participating Plans into the AEU Plan.

95.   The Participating Plans Williams-Manny placed into the AEU Plan also incurred unpaid claims during the relevant time.

96.   Thus, the amount in controversy as respects Williams-Manny is in excess of $75,000, exclusive of interest and costs.

**S.   [Deleted by amendment.]**

97.   [Deleted by amendment.]

**IV.   Non-Party AEU Companies**

98.   Non-party AEU Holdings, LLC ("AEUH") at all relevant times had offices in Dallas, Texas and New York, New York.  Non-party AEU Benefits, LLC ("AEUB") is a wholly owned subsidiary of and shared offices and employees with AEUH.

99.   The names AEU Holdings, AEUH, AEU Benefits, and AEUB are used interchangeably in correspondence and on various AEU Plan-related documents, with the shortened form "AEU" also being used frequently in such documents and by certain Defendants as well as officers and employees of AEUH and AEUB.

100. AEUH and AEUB provided sales, marketing, underwriting, rating, claims

handling, program administration, and advisory services to the AEU Plan and its Participating

Plans.

101. At all relevant times, AEUH and AEUB were agents of the AEU Plan, and were

fiduciaries of the AEU Plan and its Participating Plans as that term is defined in regulations

promulgated by the DOL. Each Defendant knew or should have known that AEUH and AEUB

were agents of the AEU Plan and ERISA fiduciaries of the AEU Plan and its Participating Plans.

## V.    Non-Party Black Wolf Consulting

102. Non-party Black Wolf Consulting, Inc. ("BWC") is an Illinois corporation that at

all relevant times had its sole office in Frankfort, and later Monee, Illinois.

103. BWC served as an "aggregator" for the AEU Plan. Aggregators such as BWC

had contractual relationships with AEUB for the benefit of the AEU Plan. Aggregators recruited

brokers such as Defendants to work for them to market and sell the AEU Plan.

104. BWC was by far the highest-volume aggregator for the AEU Plan. As of mid-

2017, 76 percent of the Participating Plans in the AEU Plan had been enrolled by BWC.

105. At all relevant times, BWC was an agent of the AEU Plan, and was a fiduciary of

the AEU Plan and its Participating Plans as that term is defined in regulations promulgated by

the DOL. Each Defendant knew or should have known that BWC was an agent of the AEU Plan

and an ERISA fiduciary of the AEU Plan and its Participating Plans.

### JURISDICTION AND VENUE

106. This Court has subject matter jurisdiction under 28 U.S.C. § 1332. At the time of

the filing of the initial Complaint, the First Amended Complaint, and the Second Amended

Complaint, Plaintiff was a citizen of Tennessee and all defendants named in those complaints, including defendants that were subsequently voluntarily dismissed, were citizens of states other than Tennessee. All Defendants named in this Third Amended Complaint, except Defendant IIS, were defendants in one or more of the prior complaints, and none is or has been a citizen of Tennessee. Defendant IIS is the only new Defendant named in this Third Amended Complaint and is not a citizen of Tennessee. Therefore, there is and has been since the filing of the initial Complaint diversity of citizenship among the parties. In addition, the amount in controversy as to each Defendant in this Third Amended Complaint, *i.e.*, the damages the Independent Fiduciary seeks from each Defendant, is in excess of $75,000, exclusive of interest and costs.

107.    Under 735 ILCS 5-209(b), the Court has personal jurisdiction over the following Defendants that, at the time the initial Complaint was filed, were (and still are) resident and doing business in Illinois: Corso, Assurance, BB&G, CGI, FSC, HRB, HUB, MBA, Trendsetters, and Williams-Manny.

108.    Under 735 ILCS 5-209(a), the Court has personal jurisdiction over out-of-state Defendants ABA, AHCA, ENA, IIS, Ferrell, the HFA Defendants, MSG, and MGU, because each had significant contacts with the State of Illinois from which Plaintiff's claims arise in that each Defendant:

      a.    Had an oral insurance producer agreement and/or an implied-in-fact contract with Illinois-based BWC, an agent and fiduciary of the AEU Plan, to market, recruit, enroll, and renew Participating Plans in the AEU Plan;

      b.    Transacted business in Illinois by, among other things, instructing Participating Plans to send their premium-equivalent contributions to BWC's account at Bank of Pontiac in Illinois, from which each Defendant was paid periodic fees and/or commissions for services provided to the AEU Plan and Participating Plans; and

      c.    Received and sent numerous communications directly to and from persons

in Illinois, including employees of BWC who were based in Illinois,
related to the AEU Plan and the Participating Plans.

109.    Venue is appropriate in the Northern District of Illinois under 28 U.S.C.

§ 1391(b)(2) because a substantial part of the events, acts, transactions, and occurrences giving

rise to the Independent Fiduciary's claims occurred within the Northern District of Illinois.

### FACTS COMMON TO ALL COUNTS

**I.    General Overview.**

110.    Given the increasing cost of health insurance, small and medium-size employers

frequently seek more affordable group health care benefits for their employees. One such option

is self-funded health benefit plans with stop-loss insurance that covers claims above a certain

dollar amount. Using such plans, employers seek to provide affordable group health benefits for

their employees. If the requisite steps are followed, these plans may not be subject to state

regulation.

111.    Employer-sponsored group health benefit plans are generally governed by

ERISA. In situations where multiple employers combine their contributions for an insurance

program or otherwise share insurance risks, such arrangements are MEWAs. MEWAs are

subject to state insurance regulation by reason of 29 U.S.C. § 1144(b)(6).

112.    Compliance with state insurance laws and regulations can be time consuming and

costly. For example, state laws and regulations usually have extensive consumer-protection

provisions and require minimum reserves that can be in the hundreds of thousands of dollars. In

addition, state laws generally require regulated entities to obtain annual independent audits and

are subject to periodic regulatory examinations addressing financial and market-conduct issues

for which the regulated entity must pay.

113.    Creative attorneys and promoters sometimes attempt to structure employer-

16

sponsored ERISA health benefit plans to avoid state regulation.  Such plans are intended to

function as follows:

> a.    the employer creates and sponsors an employee benefit plan under ERISA to provide health benefits solely to its own employee-participants and their dependents;

> b.    the employer and employee-participants make periodic monetary contributions to the plan (sometimes known as "premium equivalents");

> c.    the plan reimburses medical claims of the employee-participants and their dependents up to a certain dollar amount ("attachment point");

> d.    the plan obtains stop-loss insurance to cover large claims over the attachment point;

> e.    the plan is considered "self-funded" (*i.e.*, not insurance subject to regulation) by virtue of the above and the fact that the employer remains obligated to pay claims incurred in excess of the premium equivalents and proceeds from the stop-loss insurance; and

> f.    the plan does not accept contributions from nor is it obligated to reimburse medical claims of any other employer-sponsored health benefit plan or its employee-participants and dependents, and there is no risk sharing among multiple (*i.e.*, two or more) plans.

114.    The AEU Plan was allegedly intended to avoid being a MEWA subject to state

regulation.  In practice, however, as was or should have been obvious to each Defendant, the

Participating Plans each Defendant placed into the AEU Plan shared risks in several ways,

including by the payment of each other's claims from commingled funds, such that, in practice,

they did not avoid being a MEWA.

115.    By their acts and omissions described below, each Defendant failed to fulfill its

contractual and common law duties to the AEU Plan and Participating Plans.  In addition, the

Defendants based in Illinois, West Virginia, and North Carolina violated statutory provisions

relating to procuring, binding, placing, and renewing health insurance coverage.

## II.     AEU Plan Background.

116.     Prior to 2015, a company named ALL Insurance Solutions Management, LLC ("AISM"), sponsored, managed, and administered a self-funded health benefits program for small and medium-size employers, Professional Employer Organizations, ("PEOs") and other similar entities ("AISM Program").

117.     In July 2015, AISM engaged AEUH through its wholly owned subsidiary, AEUB, to manage the AISM Program.

118.     AEUH and AEUB managed the AISM Program from July 2015 until late-April 2016.

119.     On April 26, 2016, AEUH and AISM entered into an Asset Purchase Agreement whereby AEUH acquired all of the assets of AISM, including the AISM Program.  AEUH took over the sales, marketing, underwriting, rating, claims handling, and program advisory functions of the AISM Program, which became the AEU Plan.  From the time of that purchase, AEUH and AEUB sponsored, managed, and administered the AEU Plan as agents and fiduciaries of the AEU Plan.

## III.     Defendants' Involvement with the AEU Plan and Participating Plans.

120.     Defendants were brokers for the AEU Plan who worked with and for BWC in its capacity as aggregator.  The AEU Plan, through AEUB and BWC as its agents and authorized representatives, retained Defendants, *inter alia*, to market, recruit, enroll, and renew the enrollment of Participating Plans.  The Participating Plans, through their employer-sponsors as their agents and authorized representatives, retained Defendants, *inter alia*, to locate and identify an appropriate health plan and make sure the plan was properly in place.  Once the AEU Plan and the Participating Plans retained them, Defendants had an obligation to:

    a.    know and understand how the AEU Plan worked;

    b.    instruct potential and existing Participating Plans about the AEU Plan's requirements;

    c.    ensure that the Participating Plans received, completed, and submitted required documentation;

    d.    ensure that the AEU Plan was marketed and sold in accordance with its underwriting standards;

    e.    ensure that the AEU Plan was financially sound and appropriate for each Participating Plan and advise if it was not; and

    f.    ensure that contributions were handled properly and segregated to avoid commingling, risk sharing, and the collective payment of claims.

**A.    Defendants' Contracts with the AEU Plan.**

121.    Each Defendant entered into an oral and/or implied-in-fact contract with the AEU Plan to serve as an insurance producer and broker for the AEU Plan. The AEU Plan contracted with each Defendant through the AEU Plan's agents and authorized representatives, AEUB as plan administrator and BWC as principal aggregator.

122.    Alternatively, each Defendant entered into an oral and/or implied-in-fact contract with AEUB and BWC to serve as an insurance producer and broker under which the AEU Plan was an intended, direct third-party beneficiary. The primary purpose and intent of such contracts was for each Defendant to serve as a producer and broker for the AEU Plan and influence the Participating Plans to enroll in the AEU Plan as their health benefit plan. Thus, the contracts between Defendants and AEUB and BWC were intended to directly benefit the AEU Plan.

123.    [Deleted by amendment.]

124.    In accordance with these agreements, each Defendant marketed the AEU Plan and solicited sponsoring employers and their Participating Plans to use the AEU Plan as their health benefit plan. Each Defendant also enrolled and in some cases renewed enrollment of

19

Participating Plans sponsored by such employers in the AEU Plan.

125.    Each Defendant's contractual duties to the AEU Plan included understanding how the AEU Plan was structured and its legal requirements, delivering required documents to its Participating Plan clients for signature, ensuring that required documentation was completed and submitted to the AEU Plan before accepting contributions from Participating Plans, and marketing the AEU Plan according to the Plan's underwriting standards.

126.    In exchange for each Defendant's successful enrollment and/or renewal of a Participating Plan, each Defendant was paid significant fees and/or commissions. Commissions were generally paid on a monthly basis from BWC's Bank of Pontiac account from commingled contributions each Defendant's Participating Plan clients transferred to that account at the direction and with the knowledge and approval of each Defendant.

127.    The AEU Plan received consideration by obtaining new Participating Plans and the renewed participation of existing Participating Plans.

**B.    Defendants' Contracts with the Participating Plans.**

128.    Each Defendant entered into an oral and/or implied-in-fact contract with each of its Participating Plan clients to serve as an insurance broker for those Participating Plans. Each Participating Plan contracted with its Defendant broker through the Participating Plan's employer-sponsor as agent and authorized representative of the Participating Plan.

129.    Alternatively, each Defendant entered into an oral and/or implied-in-fact contract with the employer-sponsor of each Participating Plan it placed in the AEU Plan, to serve as an insurance broker. Each Participating Plan was an intended, direct third-party beneficiary of such contracts. The primary purpose and intent of such contracts was to identify an appropriate health benefit program for each Participating Plan, and to procure, enroll, and renew enrollment into

such program for the benefit of each Participating Plan. Thus, the contracts between Defendants and the employer-sponsors were intended to directly benefit the Participating Plans.

130.    [Deleted by amendment.]

131.    In accordance with these agreements, each Defendant undertook to identify and procure an appropriate health benefit program for its Participating Plan clients, and enrolled and in some cases renewed enrollment of its Participating Plan clients into the AEU Plan.

132.    Each Defendant's contractual duties to its Participating Plan clients included understanding how the AEU Plan was structured and its legal requirements, instructing its Participating Plan clients concerning that structure and those legal requirements, ensuring that the AEU Plan was financially sound and appropriate for each Participating Plan client, and ensuring that client funds were handled properly.

133.    In exchange for each Defendant's successful procurement, enrollment, and/or renewal of a Participating Plan into the AEU Plan, each Defendant was paid significant fees and/or commissions.

134.    The consideration to each Participating Plan was the identification of and enrollment or renewal in the health benefit program.

**C.    Defendants' Duty of Care.**

135.    Each Defendant acted in a dual capacity in undertaking its activities related to the AEU Plan and the Participating Plans. A broker-client relationship existed between each Defendant and the AEU Plan, on the one hand, and each Defendant and the Participating Plans it placed with the AEU Plan, on the other hand.

136.    Each Defendant owed a duty of reasonable care to the AEU Plan and the Participating Plans it placed in the AEU Plan, requiring it to exercise good faith, reasonable skill,

and ordinary diligence in its activities relating to the AEU Plan and Participating Plans.

137.     Each Defendant had a duty to inform the AEU Plan and the Participating Plans it placed in the AEU Plan of all material facts within its knowledge that could affect the transaction or the subject matter of the broker-client relationship.

138.     Each Defendant's duty of care to the AEU Plan and the Participating Plans it placed with the AEU Plan included obtaining and exercising a reasonable level of competence concerning the complex product being marketed as the AEU Plan, its structural requirements, and the legal environment in which is operated.

139.     Each Defendant undertook to enroll and renew enrollment of Participating Plans in the AEU Plan, and therefore owed the AEU Plan (a) a duty of reasonable diligence in making sure required documentation was completed and submitted to the AEU Plan before accepting contributions from Participating Plans, and (b) a duty of reasonable care in marketing the AEU Plan accurately and correctly.

140.     Each Defendant undertook to procure appropriate health coverage for its Participating Plan clients, and therefore owed a duty to use reasonable diligence in attempting to place the requested coverage and to inform the client promptly if unable to do so.

141.     Each Defendant had an obligation to investigate the financial soundness of the AEU Plan and to refrain from placing Participating Plans in the AEU Plan if it knew, or in the exercise of reasonable diligence should have known, that the AEU Plan was insolvent. Each Defendant also had a duty to advise the client or take other action upon gaining information that a client's coverage under the AEU Plan may be threatened due to its impaired financial condition.

**IV.     Defendants' Specific Breaches of Duties.**

142.    Each Defendant breached its duties to the AEU Plan and the Participating Plans by the improper acts and omissions alleged herein.

**A.    Duties Regarding the AEU Plan Structure and Requirements.**

143.    The sales and marketing of the AEU Plan was centralized at AEUB so that AEUB could control all marketing material to ensure that aggregators such as BWC and brokers such as Defendants had accurate information to provide to Participating Plans. AEUB provided marketing materials to BWC, which in turn provided them to Defendants.

144.    Each Defendant had a duty to be familiar with the documents the Participating Plans were required to complete. Each Defendant owed more than a duty to simply fill out application forms; Defendants were obligated to take all reasonable steps necessary to ensure that appropriate insurance was properly in place. This required Defendants to give their clients necessary information, and to work with their respective clients to get completed and executed documents so the clients would meet the requirements of the AEU Plan and avoid being subject to state regulation.

**1.    VEBA and AEU Plan Documents.**

145.    Under the AEU Plan, with the guidance of Defendants, each employer was to establish an employee welfare benefit plan governed by ERISA to provide health benefits solely for its own employees and, if any, their respective spouses and dependents, thereby establishing its own employee welfare benefit plan, referred to herein as a Participating Plan.

146.    Under the AEU Plan, with the guidance of Defendants, each employer was to establish a trust for its specific Participating Plan. The employer was to be the sole grantor of the trust which was to be formed under the laws of the District of Columbia to serve as the self-funding mechanism for the health benefits provided by the Participating Plan to participating

23

employees. Each trust was required to obtain an employer identification number ("EIN") and file an annual Form 5500 with the DOL.

147.    Each trust was supposed to become a tax-exempt organization known as a "voluntary employees' beneficiary association" ("VEBA") under Section 501(c)(9) of the Internal Revenue Code ("IRC"), 26 U.S.C. § 501(c)(9).

148.    Until April or May 2017, the marketing materials provided to Defendants included the documents Defendants were to have each Participating Plan complete. After April or May 2017, the documents were put online and Defendants were instructed to have their Participating Plans complete the documents online.

149.    The documents that each Defendant was supposed to have its Participating Plan clients complete and execute to meet AEU Plan requirements were:

        a.     VEBA Trust Agreement

        b.     AEUB Program Advisory Services Agreement

        c.     Collection Agreement with Aggregator

        d.     Certificate to be issued by Bermuda trust

        e.     Plan Administrator Services Agreement

150.    Defendants knew that each Participating Plan was to set up its own VEBA trust, and knew of the requirements in the VEBA Trust Agreement and other AEU Plan documents because AEUB, through BWC, provided those documents to them.

151.    Each Defendant had a duty but failed to ensure that each Participating Plan client set up its own VEBA trust and execute the VEBA Trust Agreement and all required documentation associated therewith.

152.    Because of each Defendant's improper actions and inactions and breaches of duty,

24

many Participating Plans never signed a VEBA Trust Agreement or other required documentation fundamental to the arrangement. As a result, the requirements in the VEBA Trust Agreement and other AEU Plan documents frequently were not met.

153.    To qualify as a VEBA trust, each trust was also required file a Form 1024 notice with the IRS and receive a determination from the IRS that the entity is qualified under IRC § 501(c)(9).

154.    None of the purported VEBA trusts filed a Form 1024 notice with the IRS, and therefore none received any determination from the IRS that the entity was qualified under IRC § 501(c)(9). Thus, each Defendant failed to ensure its Participating Plan clients' trusts were properly qualified as VEBA trusts.

155.    Defendants also knew or should have known that the AEU Plan did not have an accurate or up-to-date Plan Document/Summary Plan Description ("PD/SPD"), as required by ERISA. Defendants knew that each VEBA trust was supposed to have its own PD/SPD. Each Defendant knew that the Participating Plans it placed in the AEU Plan were never provided a proper PD/SPD. Defendants either provided an old, outdated PD/SPD, or no plan documents at all. Accordingly, each Defendant knew or should have known that the AEU Plan was not in compliance with ERISA and should not be offered or sold to clients.

156.    The AEU Plan, as stated in the documents provided to Defendants, also required an annual independent audit of the Plan. Each Defendant failed to confirm that any audit took place, much less annually, nor did any Defendant request or review any audit before procuring or renewing the AEU Plan for each of its Participating Plan clients.

157.    Each Defendant also knew or should have known from the VEBA Trust Agreement that the VEBA trustees (typically the employers) were required to purchase a

25

fiduciary bond. Each Defendant failed to ensure that such trustees obtained a bond. Many employers did not even know that as trustee they were required to obtain a bond.

158.    Each Defendant should not have allowed its Participating Plan clients to enroll in the AEU Plan because each Defendant knew or should have known that the Participating Plans did not meet the requirements of the AEU Plan, ERISA, the IRC, or state insurance laws and regulations. Each Defendant should also have advised the AEU Plan that non-compliant Participating Plans were joining the AEU Plan.

159.    Each Defendant induced its Participating Plan clients to rely on that Defendant's procurement of insurance through the AEU Plan. The Participating Plans reasonably, but due to each Defendant's breaches of duty, incorrectly, assumed they were insured against the risks that resulted in their losses alleged herein and that the AEU Plan was adequately funded.

**2.      Stop-Loss Coverage with the Bermuda Trusts.**

160.    Each Defendant marketed the AEU Plan as including the purchase of stop-loss insurance via a Bermuda trust.

161.    Under the AEU Plan's intended structure, each Participating Plan's VEBA trust was to be a co-beneficiary with other Participating Plans in one of two Bermuda trusts ("BPTs"). Each BPT in turn was to purchase stop-loss coverage with the BPT listed as the named insured for the benefit of each of its beneficiary Participating Plans. This arrangement was to give each Participating Plan's trust the right to receive payments from claims made against the stop-loss policy for health care costs of the Participating Plan's covered employees. A portion of the premium equivalent contributions collected from the Participating Plans was used to fund each BPT's purchase of stop-loss insurance. Each BPT was to provide a certificate to each of its beneficiary Participating Plans evidencing such obligation.

26

162.     Each Defendant failed to ensure that the BPTs issued certificates to the Participating Plans it placed in the AEU Plan. No certificates were issued after January 2016.

163.     Each Defendant owed the Participating Plans a duty but failed to ensure that all required steps related to joining a BPT were completed, so that the Participating Plans would comply with applicable law and have stop-loss insurance coverage enforceable against one of the BPTs.

### 3.     Conclusion as to AEU Plan Structure and Requirements.

164.     As of July 2017, one BPT had 683 Participating Plans associated with it of which only 128 had signed trust documents, 574 had EINs issued to Participating Plan trusts, none were registered with the District of Columbia, none had the required ERISA bond, and none had filed a Form 1024 or Form 5500.

165.     As of July 2017, a second BPT had 220 Participating Plans associated with it of which 14 had signed trust documents, none had EINs, none were registered with the District of Columbia, none had the required ERISA bond, and none had filed a Form 1024 or Form 5500.

166.     Defendants should not have marketed the AEU Plan to the Participating Plans, should not have procured the AEU Plan on behalf of the Participating Plans, and should not have permitted the Participating Plans to enroll or renew enrollment in the AEU Plan, unless and until the AEU Plan requirements and all legal and regulatory requirements as alleged above were properly met.

167.     Because of Defendants' improper actions and inactions and breaches of duty, the AEU Plan was not operated in accordance with its intended structure, which resulted in the improper commingling of funds, risk sharing among the individual Participating Plans, the application and violation of state insurance laws and regulations, and ultimately the AEU Plan's

27

insolvency.

**B.    Failure to Properly Handle and Segregate Fiduciary Funds.**

168.    Defendants knew or should have known that to become a VEBA under Section 501(c)(9) of the IRC, each Participating Plan's assets must be held in trust for the "members" of the trust under ERISA, *i.e.*, there must be separate accounts for each VEBA.

169.    The VEBA Trust Agreement required that "[a]ll Sponsor contributions and all Employee Participants' contributions shall be deposited in the bank accounts for the Trust, which may be an escrow account maintained by the Plan Administrator." VEBA Trust Agreement Art. II § 4 & Art. IV § 2(a).

170.    Thus, a separate VEBA trust with a separate bank account, or at least separate accounting, was to be set up for each Participating Plan's contributions, and contributions from that Participating Plan were to go to the separate account. Commingling of funds from different Participating Plans without separate accounting was prohibited as such pooling would result in the sharing of risk and the creation of a MEWA subject to state regulation.

171.    Based on the VEBA Trust Agreement and other AEU Plan documents, each Defendant knew or should have known that a separate bank account, or at least separate accounting, was to be set up for each Participating Plan. Each Defendant, therefore, should have instructed the Participating Plans it placed in the AEU Plan concerning these requirements, to ensure that funds of the Participating Plans it placed in the AEU Plan were segregated and that a separate bank account or at least separate accounting was set up for each such Participating Plan.

172.    There was no separate accounting or bank account for any of the Participating Plans Defendants placed in the AEU Plan. Instead, as Defendants knew or should have known,

28

contributions from those Participating Plans were commingled and pooled with contributions from other Participating Plans.

173. The Participating Plan contributions were first commingled and pooled in BWC's Bank of Pontiac account. Each Defendant knew such commingling occurred because each instructed the Participating Plans it placed in the AEU Plan to send their contributions to that account, from which each Defendant's commissions were also paid.

174. After BWC paid its and each Defendant's commissions, each Defendant knew or should have known that the remaining contribution amounts were (a) commingled and pooled in designated administrative representative bank accounts from which fees were withdrawn for AEUH and AEUB, the designated administrative representative, and the Third Party Administrator ("TPA"); (b) the remaining contributions were then commingled and pooled in the BPTs, where the BPTs took their fees and paid stop loss insurance premiums from the pooled funds; and (c) the remaining commingled contributions were then transferred back to the designated administrative representative to send to the TPAs to pay claims.

175. Neither Defendants nor anyone else provided accountings of these funds to the AEU Plan or the Participating Plans. Further, each Defendant failed to provide the AEU Plan or the Participating Plans it placed in the AEU Plan material information about all of the fees and commissions being extracted.

176. Had each Defendant properly instructed its Participating Plan clients and ensured there were separate accounts or accounting for each of them, the collective payment of claims would have been avoided. Instead, Defendants knew or should have known that claims were not paid solely by and for each separate Participating Plan, but were paid from commingled and pooled funds based on which medical providers or participants were complaining the loudest

29

about unpaid claims, including threatening or filing litigation.

177.    The commingling resulted in some or all Participating Plans paying the commissions, fees, and claims incurred by other Participating Plans. Defendants knew or should have known that this and other risk sharing in the AEU Plan as operated resulted in the AEU Plan becoming a MEWA that was subject to state regulation, including licensing requirements.

178.    Because the required licenses to transact insurance were never obtained, each Defendant breached its duties to its Participating Plan clients by procuring coverage from an unlicensed and therefore unauthorized insurer.

**C.      Defendants Improperly Marketed the AEU Plan.**

179.    Each Defendant held itself out as having experience or expertise in insurance and benefit plan products such as the AEU Plan.

180.    Each Defendant had a duty to accurately represent the nature, extent, and scope of the coverage being offered.

181.    AEUB, through BWC, provided a "VEBA Tool Kit Presentation" to Defendants to provide to employers describing the VEBA product, how premium equivalents are collected, how claims are paid, and the benefits versus fully insured plans. The Tool Kit included a PowerPoint presentation stating that the Plan was a "Self-Funded Health Benefits" plan, that "Each employer client has their own self funded plan to deliver medical and prescription drug benefits to employees," and that the Plan was "Not insurance" but was "A self funded trust program with secure stop loss in Bermuda."

182.    Each Defendant had a duty to market the AEU Plan accurately and correctly and to make sure its clients understood that the individual Participating Plans were self-funded such that additional contributions would be required if the monthly premium-equivalent contributions

and stop-loss proceeds were insufficient to meet all claims and other obligations.

183.    Each Defendant failed to properly instruct its clients and to make sure its clients understood that the AEU Plan was a self-funded plan and/or the consequences thereof.

184.    Each Defendant also failed to ensure that the AEU Plan monitored the claim costs of the Participating Plans it placed in the AEU Plan.

185.    Each Defendant knew or should have known that none of its Participating Plan clients was ever assessed any amount beyond the monthly premium-equivalent contributions it made. No Participating Plan was ever informed it needed to make additional contributions to pay excess claims for its purportedly self-funded plan.

186.    Because of each Defendant's improper actions and inactions, the Participating Plans were not self-funded and therefore the Participating Plans did not obtain the product marketed to them, and the AEU Plan was insufficiently funded to meet the claims obligations of all the Participating Plans.

### D.    Defendants Marketed and Sold the AEU Plan in Violation of Required Underwriting Standards.

187.    Defendants knew or should have known of the "Underwriting Guidelines" for the AEU Plan, which were set forth in the in the marketing materials provided to them by AEUB through BWC. Those guidelines stated as follows regarding minimum participation by employer groups: "Minimum of 5 active full time employees needed to provide a proposal." The guidelines also state that participation requirements are based on the size, *i.e.*, number of full-time employees, in the group. For groups in which employees contribute toward the cost of the coverage, the document requires 100 percent participation for groups of five lives, "100 less one" percent for groups of six to nine lives, and 75 percent participation for groups of 10 and over.

188.    Defendants' actions and inactions led to the Participating Plans not being properly

31

underwritten. Instead of marketing and selling the AEU Plan only to employers with a minimum of five active full-time employees, as was required, each Defendant recruited and enrolled Participating Plans with less than five active full-time employees, including one-person "groups." This violated the underwriting requirements of the AEU Plan and the stop-loss carriers.

189.    Marketing and selling the AEU Plan to inherently risky small and one-person "groups," along with (a) the failure to separately account for each Participating Plan's contributions and claims, (b) the failure to assess Participating Plans for incurred claims in excess of contributions and stop-loss proceeds, and (c) the collection of undisclosed and excessive fees and commissions, led the AEU Plan to have insufficient funds to pay the claims incurred by all Participating Plans.

190.    Each Defendant also knew or should have known that some of the purported VEBA trusts each placed in the AEU Plan were not organizations of associated employees, but instead were associations of various different employer groups. Defendants knew that each employer needed to set up its own VEBA trust and that associations of employer groups could not set up a single VEBA trust. Even so, at least Corso, ABA, AHCA, BB&G, CGI, ENA, IIS, HUB, MSG, and MGU placed associations in the AEU Plan which were, in fact, set up as single purported VEBA trusts. Defendants knew or should have known that each association of employer groups that had been set up as a single purported VEBA trust was actually a MEWA subject to state insurance laws and regulations.

E.    Conclusion.

191.    Because the AEU Plan was not in compliance with its structural requirements, including those disclosed in the AEU Plan documents, Defendants should not have allowed their

32

respective clients to participate or remain in the AEU Plan and incur claims, and should have

directed their respective clients to cease making contributions to the AEU Plan and to participate

in an appropriate program that complied with applicable program requirements, laws, and

regulations.

192.     Despite their knowledge and because of their improper actions and inactions, each

Defendant allowed its Participating Plan clients to participate in the AEU Plan under

circumstances which each Defendant knew or should have known would violate ERISA, the

IRC, and state insurance laws and regulations.

193.     While failing to ensure that all required steps were taken to protect the AEU Plan

and the Participating Plans, Defendants did not hesitate to ensure that their own commissions

were paid, which were taken directly from monthly contributions immediately upon their receipt

by BWC and paid to Defendants.

194.     Based on information currently available to the Independent Fiduciary, in excess

of $60 million of claims remains unpaid, a significant percentage of which was incurred by

Defendants' Participating Plan clients.

195.     During the relevant time, employers and participants made numerous

communications to Defendants, AEUH and AEUB, and the TPAs that claims were not being

paid.

196.     The failure to pay claims was so bad that complaints were being made to the

DOL, state insurance regulators, and state attorneys general.

197.     Each Defendant breached its duty to advise its Participating Plan clients or take

other appropriate action, including refraining from procuring, enrolling, or renewing enrollment

in the AEU Plan, because through reasonable diligence each Defendant should have ascertained

that the AEU Plan was unable to meet its obligations as they became due and was therefore
insolvent.

## COUNTS

### Count I:  Breach of Contract by Each Defendant

198.    Independent Fiduciary realleges and incorporates the allegations set forth above.

199.    Each Defendant contracted with the AEU Plan through AEUB and BWC acting as
agents and authorized representatives of the AEU Plan, to serve as an insurance producer and
broker for the AEU Plan.  Alternatively, each Defendant contracted with AEUB and BWC for
the benefit of the AEU Plan.

200.    Each Defendant contracted with its Participating Plan clients through each
Participating Plan's employer-sponsor acting as agent and authorized representative of the
Participating Plan, to serve as an insurance broker for the Participating Plan.  Alternatively, each
Defendant contracted with each Participating Plan client's employer-sponsor for the benefit of
the Participating Plan client.

201.    Each Defendant breached its contractual duties owed to the AEU Plan and its
Participating Plan clients by its improper actions and inactions alleged above.

202.    As a direct and proximate result of each Defendant's breaches of duty, (a) the
AEU Plan was caused to incur claims obligations and related expenses, and to incur and pay
improper and unnecessary fees and commissions to Defendants; (b) the Participating Plans each
Defendant placed in the AEU Plan were caused to make contributions, incur claims, and
participate in a plan that was not in compliance with its own requirements, ERISA, the IRC, and
state insurance laws and regulations, (c) those Participating Plans were caused to pay
unnecessary, undisclosed, and excessive fees and commissions, (d) some or all of those

34

Participating Plans were caused to pay fees, commissions, and claims incurred by other Participating Plans, and (e) the AEU Plan and those Participating Plans have insufficient funds to pay participant claims.

203.    Each Defendant, therefore, is liable for (a) all of the unpaid claims of each Participating Plan it placed with the AEU Plan, and (b) the amount of the fees and commissions it was paid relating to such Participating Plans.

### Count II: Negligence by Each Defendant

204.    Independent Fiduciary realleges and incorporates the allegations set forth above and Count III below.

205.    Each Defendant owed duties of reasonable care, good faith, and ordinary diligence, as alleged above, to the AEU Plan and to the Participating Plans it placed in the AEU Plan.

206.    Each Defendant breached those duties by its improper actions and inactions alleged above.

207.    As a direct and proximate result of each Defendant's breaches of duty, (a) the AEU Plan was caused to incur claims obligations and related expenses, and to incur and pay improper and unnecessary fees and commissions to Defendants; (b) the Participating Plans each Defendant placed in the AEU Plan were caused to make contributions, incur claims, and participate in a plan that was not in compliance with its own requirements, ERISA, the IRC, and state insurance laws and regulations, (c) those Participating Plans were caused to pay unnecessary, undisclosed, and excessive fees and commissions, (d) some or all of those Participating Plans were caused to pay fees, commissions, and claims incurred by other Participating Plans, and (e) the AEU Plan and those Participating Plans have insufficient funds to pay participant claims.

35

208.    Each Defendant, therefore, is liable for (a) all of the unpaid claims of each

Participating Plan it placed with the AEU Plan, and (b) the amount of the fees and commissions

it was paid relating to such Participating Plans.

### Count III: Civil Liability for Insurance Producers
### (Against Illinois Defendants)

209.    Independent Fiduciary realleges and incorporates paragraphs 1 to 197 above, as if

set forth fully herein.

210.    Independent Fiduciary brings this count against the following Illinois-based

Defendants (each an "Illinois Defendant" and collectively the "Illinois Defendants"):

        a.    A.J. Corso & Associates, Inc.

        b.    Assurance Agency, Ltd.

        c.    Brown, Brown & Gomberg, Ltd.

        d.    Commercial Group Intermediaries, Inc.

        e.    Financial Security Consultants, Inc.

        f.    The HFA Plan and Mark Krogulski

        g.    Health Care Reform Benefit Solutions, Inc. dba HRB Solutions, Inc.

        h.    HUB International Midwest Limited

        i.    M. Brown & Associates, Ltd.

        j.    Trendsetters & Associates, Inc.

        k.    Williams-Manny Inc. dba Gallagher Williams-Manny Insurance Group

211.    Under 215 ILCS § 5/2-2201, entitled "Ordinary care; civil liability," "an

insurance producer ... shall exercise ordinary care and skill in renewing, procuring, binding, or

placing the coverage requested by the insured or proposed insured." *Id.* § 2-2201(a).

212.    The Participating Plan clients of the Illinois Defendants constituted insureds or

36

proposed insureds with whom the Illinois Defendants worked in "renewing, procuring, binding, or placing the coverage requested" as those terms are used in 215 ILCS § 5/2-2201(a).

213.    Each Illinois Defendant failed to exercise ordinary care and skill in renewing, procuring, binding, or placing the coverage requested for its Participating Plan clients.

214.    Accordingly, each Illinois Defendant is liable for its negligence in renewing, procuring, binding, and/or placing the coverage requested by its Participating Plan clients.

### Count IV: Strict Liability for Procurement of Unauthorized Insurer
### (Against Illinois Defendants)

215.    Independent Fiduciary realleges and incorporates paragraphs 1 to 197 above, as if set forth fully herein.

216.    Under 215 ILCS § 5/121-2 *et seq.*, entities that transact insurance in Illinois must obtain a Certificate of Authority from the Director of the Illinois Department of Insurance. Those that fail to do so are unauthorized insurers.

217.    Under 215 ILCS § 5/121-3, "Transaction of insurance business defined," the AEU Plan transacted insurance in Illinois.

218.    The AEU Plan failed to obtain the necessary Certificate of Authority and therefore operated as an unauthorized insurer under 215 ILCS § 5/121-2 *et seq*. Thus, the Illinois Defendants caused their Participating Plan clients to enroll and/or renew enrollment in a plan operated by an unauthorized insurer.

219.    Illinois law provides:

> If any such unauthorized insurer fails to pay any claim or loss within the provisions of such an insurance contract, any person who assisted or in any manner aided directly or indirectly in the procurement of the insurance contract shall be liable to the insured for the full amount of the claim or loss as provided in that insurance contract.

215 ILCS § 5/121-4.

37

220.    The AEU Plan constituted or included an insurance contract as that term is used in 215 ILCS § 5/121-4.  The Participating Plans constituted insureds as that term is used in 215 ILCS 5/121-4.

221.    The AEU Plan has failed to pay claims and losses due under such insurance contract.

222.    Each Illinois Defendant assisted in or aided directly or indirectly in the procurement of the AEU Plan for its Participating Plan clients.

223.    Each Illinois Defendant is therefore strictly liable to its Participating Plan clients for the full amount of their unpaid claims and losses.

### Count V: Strict Liability for Procurement of Nonadmitted Insurer
### (Against West Virginia Defendants)

224.    Independent Fiduciary realleges and incorporates paragraphs 1 to 197 above, as if set forth fully herein.

225.    Independent Fiduciary brings this count against the following West Virginia-based Defendants (each a "West Virginia Defendant" and collectively the "West Virginia Defendants"):

      a.    Innovative Insurance Solutions, LLC

      b.    The Ferrell Agency, Inc.

226.    Under W. Va. Code § 33-12C-4(a), entities "shall not engage in the transaction of insurance unless authorized by a license in force pursuant to the laws" of West Virginia unless they are otherwise exempted by the insurance laws of West Virginia.

227.    Under W. Va. Code § 33-12C-3(y), "Transaction of insurance," the AEU Plan transacted insurance in West Virginia.

228.    The AEU Plan failed to obtain the necessary license from West Virginia and

38

therefore operated as a nonadmitted insurer. Thus, the West Virginia Defendants caused their

Participating Plan clients to enroll and/or renew enrollment in a plan operated by a nonadmitted

insurer.

229.    West Virginia law provides:

> If the nonadmitted insurer fails to pay a claim or loss within the provisions
> of the insurance contract and the laws of this state, a person who assisted
> or in any manner aided directly or indirectly in the procurement of the
> insurance contract, shall be liable to the insured for the full amount under
> the provisions of the insurance contract.

W. Va. Code § 33-12C-4(d).

230.    The AEU Plan constituted or included an insurance contract as that term is used in

W. Va. Code § 33-12C-4(d). The Participating Plans constituted insureds as that term is used in

W. Va. Code § 33-12C-4(d).

231.    The AEU Plan has failed to pay claims and losses due under such insurance

contract.

232.    Each West Virginia Defendant assisted in or aided directly or indirectly in the

procurement of the AEU Plan for its Participating Plan clients.

233.    Each West Virginia Defendant is therefore strictly liable to its Participating Plan

clients for the full amount of their unpaid claims and losses.

## Count VI: Strict Liability for Placement of Unauthorized Insurer
### (Against HFA Defendants)

234.    Independent Fiduciary realleges and incorporates paragraphs 1 to 197 above, as if

set forth fully herein.

235.    Independent Fiduciary brings this count against North Carolina-based Defendants

The HFA Plan and Mark Krogulski ("HFA Defendants"). Independent Fiduciary brings this

39

Count against the HFA Defendants in the alternative to Count IV to the extent the HFA

Defendants performed any relevant broker services as alleged herein while licensed in North

Carolina.

236.    Under N.C. Gen. Stat. § 58-28-5 *et seq.*, entities that transact insurance in North

Carolina must obtain a license from the Commissioner of the North Carolina Department of

Insurance. Those that fail to do so are unauthorized insurers.

237.    Under § 58-28-12, the AEU Plan transacted insurance in North Carolina.

238.    The AEU Plan failed to obtain the necessary license and therefore operated as an

unauthorized insurer under § 58-28-5 *et seq.* Thus, the HFA Defendants caused their

Participating Plan clients to enroll and/or renew enrollment in a plan operated by an unauthorized

insurer.

239.    North Carolina law provides:

> No person shall in this State act as agent for any insurer not authorized to
> transact business in this State, or negotiate for or place or aid in placing
> insurance coverage in this State for another with any such insurer.

N.C. Gen. Stat. § 58-28-45(a).

240.    The HFA Defendants acted as an agent for the AEU Plan, and negotiated for

and/or placed or aided in placing insurance coverage with the AEU Plan in North Carolina for its

Participating Plan clients.

241.    North Carolina law also provides:

> In addition to any other penalties or remedies provided by law, any person
> who violates this section shall be strictly liable for any losses or unpaid
> claims if an unauthorized insurer fails to pay in full or in part any claim or
> loss within the provisions of any insurance contract issued by or on behalf
> of the unauthorized insurer in violation of this Article. The liability

40

> imposed by this subsection shall be joint and several if more than one
> person violates this section.

N.C. Gen. Stat. § 58-28-45(l).

242.   The AEU Plan constituted or included an insurance contract as that term is used in

§ 58-28-45(l).

243.   The AEU Plan has failed to pay claims and losses due under such insurance

contract.

244.   The HFA Defendants are therefore strictly liable to their Participating Plan clients

for the full amount of their unpaid claims and losses.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Independent Fiduciary respectfully

prays:

1.   That the Court award the Independent Fiduciary a judgment against each

Defendant in an amount to be proven at trial, plus pre- and post-judgment interest;

2.   That the Court award the Independent Fiduciary its costs and expenses;

3.   That the Court award the Independent Fiduciary such other, further, and general

relief to which it may be entitled and which this Court shall deem to be just and equitable; and

4.   That a jury be empaneled to hear all issues triable to a jury in this case.

Dated: October 2, 2019                         Respectfully Submitted,

                                               **Receivership Management, Inc. in its Capacity
                                               as the Independent Fiduciary of the AEU
                                               Holdings, LLC Employee Benefit Plan and
                                               Participating Plans**

                                               By:    /s/ Alan F. Curley
                                                      One of Its Attorneys

Alan F. Curley (6190685)
Laura R. Feldman (6296356)
Samuel G. Royko (6325838)
Robinson Curley P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100
acurley@robinsoncurley.com
sroyko@robinsoncurley.com

J. Graham Matherne
Andrew J. Pulliam
Wyatt, Tarrant & Combs, LLP
333 Commerce Street, Suite 1400
Nashville, Tennessee 37201
(615) 244-0080
gmatherne@wyattfirm.com
apulliam@wyattfirm.com

42

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on October 2, 2019, he caused the foregoing

**THIRD AMENDED COMPLAINT** to be filed with the Clerk of the Court for the Northern

District of Illinois, using the Court's CM/ECF system, which shall send notification of such

filing to all counsel of record, and that he served a copy of the foregoing by United States First

Class Mail, with proper postage prepaid, upon the following defendant who has yet to appear in

this case:

> The Ferrell Agency, Inc.
> c/o Michael Ferrell
> P.O. Box 9276
> South Charleston, West Virginia 25309
> and
> 608 Chestnut Street
> South Charleston, West Virginia 25309

> /s/ Alan F. Curley
> Alan F. Curley

6

# Exhibit
# C



October 28, 2019

**Via Email and Certified Mail**

Kristina Brooks
Innovative Insurance Solutions, LLC
5036 Washington Street
Cross Lanes, WV 25313

|  |  |  |
|--|--|--|
| **Re:** | *Insured:* | *Innovative Insurance Solutions, LLC;* |
|  |  | *Mullins Consulting & Marketing* |
|  | *Insurer:* | *AIX Specialty Insurance Company* |
|  | *Type of Policy:* | *Miscellaneous Professional Liability* |
|  | *Policy No.:* | *L1QD822040-00* |
|  | *Policy Period:* | *August 14, 2019 to August 14, 2020* |
|  | *Claimant:* | *Receivership Management, Inc.* |
|  | *Claim No.* | *19-00543897* |

Dear Ms. Brooks:

This correspondence will confirm receipt of a lawsuit filed in the United States District Court for the Northern District of Illinois. This matter was reported to AIX Specialty Insurance Company ("AIX") on or about September 30, 2019. Please allow this letter to serve as AIX's preliminary coverage evaluation of the above-referenced claim. Unfortunately, and as detailed below, AIX must respectfully decline coverage for the above-mentioned claim.

## **BACKGROUND**

My understanding of this matter is based upon our conversation and my review of the documentation provided.

A lawsuit was filed in the United States District Court for the Northern District of Illinois captioned, *Receivership Management, Inc. in its capacity as the Independent Fiduciary of the AEU Holdings, LLC Employee Benefit Plan and Participating Plans v. A.J. Corso & Associates, Inc.; American Benefits Association, Inc.; Assurance Agency, Ltd.; Brown, Brown & Gomberg, Ltd.; Commercial Group Intermediaries, Inc.; Employers Network Association, Inc. dba Louis Deluca and Affiliates; Innovative Insurance Solutions, LLC; The Ferrell Agency, Inc.; Financial Security Consultants, Inc.; The HFA Plan and Mark Krogulski, individually; Health Care Reform Benefit Solutions, Inc. dba HRB Solutions, Inc.; HUB International Midwest Limited; M. Brown & Associates, Ltd.; Madison Street Group, LLC; MGU of the West Insurance Services, Inc. dba OneSource StopLoss Insurance; Trendsetters & Associates, Inc.; Williams-Manny, Inc. dba Gallagher-Williams-Manny Insurance Group*, under Civil Action No. 1:19-cv-01385. It is our understanding that the original Complaint was filed in early 2019

Page 2 of 7

and an original defendant was Employers' Innovative Network, LLC ("EIN") and Jeff Mullins was served with the original Complaint on March 27, 2019.

It is also our understanding that EIN filed a Motion to Dismiss on May 16, 2019. The **named insured**, Innovative Insurance Soutions, LLC ("IIS") was served with the Third Amended Complaint on September 27, 2019.

In the Third Amended Complaint, it alleges that IIS is being named for the first time in the litigation; that Jeff Mullins and Kristina Brooks are members of the insured; that Mullins acted as IIS's agent and is also the principal of EIN. You have advised that you were employed by EIN (and still are employed there) as Director of Training. You also advised that you created IIS while employed by EIN. The Third Amended Complaint alleges that EIN is an affiliate of IIS; and that through Mullins and EIN, IIS received notice of this action and that it will not be prejudiced in defending on the merits and IIS, through Mullins and EIN, knew or should have known that this action would have been brought against it but for a mistake concerning its identity.

The Third Amended Complaint states that the case involves a highly complex workplace health benefits plan (generally governed by ERISA) intended to avoid consumer protections and attendant costs of multi-state insurance regulation. Defendants are insurance agents and brokers who marketed and sold the plan. It also alleges that the defendants' breaches of contractual, common law, and statutory duties proximately caused harm to the plan and others for which Plaintiff, the Independent Fiduciary appointed to liquidate the plan, seeks damages.

Counts against IIS are as follows: Count I: Breach of Contract; Count II: Negligence; Count V: Strict Liability for Procurement of Non-admitted Insurer (against West Virginia Defendants; Counts II, III and VI are not against IIS, but other co-defendants.

Please note that AIX does not take the allegations set forth in the Third Amended Complaint as true or accurate, but merely recites them for informational purposes.

## POLICY INFORMATION

The **insured's** policy with AIX is a claims-made and reported policy with effective dates of August 14, 2019 to August 14, 2020. We note the **Retroactive Date** is November 11, 2008 and the **Pending or Prior Litigation Date** is August 14, 2019. The policy has a limit of liability of $1 million per claim and $3 million in the aggregate. Pursuant to Endorsement No. 920-1201SL, the policy has a $5,000 deductible that applies to **damages**. The amount of $3 million is the limited of liability for **Claim Expenses** arising out of all **Claims** first made against an **Insured** during the **Policy Period.** The Aggregate limit shown in Item 3.b. of the Declarations is the most **We** will pay for the sum of all **Damages** for all **Claims** under this **Policy.** The named insured on the Policy is Innovative Insurance Solutions LLC; Mullins Consulting & Marketing.

AIX would like to direct your attention to relevant sections of the Policy as guidance as to why this matter is not afforded coverage under the Policy.

Page 3 of 7

The policy provides the following information:

**This is a CLAIMS-MADE AND REPORTED policy. Subject to the terms, conditions, exclusions, and limitations of this Policy, coverage is limited to liability for only those Claims that are first made against You and reported to Us in writing after the Retroactive Date and during the Policy Period or any optional Extended Reporting Period, if exercised by You.**
...

**A. COVERAGE – WHAT THIS POLICY INSURES**
1. Professional Services Coverage

**We** will pay on **Your** behalf those sums which **You** become legally obligated to pay as **Damages** because of any **Claim** made against **You** for a **Wrongful Act**.

...

The following additional requirements and limitations shall apply to coverage provided under A.1., A.2., A.3., and A.4. above:

a. The **Wrongful Act** must have first occurred on or after the applicable **Retroactive Date(s);**
b. None of **You** had knowledge of facts which could have reasonably caused **You** to foresee a **Claim**, or **Supplemental Coverage Matter** or knowledge of any **Claim** or **Supplemental Coverage Matter**, prior to the inception date of this **Policy; and**
c. The **Claim** or **Supplemental Coverage Matter** must first be made and reported to **Us** in writing during the **Policy Period** or any **Extended Reporting Period**, if applicable.

**D. DEFINITIONS**

**Claim** means a:
1. Written demand received by an **Insured** for **Damages** or **Equitable Relief;**
2. **Suit;**
3. Formal administrative or regulatory proceeding commenced by the filing of charges, formal investigative order or similar document;
4. Arbitration or mediation proceeding commenced by the receipt of a demand or mediation or similar document; or
5. Written request first received by an **Insured** to toll or waive a statute of limitations.

All **Claims** made against any **Insured** that include, in whole or in part, alleges of **Wrongful Acts**, facts or circumstances that have a causal or logical connection will be considered one **Claim. Wrongful Acts,** facts or circumstances alleged in one or more of such **Claims** give rise (directly or indirectly) to the **Wrongful Acts**, facts or circumstances alleged in the other such **Claims. Wrongful Acts**, facts or circumstances shall be deemed to have a logical connection if there is a goal, motive or methodology that is both common and central to the matters alleged in such **Claims.** All such **Claims** will be considered first made at the time the earliest of such **Claim** was made against any **Insured**.

**Wrongful Act** and **Wrongful Acts** means any actual or alleged negligent act, error, omission, misstatement or **Personal Injury**, in the rendering or failure to render **Your Professional Services**.

**E. EXCLUSIONS – WHAT THIS POLICY DOES NOT INSURE**
This **Policy** does not apply to **Claim(s)** or **Supplemental Coverage Matter(s)**:

...

7 Waterside Crossing, Suite 101, Windsor, CT 06095
Tel. (860) 697-4336; Email: calong@hanover.com

9.   ERISA
     Based upon, arising out of, or in any way related to, directly or indirectly, any breach of fiduciary
     duty, responsibility, or obligation in connection with any employee benefit or pension plan
     including violations of the responsibilities, obligations or duties imposed upon fiduciaries by the
     Employee Retirement Income Security Act of 1974 ("ERISA") as amended, or similar statutory or
     common law of the United States of America or any state or jurisdiction therein;

...

15.  Contract
     Based upon, arising out of, or in any way related to, directly or indirectly, liability **You** assume
     under any contract or agreement; however, this exclusion does not apply to liability **You** would
     have in the absence of such contract or agreement.

...

18.  Misappropriation
     Based upon, arising out of, or in any way related to, directly or indirectly, any actual or alleged
     commingling, missing or improper use of funds, premiums, accounts, fees, taxes, claims
     payments, commissions or brokerage monies for which any **Insured** collected or should have
     collected; any funds received by any **Insured** or credited to any **Insured's** account which the
     **Insured** returned or should have returned; or any claim amount that any **Insured** paid or should
     have paid to another person or organization;

...

27.  Pending and Prior Litigation
     Based upon, arising out of, or in any way related to, directly or indirectly, any demand, litigation,
     or alternative dispute resolution, administrative, regulatory, or investigation that is pending prior to
     the Pending or Prior Litigation Date stated in Item 7. of the Declarations page, or the same or
     substantially similar fact, circumstance, situation, transaction, event, act, error, or omission
     underlying or alleged therein;

...

30.  Insolvency
     Based upon, arising out of, or in any way related to, directly or indirectly, the financial inability to
     pay, insolvency, receivership, bankruptcy or liquidation of any insurance company, any Individual
     Practice Association, Health Maintenance Organization, Preferred Provider Organization, Dental
     Service Plan, Risk Retention Group, Risk Provider Group, self-insured plan or any pool,
     syndicate, association or other combination formed for the purpose of providing insurance, or
     reinsurance, or any healthcare provider or any reinsurer with **You** directly placed the subject risk;
     however, this Exclusion does not apply if, at the time **You** placed the subject risk with such entity,
     it was rated by Demotech as A or higher, by AM Best as B+ or higher, or alternatively, was a
     member insurer of the state guaranty fund or guaranty association in the state or of domicile of
     the subject risk, or was guaranteed by a governmental body or bodies and/or operated by a
     governmental body or bodies, or was placed through a state established residual market
     insurance program or was placed with a County Mutual reinsured by carriers rated by AM Best
     as B+ or higher.

## INITIAL COVERAGE EVALUATION

Although a **Claim** has been made against the **Insured**, several exclusions apply to preclude coverage
and AIX is under no obligation to provide a defense and there is no indemnity coverage for this matter.

As outlined above in the Professional Services Coverage, it states "None of **You** had knowledge of
facts which could have reasonably caused **You** to foresee a **Claim** or **Supplemental Coverage Matter**
or knowledge of any **Claim** or **Supplemental Coverage Matter**, prior to the inception date of this

Page 5 of 7

Policy,". We note that Jeffrey Mullins and Kristina Brooks received noticed of this lawsuit on March 27, 2019 when Employers Innovative Network (EIN) was served with the Complaint. As alleged in the Third Amended Complaint, and confirmed by you, EIN is an affiliate of Innovative Insurance Solutions and both Mullins and Brooks are employed by EIN. The Third Amended Complaint also states that IIS, through Mullins and EIN knew or should have known that this action would have been brought against it but for a mistake concerning its identity.

As IIS had knowledge of facts which could have reasonably caused it to foresee a claim before the August 14, 2019 policy inception date, the Professional Services Coverage insuring agreement has not been met and AIX has no obligation to provide defense or indemnity coverage for this matter.

On the Insurance Agents & Brokers Professional Liability Application signed by Kristina Brooks on June 4, 2019 on behalf of Innovative Insurance Solutions, LLC & Mullins Consulting & Marketing, at question 34 it reads:

> 34. Are you aware of any alleged act, circumstances, situation or error or omission which may result in a claim being made against you or any of the persons or business described in this application?
>
> [ ] Yes  [√] No

Right above the signature line on the application, it reads:

> YOU HEREBY DECLARE that the above statements and particulars are true and that you have not suppressed or misstated any material facts and you agree that this Application will be the sole basis of any subsequent contract or insurance with us. Signature on the Application does not bind you to us to complete the insurance.

Next, in the AllRisks Insurance Agents & Brokers Errors & Omissions Insurance Representation Statements signed by Kristina Brooks on August 8, 2019 at question 2 which reads:

> 2. Does any of the Applicant's professional staff know of any incident, negligent act, error or omission, or other circumstance that could result in a claim or suit against the Applicant or any predecessor firm or any of the Applicant's current or former professional staff?        [ ] Yes  [√] No

The language above the signature line reads, in part:

> The undersigned, acting on behalf of the Applicants, represents that the statements set forth in this Application are true and correct and that thorough efforts were made to obtain requested information from all of You to facilitate the proper and accurate completion of this Application. ...

The original Complaint filed against EIN and served on Mullins on March 27, 2019 provided IIS with knowledge of circumstances that could result in a claim or suit. As such, it appears the answers to the above questions on the applications were inaccurate. AIX reserves its rights to rescind the Insurance Agents Advantage Professional Liability Policy issued under Policy No. L1QD822040-00.

In addition, the **Pending or Prior Litigation Date** listed in Item 7 of the MPL Policy lists the date as August 14, 2019. As this litigation was initiated prior to August 14, 2019, the **Pending or Prior Litigation Date** would preclude coverage for this matter and AIX has no obligation to provide defense or indemnity coverage for this matter.

Page 6 of 7

Even if AIX assumes there is coverage for this matter, other exclusions would apply to preclude coverage. Allegations against the **Insured** in the Third Amended Complaint include breach of contract, ERISA violations, commingling of funds and insolvency of the Plan. As these allegations are precluded from coverage by **Exclusions E.9, 15, 18 and 30**, AIX has no obligation to provide defense or indemnity coverage for this matter.

The foregoing evaluation as to coverage is based upon, and is necessarily limited to, the materials currently in AIX's possession. If you have any information which may impact this determination, please forward it to my attention at your earliest convenience. AIX continues to reserve the right to raise other policy terms and conditions as defenses to coverage, which may be warranted in light of additional information received by AIX, including rescission of the Policy. AIX does not waive any rights it has or may have under the Policy, at law or in equity, including those rights under terms of the policy not referenced in this letter. Nothing contained in or omitted from this letter should be construed as a waiver of any rights AIX has or may have under the Policy, at law or in equity.

This claim has been assigned **Claim Number 19-00543897** which should be included on all correspondence relating to this matter. Please do not hesitate to contact me at 860-697-4336 or calong@AIX.com with any questions or concerns you may have.

**If you believe this claim has been wrongfully denied or rejected, in whole or in part, you may contact the West Virginia Offices of the Insurance Commissioner at: Consumer Service Division, WV Offices of the Insurance Commissioner, Post Office Box 50540, Charleston, West Virginia 25305-0540; telephone (888) 879-9842; www.wvinsurance.gov.**

Very truly yours,

*Cathleen C. Long*

Cathleen C. Long, J.D.
Specialty Claims Consultant
AIX Insurance Company


cc:     Tabitha DeGirolano, RPLU
        All Risks, Ltd.
        Via Email: TDEGIROLAN@allrisks.com

Page 7 of 7

**Fraud Warning Statement for all States (except as individually listed below):** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects that person to criminal and civil penalties (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). (In New York, the civil penalty is not to exceed five thousand dollars ($5,000) and the stated value of the claim for each such violation). (Not applicable in AL, AR, AZ, CA, CO, DC, FL, KS, LA, ME, MD, MN, NM, OK, PR, RI, TN, VA, VT, WA and WV).

**APPLICABLE IN AL, AR, DC, LA, MD, NM, RI, TX (Workers' Compensation Only), and WV:** Any person who knowingly (or willfully in MD) presents a false or fraudulent claim for payment of a loss or benefit or who knowingly (or willfully in MD) presents false information in an application for insurance is guilty of a crime and may be subject to fines or confinement in prison.

**APPLICABLE IN ARIZONA:** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**APPLICABLE IN CALIFORNIA:** For your protection California law requires the following to appear on this form or other explanatory words of similar meaning: Any person who knowingly presents false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**APPLICABLE IN COLORADO:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the department of regulatory agencies.

**APPLICABLE IN DELAWARE, FLORIDA and OKLAHOMA:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony (In FL, a person is guilty of a felony of the third degree).

**APPLICABLE IN KANSAS:** Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act.

**APPLICABLE IN MAINE, TENNESSEE, VIRGINIA, WASHINGTON AND NORTH CAROLINA:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**APPLICABLE IN INDIANA:** A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

**APPLICABLE IN KENTUCKY:** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**APPLICABLE IN NEW HAMPSHIRE:** Any person who with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

**APPLICABLE IN MINNESOTA:** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime. **MN Workers' Compensation Only:** Any person who with intent to defraud, receives workers compensation benefits to which the person is not entitled by knowingly misrepresenting, misstating, or failing to disclose any material fact is guilty of theft and shall be sentenced pursuant to s 609.52, subdivision 3.

**PENNSYLVANIA Motor Vehicle Only:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and payment of a fine of up to $15,000.

7 Waterside Crossing, Suite 101, Windsor, CT 06095
Tel. (860) 697-4336; Email: calong@hanover.com

# Exhibit
# D



November 18, 2019

**Via Email and Certified Mail**

Kristina Brooks
Innovative Insurance Solutions, LLC
5036 Washington Street
Cross Lanes, WV 25313

| | | |
|---|---|---|
| *Re:* | *Insured:* | ***Innovative Insurance Solutions, LLC;*** |
| | | ***Mullins Consulting & Marketing*** |
| | *Insurer:* | ***AIX Specialty Insurance Company*** |
| | *Type of Policy:* | ***Miscellaneous Professional Liability*** |
| | *Policy No.:* | ***L1QD822040-00*** |
| | *Policy Period:* | ***August 14, 2019 to August 14, 2020*** |
| | *Claimant:* | ***Receivership Management, Inc.*** |
| | *Claim No.* | ***19-00543897*** |

Dear Ms. Brooks:

This correspondence will supplement our prior correspondence dated October 28, 2019. After a review and careful consideration of your email and an additional review of the Third Amended Complaint and the MPL Policy, AIX has agreed to withdraw the denial based on prior knowledge and **Pending or Prior Litigation**. However, as detailed below, AIX must continue to respectfully decline coverage for the above-mentioned claim.

## BACKGROUND

We direct your attention to the October 28, 2019 correspondence for a summary of the background of the claim. However, we want to correct a misstatement in that correspondence as follows:

Counts against IIS are as follows: Count I: Breach of Contract; Count II: Negligence; Count V: Strict Liability for Procurement of Non-admitted Insurer (against West Virginia Defendants); **Counts III, IV and VI are not against IIS, but other co-defendants.**

## POLICY INFORMATION

As previously advised, the **insured's** policy with AIX is a claims-made and reported policy with effective dates of August 14, 2019 to August 14, 2020. We note the **Retroactive Date** is November 11, 2008 and the **Pending or Prior Litigation Date** is August 14, 2019. The policy has a limit of liability of $1 million per claim and $3 million in the aggregate. Pursuant to Endorsement No. 920-1201SL, the policy has a $5,000 deductible that applies to **damages**. The amount of $3 million is the limitation of liability for **Claim Expenses** arising out of all **Claims** first made against an **Insured** during the **Policy**

Page 2 of 5

**Period.** The Aggregate limit shown in Item 3.b. of the Declarations is the most **We** will pay for the sum of all **Damages** for all **Claims** under this **Policy**. The named insured on the Policy is Innovative Insurance Solutions LLC; Mullins Consulting & Marketing.

Although a **Claim** has been made against IIS, AIX would like to direct your attention to relevant sections of the Policy as guidance as to why this matter is not afforded coverage under the Policy.

**E. EXCLUSIONS – WHAT THIS POLICY DOES NOT INSURE**
This **Policy** does not apply to **Claim(s)** or **Supplemental Coverage Matter(s)**:

...

9.  ERISA
    Based upon, arising out of, or in any way related to, directly or indirectly, any breach of fiduciary duty, responsibility, or obligation in connection with any employee benefit or pension plan including violations of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 ("ERISA") as amended, or similar statutory or common law of the United States of America or any state or jurisdiction therein;

...

15. Contract
    Based upon, arising out of, or in any way related to, directly or indirectly, liability **You** assume under any contract or agreement; however, this exclusion does not apply to liability **You** would have in the absence of such contract or agreement.

...

18. Misappropriation
    Based upon, arising out of, or in any way related to, directly or indirectly, any actual or alleged commingling, missing or improper use of funds, premiums, accounts, fees, taxes, claims payments, commissions or brokerage monies for which any **Insured** collected or should have collected; any funds received by any **Insured** or credited to any **Insured's** account which the **Insured** returned or should have returned; or any claim amount that any **Insured** paid or should have paid to another person or organization;

...

25. Carrier Failure to Pay
    Based upon, arising out of, or in any way related to, directly or indirectly, failure to pay or delay in paying all or part of any benefit payment du or alleged to be due under any insurance policy, bond or benefit plan, or any actual or alleged lack of good faith or fair dealing it eh handling of any claim or obligation due or alleged to be due under any insurance policy, bond or benefit plan by or on behalf of or in the name or right of any **Insured;**

...

27. Pending and Prior Litigation
    Based upon, arising out of, or in any way related to, directly or indirectly, any demand, litigation, or alternative dispute resolution, administrative, regulatory, or investigation that is pending prior to the Pending or Prior Litigation Date stated in Item 7. of the Declarations page, or the same or substantially similar fact, circumstance, situation, transaction, event, act, error, or omission underlying or alleged therein;

...

Page 3 of 5

30.  <u>Insolvency</u>
Based upon, arising out of, or in any way related to, directly or indirectly, the financial inability to pay, insolvency, receivership, bankruptcy or liquidation of any insurance company, any Individual Practice Association, Health Maintenance Organization, Preferred Provider Organization, Dental Service Plan, Risk Retention Group, Risk Provider Group, self-insured plan or any pool, syndicate, association or other combination formed for the purpose of providing insurance, or reinsurance, or any healthcare provider or any reinsurer with **You** directly placed the subject risk; however, this Exclusion does not apply if, at the time **You** placed the subject risk with such entity, it was rated by Demotech as A or higher, by AM Best as B+ or higher, or alternatively, was a member insurer of the state guaranty fund or guaranty association in the state or of domicile of the subject risk, or was guaranteed by a governmental body or bodies and/or operated by a governmental body or bodies, or was placed through a state established residual market insurance program or was placed with a County Mutual reinsured by carriers rated by AM Best as B+ or higher.

## <u>INITIAL COVERAGE EVALUATION</u>

Allegations against the **Insured** in the Third Amended Complaint include breach of contract, ERISA violations, commingling of funds and insolvency of the Plan. As these allegations are precluded from coverage by **Exclusions E.9, 15, 18, 25 and 30**, AIX has no obligation to provide defense or indemnity coverage for this matter.

Although AIX has decided to withdraw its denial based on **Pending or Prior Litigation** and prior knowledge, AIX continues to reserve its rights under the **Pending or Prior Litigation Date** listed in Item 7 of the MPL Policy and regarding IIS having any prior knowledge of this matter before August 14, 2019.

The foregoing evaluation as to coverage is based upon, and is necessarily limited to, the materials currently in AIX's possession. If you have any information which may impact this determination, please forward it to my attention at your earliest convenience. AIX continues to reserve the right to raise other policy terms and conditions as defenses to coverage, which may be warranted in light of additional information received by AIX, including rescission of the Policy. AIX does not waive any rights it has or may have under the Policy, at law or in equity, including those rights under terms of the policy not referenced in this letter. Nothing contained in or omitted from this letter should be construed as a waiver of any rights AIX has or may have under the Policy, at law or in equity.

This claim has been assigned **Claim Number 19-00543897** which should be included on all correspondence relating to this matter. Please do not hesitate to contact me at 860-697-4336 or calong@AIX.com with any questions or concerns you may have.

Page 4 of 5

**If you believe this claim has been wrongfully denied or rejected, in whole or in part, you may contact the West Virginia Offices of the Insurance Commissioner at: Consumer Service Division, WV Offices of the Insurance Commissioner, Post Office Box 50540, Charleston, West Virginia 25305-0540; telephone (888) 879-9842; www.wvinsurance.gov.**

Very truly yours,

*Cathleen C. Long*

Cathleen C. Long, J.D.
Specialty Claims Consultant
AIX Insurance Company


cc:    Tabitha DeGirolano, RPLU
       All Risks, Ltd.
       Via Email: TDEGIROLAN@allrisks.com

Page 5 of 5

**Fraud Warning Statement for all States (except as individually listed below):** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects that person to criminal and civil penalties (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). (In New York, the civil penalty is not to exceed five thousand dollars ($5,000) and the stated value of the claim for each such violation). (Not applicable in AL, AR, AZ, CA, CO, DC, FL, KS, LA, ME, MD, MN, NM, OK, PR, RI, TN, VA, VT, WA and WV).

**APPLICABLE IN AL, AR, DC, LA, MD, NM, RI, TX (Workers' Compensation Only), and WV:** Any person who knowingly (or willfully in MD) presents a false or fraudulent claim for payment of a loss or benefit or who knowingly (or willfully in MD) presents false information in an application for insurance is guilty of a crime and may be subject to fines or confinement in prison.

**APPLICABLE IN ARIZONA:** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**APPLICABLE IN CALIFORNIA:** For your protection California law requires the following to appear on this form or other explanatory words of similar meaning: Any person who knowingly presents false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**APPLICABLE IN COLORADO:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the department of regulatory agencies.

**APPLICABLE IN DELAWARE, FLORIDA and OKLAHOMA:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony (In FL, a person is guilty of a felony of the third degree).

**APPLICABLE IN KANSAS:** Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act.

**APPLICABLE IN MAINE, TENNESSEE, VIRGINIA, WASHINGTON AND NORTH CAROLINA:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**APPLICABLE IN INDIANA:** A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

**APPLICABLE IN KENTUCKY:** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**APPLICABLE IN NEW HAMPSHIRE:** Any person who with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

**APPLICABLE IN MINNESOTA:** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime. **MN Workers' Compensation Only:** Any person who with intent to defraud, receives workers compensation benefits to which the person is not entitled by knowingly misrepresenting, misstating, or failing to disclose any material fact is guilty of theft and shall be sentenced pursuant to s 609.52, subdivision 3.

**PENNSYLVANIA Motor Vehicle Only:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and payment of a fine of up to $15,000.

7 Waterside Crossing, Suite 101, Windsor, CT 06095
Tel. (860) 697-4336; Email: calong@hanover.com

# Exhibit
# E

FILE
COPY



**Laura E. Hayes**
304.340.3886
lhayes@spilmanlaw.com

January 28, 2020

Cathleen C. Long, J.D.
Specialty Claims Consultant
7 Waterside Crossing
Suite 101
Windsor, CT 06095

RE:  Insured:         Innovative Insurance Solutions, LLC;
                       Mullins Consulting & Marketing
     Insurer:         AIX Specialty Insurance Company
     Type of Policy:  Miscellaneous Professional Liability
     Policy No.:      L1QD822040-00
     Policy Period:   August 14, 2019 to August 14, 2020
     Claimant:        Receivership Management, Inc.
     Claim No.:       19-00543897

Dear Ms. Long:

I am in receipt of your letter of November 18, 2019 to my client, Kristina Brooks of Innovative Insurance Solutions, LLC. It is my understanding that my client has submitted a claim to you for coverage arising out of the lawsuit known as *Receivership Management Inc., in its capacity as Independent Fiduciary of the AEU Holdings, LLC Employee Benefit Plans and Participating Plan v. AJ Corso and Associates, Inc., Innovative Insurance Solutions, LLC, et al.,* Civil Action No. 1:19-cv-01385 pending in the United States District Court for the Northern District of Illinois.

In response, you denied coverage for my client twice. First, in your letter of October 25, 2019 you denied coverage based upon the exclusion of the policy entitled "Pending and Prior" "Litigation." In your letter of November 18, 2019 you withdrew that reason for the denial of coverage for the claims. However, you contend that the claims are still not covered under Policy No. L1QD822040-00 due to the following exclusions: ERISA, Contract, Misappropriation, Carrier Failure to Pay, and Insolvency. If you review the Third Amended Complaint and the allegations that are being made against my client, you will realize that your denial of my client's claim is clearly wrong.

As I am sure you are aware, the duty to defend is broader than the duty to indemnify. *See AETNA Casualty and Surety Co. v. Pitrolo,* 342 S.E. 2d 156 (W. Va. 1986); *Camden-Clark*

Spilman Thomas & Battle, PLLC
300 Kanawha Boulevard, East | PO Box 273 | Charleston, West Virginia 25321-0273 | P 304.340.3800 | F 304.340.3801
West Virginia | North Carolina | Pennsylvania | Virginia | spilmanlaw.com

FILE
COPY





Cathleen C. Long, J.D.
January 28, 2020
Page 2

*Memorial Hospital v. Fire and Marine Insurance*, 682 S.E. 2d 566 (W. Va. 2009). Under *Pitrolo*, the Supreme Court of Appeals of West Virginia found that:

> [a]s a general rule, an insurer's duty to defend is tested by whether the allegations in the Plaintiff's complaint are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy. There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within coverage.

*Id.* at 160.

The Court also stated that:

> it is generally recognized that the duty to defend an insured may be broader than the obligation to pay under a particular policy. This ordinarily arises by virtue of language in the ordinary liability policy that obligates the insurer to defend even though the suit is groundless, false, or fraudulent.

*Id.* at 160.

In addition, it is well-established law that an insurer's duty extends not only to the allegations made in the complaint, but extends to the investigation of the facts to determine whether a claim may be covered under the policy. *Camden-Clark Memorial Hospital v. Fire and Marine Insurance*, 682 S.E. 2d 566 (W. Va. 2009). Moreover, under *Camden Clark*, if only one claim is covered, then an insurer has to defend all claims against the insured. *Id.* at 575

The Third Amended Complaint contains multiple causes of actions against my client including claims for violation of West Virginia Code § 33-12C-4(a) (Count V), as well as negligence claims (Count II) that are clearly covered under Policy No. L1QD822040-00. First, Count V alleges that my client violated West Virginia Code § 33-12C-4(a) by not obtaining a license to transact insurance in West Virginia. This claim is not excluded by any of the exclusion you cite in your letter.

Second, despite your assertion, the negligence claims are covered. Your reliance upon the ERISA exclusion to prohibit coverage for this claim is wrong. As you review the Third Amended Complaint, you will note that my client is not being sued for a breach of a fiduciary duty under an established ERISA Plan. Therefore, the ERISA exclusion that you cite as your basis for denial is not applicable. Moreover, in a 2007 case that is almost identical to the facts of this case, another insurance company tried to use an ERISA exclusion to deny coverage. That insurer was forced to provide coverage for the claims asserted against its insured. As we obtain more information about this matter, there may be other exclusions that are not applicable as well.





Cathleen C. Long, J.D.
January 28, 2020
Page 3

As I am sure you are aware, West Virginia courts take a dim view of an insurer breaching its duty to defend and indemnify its own insured. The costs associated with such a breach will be astronomical. Therefore, I urge you to reconsider your denial of my client's claim.

I look forward to hearing from you.

Very truly yours,

Laura E. Hayes

LEH:rlm:12570892